# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director and
Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

May 6, 2024

**Via Email and ECF**
**To Be Filed Provisionally Under Seal**
The Honorable Marcia M. Henry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re:     **United States v. Terrence Wise, 23-CR-9 (DG)**

Dear Judge Henry,

We write to update the court on Mr. Wise's medical status, and to respond to the government's May 3, 2024 letter.

At the outset, we file this letter provisionally under seal, solely because it responds to a sealed filing. We move to unseal both this filing and ECF No. 26. In its filing, the government writes, "Because this letter discusses the defendant's personal medical information, the government respectfully requests that it be filed under seal." ECF No. 26 at 2. We have consulted with Mr. Wise, and he consents to the public filing of the government's letter, as well as this letter. The Circuit has "reinforce[d] the requirement that district courts avoid sealing judicial documents in their entirety unless necessary. Transparency is pivotal to public perception of the judiciary's legitimacy and independence." *United States v. Aref*, 533 F.3d 72, 83 (2d Cir. 2008). Mr. Wise is the only party here with a privacy interest that may potentially justify sealing, and he does not invoke it.

On May 3, 2024, Mr. Wise underwent a needle biopsy and is awaiting the results. He has been advised that he almost certainly has lung cancer, and the purpose of the biopsy is to determine the type and stage of his cancer. Once the cytology and pathology examinations are complete, his doctors will create a treatment plan. The mass in his chest—which measured 3.2 centimeters on February 29, 2024, when MDC Brooklyn sent him for an outside CT scan—has grown to 2.5 inches, or 6.35 centimeters. As he advised MDC Brooklyn on April 11, 17, and 22 in writing, and as he advised multiple members of his unit team in person, he continues to cough up blood, filling a collection container.

On May 2, 2024, this Court ordered MDC Brooklyn to provide a written explanation for its delay in treating Mr. Wise between February 29, 2024, when MDC doctors sent Mr. Wise for a lung CT scan; April 11, 2024, when Mr. Wise first complained of coughing up blood; and April 29, 2024, when MDC doctors sent Mr. Wise to the emergency room after undersigned

counsel intervened. The MDC's written explanation, filed by the government at ECF No. 26, raises grave concerns about the care, or absence of care, provided to Mr. Wise while he was at the MDC. The MDC's admitted mistreatment of Mr. Wise strongly suggests that he should no longer be in their custody. This Court should hold an evidentiary hearing to uncover how this happened, and how it can be prevented in the future.

First, the MDC notes that Mr. Wise had a chest x-ray on November 7, 2023, "and no mass was noted at that time." ECF No. 26 at 1. But chest x-rays are not the appropriate imaging for lung cancer screening. *E.g.*, Edwin JR van Beek et al., *Lung cancer screening: Computed tomography or chest radiographs?* World J. of Radiology (Aug 28, 2015), *at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4553249/ ("Clearly, based on the above studies, CT is superior to CXRs for screening in lung cancer.) Rather, the x-ray revealed an unrelated calcified nodule. *Id*. On November 9, 2023, having reviewed the x-ray, the MDC's Dr. Awd requested a lung CT scan. *See* ECF No. 24, Ex. C. But the MDC did not send Mr. Wise out for that requested scan until February 29, 2024, nearly four months later. That scan showed a 3.6 x 2.3 x 3.6cm mass.

Next, the MDC states that "MDC Brooklyn did not receive the results until March 11, 2024." ECF No. 26 at 1. "The results were somehow missed by the health services department, and the delay was unfortunate." The MDC's admission materially glosses over what the health services department "missed:"

- The medical record shows that Mr. Wise's lung CT took place on February 28, 2024. ECF No. 24, Ex. F. The report was signed on February 29, 2024 at 9:02am. The MDC alleges that it received the report on March 11, 2024, but provides no record of this receipt from the hospital. Rather, the Health Services record states that it was "scanned" on March 11, 2024. Then, it was cosigned by Bialor, Bruce, MD, the Clinical Director of the MDC, on March 18, 2024. *Id*. Health services therefore processed the report on March 11, and Dr. Bialor signed it on March 18, 2024, raising several critical questions:

  What is the MDC's procedure, and timeline, for seeking and receiving results from outside providers to whom they sent patients in their care? Who in Health Services is responsible for processing results? What does Dr. Bialor mean when he cosigns a test result of a 3.2cm mass on his patient's lung, who his department had sent for outside testing? When he signed the result but "missed" it, did he fail to read what he had signed? Did he read it but fail to recognize its import? Was he not the person who signed his name?

- The MDC "missed" Mr. Wise's March 12, 2024 written request for his test results, which had apparently come into their system the day before. ECF No. 24 at 2.

- The MDC "missed" Federal Defenders' March 13, 2024 subpoena, *Touhy* request, and HIPAA release for Mr. Wise's medical records, filed in accordance with their protocol. *Id*.

- The MDC "missed" Mr. Wise's April 11, 17, and 22 written "cop-out" requests for medical attention, including that he is seeking the results of his medical tests, and that he is coughing up blood, now a month beyond the MDC's apparent receipt of his results.

- The MDC "missed" Federal Defenders' April 24, 2024 email alerting the facility to all of the outstanding requests, advising that he continued to cough up blood, and seeking his test results, failing to see him for another two days.

To be sure, MDC Brooklyn is correct that "the delay was unfortunate." ECF No. 26 at 1. Deeming their neglect of their patient "unfortunate" denotes a lack of patient-centered care. It reflects a failure to recognize the gravity of their mistake. The MDC's admission is cold comfort to Mr. Wise, who is sitting in a hospital room, his family banned from his bedside, waiting to learn his fate. Because of their "unfortunate" delay—nearly six months counting from Dr. Awd's November 9, 2024 order of the CT scan, and two months after his mass measured 3.2cm—the mass more than doubled in size, which may significantly impact Mr. Wise's treatment options, and accordingly, his chance at survival. To call it "unfortunate" lacks basic humanity. It is an insult to Mr. Wise.

Then, the MDC confoundingly asserts that "Health Services generally responds to sick calls within 2 weeks." ECF No. 26 at 1. Admitting that "the March 11th sick call was missed," the MDC seems to justify the delay in responding to Mr. Wise's April 11, 17, and 22 sick calls on April 26, 2024, following defense counsel's intervention. This overlooks that Mr. Wise's April 11, 17, and 22 complaints were that he was *coughing up blood*. ECF No. 24, Ex. H, I, J. That's an emergency requiring immediate medical attention, particularly for a patient who has a (then-) documented 3.2cm mass on his lungs, not a routine complaint to be handled sometime in the next two weeks. What's worse, Mr. Wise did not rely only on the written cop-out system, but also complained verbally to numerous Unit 53 corrections officers, including Officers Cox and Willoughby, and even handed them a milk carton containing his bloody sputum. The MDC's explanation that they "generally respond to sick calls within 2 weeks" suggests that its Health Services Department does not employ any triage system, whether by software or human review.

The written explanation then jumps to April 29, 2024, when Dr. Bialor "submitted an emergency consult and had Mr. Wise admitted to the hospital for further urgent workup including biopsy." ECF No. 26 at 1. That skips over several notable events. First, no one saw Mr. Wise at all until the April 26, 2024 deadline set by defense counsel in the urgent email seeking the now two-month-old test results. On that date, someone at MDC Brooklyn seems to have read the results indicating the mass for the first time (at least, for the first time since Clinical Director Bialor signed them on March 18, 2024). Those worrisome results were not discussed with Mr. Wise by a doctor, but rather a nurse practitioner, Beverly Timothy. ECF No. 24, Ex. L. Ms. Timothy noted that Mr. Wise had been coughing up blood for one month, whenever he coughs. *Id*. She reviewed with him the chest CT revealing the 3.6cm mass, and his chest x-ray. Then, the nurse practitioner diagnosed the mass as a "benign neoplasm of unspecified bronchus and lung." *Id*. Given that his cancer specialists require a biopsy of Mr. Wise's cells to determine its pathology, nurse practitioner Timothy's ability to diagnose it as benign is suspect at best. Finally, her "disposition" of Mr. Wise's case was not to call an ambulance or confer with a doctor, but that Mr. Wise should "follow-up at sick call" and "follow-up at chronic care clinic as needed."

3

*Id.* No doctor reviewed her notes, or sent Mr. Wise to the hospital, for an additional three days. Apparently, MDC Health Services, a medical facility, does not provide weekend care.

On April 29, 2024, Dr. Awd cosigned the "benign" medical report at 8:07am. ECF No. 24, Ex. L. At 12:48pm, registered nurse Duvinka Jordan performed a chart review, entering a request for a pulmonology consult by May 3, 2024, requesting "a bronchoscopy and biopsy asap." *Id.*, Ex. M. At 1:42pm, defense counsel emailed the MDC seeking an urgent update. *Id.*, Ex. N. Only then, at 2:16pm, did Dr. Bialor "submit[] an emergency consult and [have] Mr. Wise admitted to the hospital." *Id.*, Ex. O; ECF No. 26 at 1. The MDC's apparent pattern of having unsupervised non-physicians (*e.g.*, a nurse practitioner; a registered nurse) review medical records with patients, make important diagnoses, make outside medical referrals, and make emergent care determinations is highly concerning.

As this Court is aware, Mr. Wise's case is only the most recent, though in some ways the most alarming, in a series of cases of medical delay and neglect at MDC Brooklyn. On May 1, 2024, Judge DeArcy Hall held an Order to Show Cause Hearing regarding the MDC's failure to provide medical care to defendant Jonathan Gouldbourne, resulting in a ruptured appendix. *See United States v. Ricketts, et al.,* 22-CR-106 (LDH), ECF No. 330; Ex. A (Tr. of Crim. Cause for Hr'g.). At that hearing, Judge DeArcy Hall held that MDC Brooklyn, in that case, had made "a pattern of misrepresentations to defense counsel and the Court." Ex. A at 14:19-22. At the hearing, MDC's lawyer admitted to the Court that members of Health Services had lied to her about a patient's care. *Id.* at 24:20-21 (THE COURT: So who was it that lied to you? MS. PAPAPETRU: The medical staff.); 25:8-15, 19-22. The Court ordered Dr. Bialor and additional medical personnel to appear at an evidentiary hearing, to turn over their internal email communications, and to take Mr. Gouldbourne for a second medical opinion. *Id.* at 59-64.

Judge DeArcy Hall's hearing followed Judge Irizarry's two hearings in *United States v. Young,* 23-CR-475 (DLI), on December 15 and 20, 2023. Ex. B, C. In that case, Judge Irizarry found that MDC Health Services neglected to treat and misdiagnosed Mr. Young's MRSA infection, finding that the Court is "not satisfied that based on what I have seen that the MDC is qualified in any way, shape, or form to address Mr. Young's condition," and ordered his transfer to a medical facility. Ex. B at 14:8-10, 15:1-3. Completely disregarding that order, the MDC instead sent Mr. Young to be examined at a hospital, and then returned him to the MDC. Ex. C. at 4-5. Judge Irizarry held, "The conduct of the MDC here has -- I tried to think of how to describe it. It's an abomination. Utterly contemptuous of the court. It's contemptuous of human life and dignity. It's appalling." *Id.* at 5:8-11. The MDC's deliberate indifference in Mr. Wise's case exponentially reinforces that conclusion.

So that this Court can ascertain how the MDC failed Mr. Wise so completely, and so many times, and so that the Court may make a reasoned determination of whether and where he should be held pending sentencing, we respectfully urge the Court to hold an evidentiary hearing. We request an order requiring the MDC to preserve and produce its internal communications, and those with the government, regarding Mr. Wise's care. And the MDC should produce all written policies and protocols in its possession regarding its usage of outside medical providers; the receipt, processing, and discussion of test results with patients; and its use of non-physicians for critical patient care.

We will provide an update upon receipt of Mr. Wise's biopsy results and treatment plan. Thank you for your consideration.

Respectfully Submitted,

_____/s/_____

Mia Eisner-Grynberg
Staff Attorney
(718) 330-1257

Allison Berger
Mitigation Social Worker
(718) 407-7425

cc:    AUSA Andrew Roddin (by ECF and email)
       Chambers of Hon. Diane Gujarati (by ECF and email)
       Sophia Papapetru, MDC Brooklyn Legal Department (by email)

# **<u>EXHIBIT A</u>**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    : 22-CR-106(LDH)
                             :
                             :
                             :
                             :
                             : United States Courthouse
    -against-                : Brooklyn, New York
                             :
                             :
                             :
                             :
                             : Wednesday, May 1, 2024
JONATHAN GOULBOURNE,         : 12:00 p.m.
                             :
        Defendant.           :
                             :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:    UNITED STATES ATTORNEY'S OFFICE
                       Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                       BY: TARA B. MCGRATH, ESQ.
                            FRANCISCO J. NAVARRO, ESQ.
                            Assistant United States Attorney


For the Defendant:    SHER TREMONTE, LLP
                      Attorneys for the Defendant -
                      Jonathan Goulbourne
                           90 Broad Street
                           23rd Floor
                           New York, New York 10004
                      BY: NOAM BIALE, ESQ.

2

A L S O   P R E S E N T:


                    METROPOLITAN DETENTION CENTER
                    Legal Department
                         80 29th Street
                         Brooklyn, New York 11232
                    BY: SOPHIA PAPAPETRIOU, ESQ.



Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

*Hearing*                                                            3

1          (In open court.)

2          COURTROOM DEPUTY:  Good afternoon.  This is a

3   criminal cause for a hearing in the matter of United States

4   v. Jonathan Goulbourne, Docket No. 22-CR-106.

5          Can counsel please state your appearances for the

6   record starting with the Government.

7          MS. MCGRATH:  Good afternoon, your Honor.  Tara

8   McGrath and Francisco Navarro for the Government.

9          THE COURT:  Good afternoon.

10          MR. NAVARRO:  Good afternoon.

11          MS. PAPAPETRIOU:  Sophia Papapetriou appearing for

12   MDC Brooklyn.

13          MR. BIALE:  Noam Biale on behalf of Jonathan

14   Goulbourne.

15          THE COURT:  You all can be seated.

16          All right, folks.  Regrettably the Court needed to

17   convene this particular hearing in response to a letter that

18   I received with respect to medical treatment provided to

19   Mr. Goulbourne.

20          I just want to make sure that we're all operating

21   on the same sheet of music with respect to some of the basic

22   facts that transpired here and I'm referring largely to

23   Mr. Goulbourne's letter dated April 30th to the Court.

24          As I understand it, from this letter on

25   April 14th, Mr. Goulbourne began to experience sharp pain in

1  his leg, it worsened to severe pain in his abdomen

2  accompanied by nausea and vomiting repeatedly.

3          As I understand it from this letter,

4  Mr. Goulbourne and his cellmate informed the correction

5  officers about his condition.  I further understand that

6  those complaints were effectively ignored and that

7  Mr. Goulbourne was instructed to stop complaining.

8          Subsequently, Mr. Goulbourne collapsed, spent the

9  night in what I imagine was unimaginable pain and he was

10  eventually moved to NYU Langone's Brooklyn emergency room

11  where he was diagnosed with an a ruptured appendix.  I'm not

12  a doctor but I will tell you that I do know as a layperson

13  that a ruptured appendix can lead to death.  In any event,

14  Mr. Goulbourne underwent an emergency appendectomy and he

15  was discharged on April 18, 2024, and returned to the MDC

16  that day with three prescriptions:  One for an antibiotic to

17  be taken twice a day for five days; two, Percocet taken

18  twice a day for three days for pain; and then, finally, a

19  medication that is to be taken for 14 days, Docusate Sodium.

20          Now, Mr. Goulbourne was permitted to carry and

21  self-manage the antibiotics and the Docusate Sodium;

22  however, the Percocet was to be administered by MDC staff.

23          Now, on Saturday, April 20th, two days only after

24  Mr. Goulbourne was returned from the emergency room having

25  just undergone emergency surgery, the MDC went into

1    lockdown.  As a result, no, not as a result of the lockdown,

2    coupled with the lockdown, Mr. Goulbourne's identification

3    card had been taken by MDC staff when he went to the

4    hospital and it was not returned to him.  And as a result,

5    he was informed that he could not be given the Percocet to

6    manage the pain.  As a result, Mr. Goulbourne spent the

7    weekend without pain management medication.

8              On April 23rd, my understanding is that

9    Mr. Goulbourne still had not received any of the pain

10   management medication.  There was an exchange that

11   Mr. Goulbourne had with the nurse on that day before he went

12   for an attorney visit.  There is some question about that

13   exchange.  I'm going to put that aside for now.  Upon his

14   conclusion of his legal visit, my understanding is that he

15   was intercepted by MDC staff who placed him in handcuffs and

16   escorted him to the SHU.  He was given a ticket for, quote,

17   threatening bodily harm, and I'm quoting from the chart

18   written by Mr. Goulbourne on April 30th, based on the

19   exchange that he had with the nurse.  My understanding is

20   that on April 23rd, at the time that Mr. Goulbourne was

21   placed in the SHU, his medication, specifically, the

22   antibiotics and the Docusate Sodium, which were to be

23   self-managed by Mr. Goulbourne were taken away from him.

24             Counsel for Mr. Goulbourne, as I understand this,

25   alerted the MDC that Mr. Goulbourne did not have his pain

*Hearing*                                                          6

1   medication.  He did not receive a response.  The Government

2   made its first of many efforts to assist Mr. Goulbourne in

3   obtaining his medication, and to my great surprise, the

4   Government also did not receive a response.

5           THE COURT:  Ms. Papapetriou, this is actually

6   important stuff.  Whatever it is that you're writing, stop

7   and pay attention to the Court.  Pretend for me that this is

8   a matter of great importance to the MDC.  Can you do that

9   for me?

10          That was a question.  Can you do that for me?

11          MS. PAPAPETRIOU:  Yes, your Honor, I am following

12  what you're reading.

13          THE COURT:  What I said was to pay attention to

14  me.

15          The Government's request for a status was ignored

16  by the MDC on that date.  My understanding is that on

17  April 25th the parties again followed up.  It was not until

18  April 26th that the MDC staff responded indicating that

19  Mr. Goulbourne had received both medications and that the

20  antibiotics were self-carry.  Of course, the response to

21  that was that Mr. Goulbourne was not in possession of the

22  medication because he had been in the SHU and he was unable

23  to take the remaining doses which I understood or understand

24  to be three or four doses.

25          The MDC responded again and then this time the MDC

*Hearing*                                                            7

1    indicated that Mr. Goulbourne's antibiotic medication was

2    completed on April 24th and therefore he would not have

3    those doses in his possession.  Counsel again wrote back

4    explaining that the antibiotic prescription could not have

5    been completed on April 24th because Mr. Goulbourne had been

6    sent to the SHU on April 23rd.

7              I received this letter on April 30th because once

8    that letter was sent to the MDC, no response was received to

9    that correspondence by either the defendant or from the

10   Government.  The Court got involved yesterday on April 30th

11   in response to the letter that was sent to the Court

12   concerning these issues.  I asked for a status update.  I

13   spoke with Ms. Papapetriou and Ms. McGrath and asked in no

14   uncertain time, indeed, I confirmed that I wanted an update

15   by 5:15 p.m. concerning the provision of Mr. Goulbourne's

16   antibiotics.  To my great surprise, even my request was

17   ignored, and at 5:15 p.m. I did not receive a response from

18   either the Government or the MDC.  Imagine my great

19   surprise, at 5:21 p.m., I asked for a follow-up, or I asked

20   my clerk to call for a follow-up with Ms. McGrath who

21   regrettably, or indicated her regret, that she had not

22   contacted the Court at 5:15 p.m. but I was told -- the

23   information that was provided to the Court, the information

24   that's in your letter, they're slightly different.  My

25   understanding, what I was told at about 5:25, 5:30 p.m. was

1   that MDC staff was trying to locate the medication that was

2   taken from Mr. Goulbourne at the time he was placed in the

3   SHU.  Here again imagine my great surprise given the fact

4   that not once but twice it was represented to defense

5   counsel that Mr. Goulbourne had already been provided with

6   the medication through the 25th of April.

7            So how is it, I asked myself, could the MDC be

8   trying to locate that very same medication?  It seems to me

9   that someone at the MDC has made an express

10  misrepresentation to counsel concerning the medical

11  treatment of his client.

12           In any event, at that time the Court determined

13  that an Order to Show Cause was necessary in this case;

14  however, before that order could issue, I received yet

15  another update.  Now, that update again is a little

16  different than the way it was stated in your letter.  The

17  oral update, as I understood it, was that he could not be

18  provided with additional antibiotics given the amount of

19  time that had lapsed between the date, which I think would

20  have been April 23rd or 24th, and the April 30th date that

21  he could no longer be medically be provided with the

22  remainder of that antibiotic regimen and that to do so maybe

23  a detriment to his health.  We're going to get to that.

24           In the letter, as I understand it from

25  Ms. McGrath, what I am hearing here is that -- and this one

*Hearing*                                                          9

1   is I've got to tell you perplexing.  As I understand it,

2   during a follow-up call at 6:22 p.m. that the Government

3   initiated MDC --

4              Did MDC initiate any contact with you before 6:22

5   p.m.?

6              MS. MCGRATH:  Ms. Papapetriou and I spoke numerous

7   times throughout this.

8              THE COURT:  My question is:  Did MDC initiate?

9              MS. MCGRATH:  Yes.  Ms. Papapetriou had called me

10  at some point before 6:22 p.m. on more than one occasion.

11             THE COURT:  Before 5:15 p.m.?

12             MS. MCGRATH:  I don't -- after we spoke with your

13  Honor the first time, Ms. Papapetriou and I spoke to discuss

14  what was going to transpire between that point at 5:15 p.m.

15  But, no, not otherwise after that before 5:15 p.m.

16             THE COURT:  According to your letter, Ms. McGrath,

17  MDC Legal advised that it had spoken to the attendant

18  medical staff at MDC who had treated the defendant following

19  his surgery and found his wounds to be healing well.  I

20  don't know what date this was.  I think it may have been the

21  25th, I don't know, it's not clear to me.  And did not

22  recommend that the defendant be provided with additional

23  antibiotics irrespective of whether he had completed his

24  prior five-day treatment.

25             So now we've moved from he was provided with the

*Hearing*                                                    10

1   antibiotics to, well, you know what, if he doesn't get it,

2   it doesn't really matter irrespective of that, irrespective

3   of what the doctor said following his surgery, let's just

4   move on.  That's where we are now according to this letter

5   at 6:22 p.m.

6          He's still recovering well and is otherwise in

7   good health.  I guess that pain that he suffered without

8   pain medication was in the MDC's mind, "recovering well."

9   Otherwise, he's in good health.

10         That's what I understand the state of play to be.

11  Did I miss something?  Anyone?  Anyone?  What did I miss,

12  tell me what it was?

13         We'll get to the tickets, I'm talking about the

14  medical stuff.

15         MR. BIALE:  Understood.

16         I just want to provide one additional piece of

17  information which is that when I met with Mr. Goulbourne

18  yesterday, he told me that the last dose of antibiotics he

19  took was Tuesday morning, the 23rd.  So that was the last

20  dose and I asked him how he was doing in terms of pain, he

21  said I'm still experiencing some pain, it's like a five out

22  of ten.  It's especially painful when I eat because the food

23  is very acidic.  But otherwise, the pain is lessening but

24  he's still experiencing some pain.  So I just wanted to

25  provide those additional details.

1          THE COURT:  All right.

2          Yes.

3          MS. MCGRATH:  And, your Honor, I can just offer a

4   few points of clarification.  So the characterization in the

5   letter is mine of what I understood the doctor to say.  So

6   my understanding from the report yesterday at 6:22 p.m. is

7   that although the defendant was meant to have a five-day

8   prescription of antibiotics, because that time had lapsed

9   the solution at this juncture is not to give him just the

10  last remaining dose.  To the extent they would be providing

11  him antibiotics, it would be another multiday series and

12  that wasn't determined warranted given the status of his

13  wound.  And so, that is what I intended to confer in that

14  clause that your Honor mentioned.

15         THE COURT:  Do I have before me anything in terms

16  of written that I can refer to from medical personnel?

17         MS. MCGRATH:  I have a copy of the defendant's

18  medical records from the MDC that I'm happy to provide.

19         THE COURT:  Does that include the conclusions that

20  you are asserting now?

21         MS. MCGRATH:  This includes his visit on

22  April 25th.  The conclusions I'm asserting now were conveyed

23  orally, I understand, to Ms. Papapetriou and then to me and

24  then to chambers.

25         THE COURT:  Right.  So on April 25th, and I just

*Hearing*                                                    12

1    want to so I can understand.  The understanding on

2    April 25th is that this gentleman had not been provided with

3    his medication at that point for two days.  And was there a

4    determination on April 25th that they no longer wanted to --

5    on April 25th, that they no longer wanted to provide him

6    with the medication?

7              MS. MCGRATH:  Your Honor, I entirely defer to

8    MDC Legal on this point because i I have not independently

9    spoken to anyone at the medical center there.

10             THE COURT:  I'll hear from MDC.

11             MS. PAPAPETRIOU:  Your Honor, from what I was told

12   by speaking to the clinical director, who is the medical

13   doctor or head medical doctor.

14             THE COURT:  Who is the clinical director?

15             MS. PAPAPETRIOU:  Bruce Baylor.

16             THE COURT:  Okay.

17             MS. PAPAPETRIOU:  He, himself, saw Mr. Goulbourne

18   this morning and based on the assessment from --

19             THE COURT:  I haven't gotten to this morning.  I

20   want to get to the 25th.  I want to understand if,

21   consistent with his medical records, if there was a

22   determination, a finding, on April 25th that this man should

23   not be provided with his antibiotics.

24             MS. PAPAPETRIOU:  Yes.

25             THE COURT:  On the 25th?

1           MS. PAPAPETRIOU:  Yes.

2           THE COURT:  Let me see it.

3           (A brief pause in the proceedings was held.)

4           THE COURT:  I'm sorry, what sentence are you

5    directing me to?

6           MS. PAPAPETRIOU:  Where it says "today he was

7    reevaluated and his incisions and wounds were healed."

8           THE COURT:  Today was reevaluated in the West SHU

9    medical room by this provider and HSA.  Upon visual

10   assessment, all incisions are closed; healing accordingly.

11   No indication of drainage, no swelling, no redness.

12          Is there another portion that I should be reading?

13   It's not a trick question, you gave me the document.

14          MS. PAPAPETRIOU:  Correct.

15          THE COURT:  What did you want me to read?

16          MS. PAPAPETRIOU:  So, at that point, there was

17   no --

18          THE COURT:  That's not the question I asked you.

19   The question I asked you if there was a determination on

20   that date that this gentleman was not to be provided with

21   antibiotics.  You said to me, yes.  I said, is it in the

22   record?  You said yes.  I asked for it.  You've given it to

23   me.  I don't see it there.  This is now three times that I

24   believe the MDC has made a misrepresentation.  Two to

25   defense counsel and now one to this court.  I am keeping

*Hearing*                                                      14

1    track.

2           Where does it say that on April 25th there was a

3    determination on that date that this gentleman should not be

4    provided with antibiotics so that perhaps the bacteria that

5    flooded his system when his appendix ruptured doesn't cause

6    him further harm?  Where does it say that?

7           You gave me the document, what should I be looking

8    at?

9           MS. PAPAPETRIOU:  That document is what the doctor

10   referred me to saying at that point --

11          THE COURT:  What this sounds like to me is that

12   the MDC has come up with a post hac rationalization for not

13   providing this man with the appropriate medical care.  This

14   is not an anomaly.  I am tired of hearing the defendants

15   that are held at the MDC are not being provided with the

16   necessary medical treatment.  I just got off the phone with

17   Judge Irizarry and, you know what, she, too, was not

18   surprised to hear that I was holding a hearing concerning

19   the medical treatment of an individual held at the MDC.  And

20   what makes it worse is that it appears to me that at least

21   in this case there is a pattern of misrepresentations to

22   defense counsel and the Court.

23          Now, I'm trying to figure out what to do about

24   that.  You are an officer of the Court, you have an

25   obligation to be candid and when you fail in that obligation

*Hearing*                                                           15

1    to be candid.  When you fail in that obligation to be

2    candid, there should be consequences.  I need to figure out

3    what I need to do because you have failed to be candid with

4    this court.

5              Now, I don't know where the root of this problem

6    lies but I intend to get to it.  I want to have -- who is

7    it?  I want Baylor in front of me because I need to

8    understand what happened in this case and how it could be

9    that we could be as far along as we are in discussions with

10   the MDC concerning medical treatment.  And from the start,

11   from April 14th, when this man complained of pain, the MDC,

12   in my personal opinion, based on what I have in front of me,

13   acted with a flagrant disregard for this man's care.  How is

14   it than a man can say I am in pain and be told to stop

15   complaining only for it to be discovered that he had a

16   ruptured appendix.  He wasn't malingering, that man was in

17   pain and then he was required to suffer for an entire

18   weekend without pain medication?

19             Why was Mr. Goulbourne's counsel told that he had

20   finished this antibiotic regimen?

21             MS. PAPAPETRIOU:  Your Honor, I spoke with the

22   doctor and he was provided the antibiotics on the 19th on

23   the evening.  So he should have taken his dose on be the

24   19th, two doses on the 20th; two doses on the 21st; two

25   doses on the 22nd; and one on the 23rd, which would have put

*Hearing*                                                              16

1   him short two doses.

2          THE COURT:  Okay.  Short two doses.  My question

3   to you was pretty plain.

4          MS. PAPAPETRIOU:  Correct.

5          THE COURT:  Why was it that defense counsel was

6   told that he had finished the antibiotic regimen.

7          MS. PAPAPETRIOU:  I'm relaying information that

8   was relayed to me when I requested this information.  So if

9   you could just please bear with me in that respect.  I am

10  only getting this information as --

11         THE COURT:  How is it that you can get the

12  information today accurately but you couldn't get the

13  information accurately when defense counsel asked for it?

14         MS. PAPAPETRIOU:  I can't speak to that.  There

15  were multiple parties involved, but --

16         THE COURT:  Who are they because I want them all

17  here.  Let's just have a party.  Who are they, let's go.

18  Give me the names.  I want to know what happened here.  Who

19  are they?  Mr. Baylor.  Who else?  Who told you what when?

20  I feel like this is an impeachment inquiry.  Who knew what

21  when let's go.  Give me the names.  Give me the names.

22         There were a lot of people involved you said who

23  are they.

24         MS. PAPAPETRIOU:  Mr. Glucksnis.

25         THE COURT:  Spell that.

1          MS. PAPAPETRIOU:  G-l-u-c-k-s-i-n-s.

2          THE COURT:  Who else?

3          MS. PAPAPETRIOU:  I have to look through some of

4   my e-mails.

5          THE COURT:  Go ahead.

6          MS. PAPAPETRIOU:  Mr. Beddoe, B-e-d-d-o-e.

7          THE COURT:  Okay.  Now, Mr. Baylor's role is what?

8          MS. PAPAPETRIOU:  He's the clinical director.

9          THE COURT:  And he was the also the individual who

10  treated and provided care to Mr. Goulbourne on April 25th,

11  correct?

12          MS. PAPAPETRIOU:  Yes.  All throughout he's

13  responsible for overseeing the care for him.

14          THE COURT:  All right.  Mr. Glucksnis?  What was

15  this person's role.

16          MS. PAPAPETRIOU:  Assistant health service

17  administrator.

18          THE COURT:  What was his role with respect to the

19  events that have transpired that are bring us here today?

20          MS. PAPAPETRIOU:  He was one of the supervisors in

21  the medical department and he's also a paramedic.

22          THE COURT:  What was his role with respect to --

23          MS. PAPAPETRIOU:  He was part of the individuals

24  deciphering this information.

25          THE COURT:  What information was provided by him

1  to you?

2        MS. PAPAPETRIOU:  That he returned from the

3  hospital on the 18th, that a prescription for Percocet was

4  issued for three days, that he had breakthrough pain on the

5  20th which he was provided seven days of Tylenol.

6        THE COURT:  Okay.  I want to make sure that you're

7  clear about what it is that I'm looking for.  I'm trying to

8  find the individuals who were responsible for giving you

9  what is apparently false information concerning the

10 provision of the antibiotics to Mr. Goulbourne once he was

11 placed in the SHU.  I understand that these gentlemen are

12 aware of what was prescribed, I think everybody in this room

13 is aware of what was prescribed.  Who told you that they had

14 completed -- he had completed his regimen of antibiotics,

15 that's what I want to know.

16        MS. PAPAPETRIOU:  These individuals, Mr. Beddoe

17 and Mr. Glucksnis, and what I was able to --

18        THE COURT:  How would they have known that, I'm

19 just curious.  It was prescribed?

20        MS. PAPAPETRIOU:  Correct.

21        THE COURT:  The medication was taken to him, taken

22 from him because he was placed in the SHU.  Presumably, it

23 was not taken by Mr. Glucksnis or Mr. Beddoe somebody else

24 took it.

25        MS. PAPAPETRIOU:  Right.  At that point, on the

*Hearing*                                                                19

1   25th, when we were made aware, we had a nurse evaluate him

2   again.

3           THE COURT:  That's not what I'm asking you.  I

4   want to know about who said that the provision that he had

5   been provided with his antibiotics once he was placed in the

6   SHU?  It's a pretty simple question because you all made the

7   representation to Mr. Biale that, in fact, it happened.

8           MS. PAPAPETRIOU:  So when they were -- when I

9   requested this information from them, they did not know he

10  was moved to the Special Housing Unit so they did not know

11  he no longer had the medication.

12          THE COURT:  You knew because that was part of the

13  problem that was raised by defense counsel in the letter.

14  So you all just didn't discuss that aspect of it?  So nobody

15  actually undertook to confirm that, in fact, he was given

16  his medication.  It was simply assumed that he had his

17  medication because the prescription called for the

18  medication to be provided.  So you all just said, well, if

19  it was prescribed, then he got it even though he has said he

20  didn't get it, his attorney said he didn't get it.  You did

21  not take any steps to confirm that this man was provided

22  with potentially life-saving medication following a surgery?

23          MS. PAPAPETRIOU:  So we notified the medical

24  department and on the 25th, Nurse Garcia saw him and he made

25  no indication that he did not have the antibiotics.

*Hearing*                                    20

1        THE COURT:  Did you not receive a letter from his

2   lawyer?

3        MS. PAPAPETRIOU:  Yes.

4        THE COURT:  Saying that he hadn't received his

5   antibiotics?

6        MS. PAPAPETRIOU:  Yes.

7        THE COURT:  So, again, nothing was done to

8   confirm.  Now, you're saying it's Mr. Goulbourne's fault.  I

9   mean, that's what you just told me.  He didn't say anything.

10  His lawyer spoke on his behalf.  So, again, my question is

11  what was done to confirm that this man was provided with the

12  medication, potentially life-saving medication?  And I think

13  the answer is nothing and I wish you would just say that.

14  What was done to confirm that the medication was provided?

15  If it was nothing, say it was nothing.  Because I'm telling

16  you, with every sentence you're losing credibility with this

17  court.  So what was done specifically to confirm that

18  Mr. Goulbourne was provided his medication, that's what I

19  want to know.  Not confirm what the prescription was, to

20  confirm that it was provided to Mr. Goulbourne.  Simple

21  question.

22        MS. PAPAPETRIOU:  I relayed the information to the

23  medical staff.

24        THE COURT:  That wasn't the question.

25        MS. PAPAPETRIOU:  I could not physically confirm

1   that that -- that he had medication.  I was going based off

2   of information --

3               THE COURT:  Somebody can physically confirm that.

4   That's what your responsibility is to do.  These people are

5   in your care, they are under your charge.  If they are

6   prescribed medication, guess what, someone needs to

7   physically confirm that they are given to.  That's the way

8   this works.  And what you are telling me is you couldn't do

9   that.  That's a conversation clearly I need to have with the

10  warden.  Sounds like it to me.  If what you are telling me

11  today is that it is not possible, it was not possible.

12              MS. PAPAPETRIOU:  I didn't say it was not

13  possible.

14              THE COURT:  So you just didn't do it?  Which one

15  is it?

16              MS. PAPAPETRIOU:  I do not track if an inmate has

17  medication?

18              THE COURT:  Who does it?

19              MS. PAPAPETRIOU:  Medical.

20              THE COURT:  Did you confirm that they confirmed

21  that it was provided?

22              MS. PAPAPETRIOU:  Yes.

23              THE COURT:  It sounds to me that someone would

24  need to have spoken to, I don't know who goes down to the

25  SHU?  Is it a captain?  Is it a lieutenant?  Is it an

*Hearing*                                                        22

1   officer?  Who goes down and provides it.  Is it a nurse that

2   goes down with a captain?  Something happens.

3           And somebody knows whether on April 23rd they gave

4   that man his antibiotics, and guess what, it's twice a day.

5   Did it happen on the 23rd at 9:00 a.m.?  No, didn't happen

6   on the 23rd at 9:00 a.m.

7           MS. PAPAPETRIOU:  His morning dose because he was

8   still in his housing unit.

9           THE COURT:  That was my hypothetical.

10          He was not given all of his antibiotics.  This man

11  had a burst appendix, he could have died.  First, he was

12  told to stop complaining.  Then only after his appendix

13  ruptured did anybody pay attention to him and then only

14  barely.

15          So no one confirmed, in fact, that this man had

16  received his antibiotics.  And the representation that was

17  made to defense counsel that he had was a blind

18  representation because the MDC could not care enough to

19  confirm it?

20          MS. PAPAPETRIOU:  The medical staff confirmed that

21  to the legal department.

22          THE COURT:  They confirmed what?

23          MS. PAPAPETRIOU:  That he had his medication.

24          THE COURT:  If it was taken away from him, and if

25  yesterday at 6:22 p.m., the message that was given to my

1    chambers was:  We're looking for the medication because we

2    don't know where we put it when he was placed in the SHU.

3    Somebody's lying, you see?

4          Those two things are irreconcilable.  It cannot be

5    that we confirmed, confirmed, that he had been given all of

6    the doses of his medication.  Confirmed it.  And I still

7    don't know who you're saying confirmed it but I will find

8    out.  And then, yesterday, for me to be told we're looking

9    for it because we don't know where it went.  Tell me how I

10   reconcile those?  Maybe that's how we should start.  You

11   help me out.  Tell me how I reconcile the facts that I have

12   before me?  Help me.

13         MS. PAPAPETRIOU:  Your Honor, I have nothing else

14   to say.

15         THE COURT:  No, I asked you a question.  How do I

16   reconcile it?  I'll tell you how this goes.  You've given me

17   these sets of facts, how do I reconcile them?

18         MS. PAPAPETRIOU:  Seems like the facts are not

19   sufficient so there is nothing further I can provide you.

20         THE COURT:  Are they irreconcilable?  Are they

21   irreconcilable, it's direct question.  I'm directing you as

22   I sit here on this bench, in this beautiful courtroom, I am

23   directing you to answer my question.  Are the facts as

24   you've given them to mean irreconcilable?  Yes or no?  It's

25   a yes-or-no question.

1          I'm directing you to answer.  Are the facts

2  irreconcilable?

3          MS. PAPAPETRIOU:  These were the facts that were

4  provided to me.

5          THE COURT:  Are they irreconcilable, it's a

6  yes-or-no question.

7          MS. PAPAPETRIOU:  No.

8          THE COURT:  They're not.  Then reconcile them for

9  me.

10          MS. PAPAPETRIOU:  Your Honor, I don't have much

11  nor information to provide.

12          THE COURT:  You just told me you can reconcile

13  them.  I'm asking you to do so.

14          MS. PAPAPETRIOU:  The inmate had all his doses

15  with the exception of the remaining two.

16          THE COURT:  So when you confirmed that he was

17  given all of his medication, that was not true.

18          MS. PAPAPETRIOU:  They were true -- in

19  whole -- what was provided to me, I took as true.

20          THE COURT:  So who was it that lied to you?

21          MS. PAPAPETRIOU:  The medical staff.

22          THE COURT:  Okay.  Which medical staff

23  specifically lied to you?  No, which specific medical staff

24  lied to you?

25          MS. PAPAPETRIOU:  I have to go and read the

1    e-mails, I was not there on Monday.

2           THE COURT:  I have all the time in the world

3    today.

4           We're going to take a ten-minute recess.  I would

5    like to know who was it on the medical staff that lied to

6    you.  Thank you.

7           (A recess in the proceedings was taken.)

8           THE COURT:  I think where we left off I was going

9    to be informed who lied, which members of the medical staff

10   lied when you inquired about the provision of the final

11   doses of Mr. Goulbourne's antibiotics.

12          So who was it that lied to you?

13          MS. PAPAPETRIOU:  Your Honor, the information was

14   provided to me, not to myself but to Ms. Lynch from

15   Mr. Glucksnis.

16          THE COURT:  Wait a minute.  So now we have

17   Ms. Lynch.  So, Ms. Lynch, who is an attorney as well?

18          MS. PAPAPETRIOU:  Correct.

19          THE COURT:  And Ms. Lynch inquired as to the

20   provision of Mr. Goulbourne's medication and Ms. Lynch was

21   lied to?

22          MS. PAPAPETRIOU:  Yes.

23          THE COURT:  I'm sorry.

24          MS. PAPAPETRIOU:  Yes, she was provided that

25   information.

1          THE COURT:  And that information as we have now

2    concluded today was false, correct?

3          MS. PAPAPETRIOU:  Yes.

4          THE COURT:  Okay.  So she was provided with false

5    information from the medical staff at the MDC concerning the

6    provision of antibiotics to Mr. Goulbourne.

7          Do I have those facts correct?

8          MS. PAPAPETRIOU:  That --

9          THE COURT:  Let me go back.

10         So I said, Ms. Lynch inquired as to the provision

11   of Mr. Goulbourne's medication, you said yes.  I then asked

12   you if the information that she was provided was false and

13   you said yes.  Right?

14         So Ms. Lynch was provided with false information

15   concerning the provision of antibiotics to Mr. Goulbourne by

16   the MDC medical staff, correct.

17         MS. PAPAPETRIOU:  Correct.

18         THE COURT:  And who was it in the MDC medical

19   staff that provided false information concerning the

20   provision of antibiotics to Mr. Goulbourne after having

21   undergone emergency -- an emergency appendectomy which

22   medical staff provided this false information to Ms. Lynch.

23         MS. PAPAPETRIOU:  Mr. Glucksnis.

24         THE COURT:  Mr. Glucksnis.

25         And who else provided the false information to

*Hearing*                                                    27

1  Ms. Lynch concerning the provision of antibiotics to

2  Mr. Goulbourne following his emergency appendectomy?

3              MS. PAPAPETRIOU:  Mr. Glucksnis.

4              THE COURT:  Just Mr. Glucksnis?  And specifically,

5  the representation was that that Mr. Goulbourne had been

6  provided the final doses of his antibiotics, correct?

7              MS. PAPAPETRIOU:  Correct.

8              THE COURT:  And, indeed, those antibiotics were

9  never provided to Mr. Goulbourne after he was placed in the

10 SHU, correct?

11             MS. PAPAPETRIOU:  Correct.

12             THE COURT:  And, on two occasions, by letter, I'm

13 not certain if it was letter or e-mail, but on April 26th,

14 the MDC staff represented that he had been provided the

15 medication and that representation was made to Mr. Biale who

16 are had inquired as to the status of Mr. Goulbourne's

17 medical treatment on April 24th.

18             So, on April 26th, the first misrepresentation was

19 made; is that correct.

20             MR. BIALE:  I have the e-mail correspondence if

21 your Honor wants.

22             THE COURT:  All right.

23             MR. BIALE:  It's in reverse chronological order.

24             THE COURT:  Okay.  So the first misrepresentation

25 that was made to Mr. Biale occurred on April 26, 2024, at

1   11:11 a.m. which it indicated -- Ms. Lynch had indicated

2   that it was her understanding and you've indicated that was

3   based on misrepresentations, express misrepresentations,

4   made to Ms. Lynch but that he had received the prescribed

5   antibiotics and the pain medication.

6          And then the second misrepresentation occurred on

7   April 29th.  And, again, that was based on information

8   Ms. Lynch had received from, one more time, his name.

9          MS. PAPAPETRIOU:  Glucksnis.

10          THE COURT:  That's part of the issue.

11          So we have the two misrepresentations.  So who was

12   it, I want to know, because, obviously, the falsity of that

13   information was revealed yesterday upon the Court's inquiry,

14   and only upon after the Court's inquiry.  But, in any event,

15   who was it that discovered that, in fact, the medication had

16   been misplaced or, at a minimum, no one knew where it could

17   be located?  That was yesterday.

18          Who was it that discovered that?

19          MS. PAPAPETRIOU:  I'm sorry.

20          THE COURT:  Yesterday, my chambers was told at

21   approximately 5:25, 5:30 p.m. in the afternoon in response

22   to any inquiry regarding the provision of Mr. Goulbourne's

23   medication that the MDC staff was currently trying to locate

24   the medication and that they were unaware of where it had

25   placed where the medication had been placed once

1   Mr. Goulbourne had been transferred to the SHU.  And I want

2   to know who provided that revelation?

3            MS. PAPAPETRIOU:  Me.

4            THE COURT:  So you learned.  And who was it that

5   told you that they couldn't find it?

6            MS. PAPAPETRIOU:  I requested that the captain

7   have a specific individual that organizes the property for

8   inmates that come to SHU.  And she inventories everything

9   and she -- she's called the SHU property officer -- and she

10  went through his belongings.

11           THE COURT:  To discover that the medication wasn't

12  there?

13           MS. PAPAPETRIOU:  Correct.

14           THE COURT:  Okay.  At that time, you were

15  undertaking to locate the medication so that means that at

16  that point in time you understood that the medication hadn't

17  been provided to him.  How did you learn yesterday, after my

18  inquiry that in fact the medication had not been provided to

19  him?

20           MS. PAPAPETRIOU:  I contacted Mr. Glucksnis.

21           THE COURT:  You contact Mr. Glucksnis.  And what

22  did you ask Mr. Glucksnis, specifically, exactly?

23           MS. PAPAPETRIOU:  Why he provided me the

24  information that he did, in fact, have his antibiotics when

25  he previously said -- when we know that he was moved to SHU.

1  At what point does he know about that medication actually

2  went up with him?

3         THE COURT:  And the response that you received was

4  what?

5         MS. PAPAPETRIOU:  That he can't confirm, but that

6  the individual was seen on the 25th.  And he did not

7  complain that his medications were discontinued.

8         THE COURT:  That's a different question.  You

9  understand that's a different question?

10        MS. PAPAPETRIOU:  Yes, but that's the information.

11        THE COURT:  That's what he responded.

12        So you didn't d not receive a response from

13 Mr. Glucksnis as to why it is he previously indicated that

14 the medication had been provided.  And instead,

15 Mr. Glucksnis regard relied on no harm, no foul kind of

16 conclusion that was articulated to Ms. McGrath which is,

17 well, he seems to be healing fine anyway in sum and

18 substance, right?

19        That's correct, in sum and substance?

20        MS. PAPAPETRIOU:  Yes, ma'am.

21        THE COURT:  I will ask these questions of the

22 medical folks but just from a layperson's perspective.

23 There is an understanding, I've got to imagine, from the

24 medical staff that the purpose of the antibiotics is to

25 allow for healing and that simply because someone is healing

1  doesn't mean you just prematurely stop the regimen.  In

2  fact, I think everybody's been to the doctor where they say,

3  you know what, just because you're feeling better doesn't

4  mean you stop the antibiotics, that means they're working.

5  But we prescribe them for seven days, you need to go the

6  full seven.

7          Was there any inquiry about the fact that

8  notwithstanding -- I'm just curious -- was there any

9  question by anyone about the fact that notwithstanding the

10  fact that on April 25th that he was healing.  Because

11  that's, by the way, all that the record says is that he was

12  healing which is what we hoped to be happening.  There is

13  nothing in the record that you provided to me in this

14  medical record that there is a medical determination made

15  that he should not be provided with antibiotics on

16  April 25th.  I just want us to be clear.  Unless I missed in

17  the record that you showed me but I don't think I did.  Am I

18  correct that there is nothing in the record that indicates

19  either expressly or implicitly that he is not to be given

20  his antibiotic regimen?

21          MS. PAPAPETRIOU:  Dr. Baylor this morning told me

22  that --

23          THE COURT:  That's not what I asked.

24          MS. PAPAPETRIOU:  Yes, I'm going to --

25          THE COURT:  I am asking about the record.

*Hearing* 32

1  MS. PAPAPETRIOU:  That record, specifically, he's

2  saying that that is -- in their medical world -- is implying

3  that no further antibiotics should be administered.

4  THE COURT:  So when I get doctors here in front of

5  me, I just want to make sure that I'm clear because I'm no

6  doctor, I didn't go to medical school, right?  I just want

7  to make sure that the medical determination at the MDC is

8  that if you prescribe antibiotics for seven days and someone

9  starts to heal that, in fact, medically, there should be a

10  medical intervention to stop the antibiotics.

11  MS. PAPAPETRIOU:  That is not what I said, your

12  Honor.

13  THE COURT:  What are you saying?  Because that's

14  what it sounds like you're saying.  Because all that this

15  record says that he was healing and I'm just trying to

16  understand how healing is somehow antithetical to the

17  provision of the remainder of his antibiotics because that

18  is, by the way, what you said.  He's healing and you said

19  implicit in noting that this man was healing was that he

20  didn't need antibiotics even though he had been prescribed

21  them.  That's what you told me.

22  What did I misunderstand?

23  MS. PAPAPETRIOU:  Nothing, your Honor.

24  THE COURT:  So when the medical people -- because

25  they're going to come in front of me -- they're going to

*Hearing* 33

1   come tell that when someone is healing as Mr. Goulbourne,

2   that antibiotics are somehow antithetical.  The provision or

3   completion, rather, the completion of antibiotics is

4   antithetical to their medical treatment.

5          MS. PAPAPETRIOU:  I do not believe someone will

6   tell you that.

7          THE COURT:  Okay.  So I'm just trying to interpret

8   the records.  And my interpretation of the records is that

9   there is nothing in there on April 25th that says that this

10  man should not be given his antibiotics.  And, at that point

11  in time, on April 25th, he'd only, in terms of days or

12  hours, we were probably at about 36 hours maybe of not

13  having the medication.  And so, to the extent that you could

14  remedy the lack of provision, potentially, it could have

15  been remedied on the 25th.  I understand that we might be in

16  a different position on May 1st in terms of the provision of

17  the antibiotics.  But on April 25th when he was seen at that

18  point in time, just so that I'm clear, we were at somewhere

19  between 48 and 36 hours that he had not had his antibiotics?

20         MS. PAPAPETRIOU:  Correct.

21         THE COURT:  Okay.  Can you tell me what is the

22  MDC's policy in terms what should occur when an inmate

23  complains of severe abdominal pain?  What is the policy in

24  terms of the practice?  What should have happened on

25  April 14th?  And if what should have happened on April 14th

*Hearing*                                                               34

1    was that Mr. Goulbourne should have been told to stop

2    complaining, I just want to document that.

3              So can you please explain to me, as a matter of

4    policy, when an inmate complains of severe abdominal pain

5    and also complains of nausea accompanied by vomiting, what

6    should occur?

7              MS. PAPAPETRIOU:  The unit officer should be

8    notified and Medical should be notified immediately.

9              THE COURT:  Do you know what whether that occurred

10   on April 14, 2024, in response to Mr. Goulbourne's

11   complaints of abdominal pain accompanied by nausea and

12   vomiting?

13             MS. PAPAPETRIOU:  I do not have that information.

14             THE COURT:  All right.  You can get that

15   information, though, correct?

16             MS. PAPAPETRIOU:  Yes.

17             THE COURT:  So the unit officer is supposed to be

18   called and then?

19             MS. PAPAPETRIOU:  Notify the medical staff.

20             THE COURT:  And then medical staff should be

21   notified.  And that medical staff, in this case, that should

22   have been notified is whom?

23             MS. PAPAPETRIOU:  Anyone in the medical

24   department.

25             THE COURT:  Anybody, okay.  So was that just

1    whoever is on duty?

2              MS. PAPAPETRIOU:  I'm sorry.

3              THE COURT:  Just is that whomever is on duty?

4              MS. PAPAPETRIOU:  There are multiple staff.  It

5    could have been a paramedic, a nurse, a PA, a doctor,

6    pharmacist.

7              THE COURT:  And am I correct to assume that once

8    the medical staff is notified, that consistent with policy,

9    that someone should then go to examine --

10              MS. PAPAPETRIOU:  Correct.

11              THE COURT:  -- an inmate?

12         Would they be examined in the Special Housing Unit

13    or would they be brought to a medical unit?

14              MS. PAPAPETRIOU:  Well, each floor has a medical

15    area.

16              THE COURT:  Okay.

17              MS. PAPAPETRIOU:  Including the Special Housing

18    Unit, there is a medical office.  So they would be brought

19    to that medical area to be examined.

20              THE COURT:  So they would be brought to the

21    medical area to be examined?  And, to your knowledge, did

22    that occur on April 14, 2024?

23              MS. PAPAPETRIOU:  No.

24              THE COURT:  It didn't occur?

25              MS. PAPAPETRIOU:  Not to my knowledge.

*Hearing*                                                              36

```
 1              THE COURT:  Okay.

 2              And, as I understand it, Mr. Goulbourne only

 3    received medical attention after he had already collapsed

 4    and that was in his cell, am I correct?

 5              MS. PAPAPETRIOU:  Not to my knowledge.

 6              THE COURT:  I'm sorry.

 7              MS. PAPAPETRIOU:  To my knowledge, he made

 8    complaints again on the 15th and that's when he was seen and

 9    taken to the hospital.

10              THE COURT:  And, at the hospital, on the 15th, is

11    when he was diagnosed with a ruptured appendix; correct?

12              MS. PAPAPETRIOU:  Correct.  So, on the 15th, he

13    was initially seen and --

14              THE COURT:  At what time?

15              MS. PAPAPETRIOU:  7:50 a.m. And they --

16              THE COURT:  When he got to the hospital his

17    appendix had already ruptured because he was diagnosed at

18    the hospital with a ruptured appendix, am I correct?

19              MS. PAPAPETRIOU:  No, I believe they

20    surgically -- I need to -- a dilated appendix.

21              THE COURT:  So that's, like, I have limited

22    experience with dilation but I'm assuming that it was

23    probably close to rupturing.

24              MS. PAPAPETRIOU:  Correct.

25              THE COURT:  Okay.
```

1          MS. PAPAPETRIOU:  It's my assumption as well.

2          THE COURT:  All right.

3          MS. PAPAPETRIOU:  So in the morning of the 15th

4  when he was seen, they provided him antibiotics and it was

5  presumed that he may -- it seemed that he had gastritis so

6  they provided him with medication.

7          THE COURT:  I'm sorry, forgive me, my mind had

8  wandered for a second.

9          You're on April 15th.

10         MS. PAPAPETRIOU:  Still, yes, in the morning.

11 When he was initially seen a few hours later, he was seen

12 again and that's when they brought him to the emergency

13 room.

14         THE COURT:  And a few hours later would be what

15 time?

16         MS. PAPAPETRIOU:  At around 1:00 o'clock.

17         THE COURT:  So 1:00 p.m. in the afternoon

18 thereabouts?

19         MS. PAPAPETRIOU:  Yes.

20         THE COURT:  Do you have documented or does anyone

21 know at about what time on April 14, 2024, Mr. Goulbourne

22 made his initial complaint?

23         MR. BIALE:  I don't think it's documented.  It's

24 not documented in the medical records because --

25         THE COURT:  Well, because it wasn't reported to

1   the medical staff.

2          MR. BIALE:  I don't know specifically.  I think he

3   said it was in the evening.

4          THE COURT:  Okay.

5          MR. BIALE:  But I can double check that with him.

6          THE COURT:  And I also want to be clear:  He still

7   had pain medication that had been prescribed to him.  So

8   we're not talking about a new prescription of pain

9   medication but rather the initial prescription that was

10  denied him on April 20th after the lockdown had been

11  initiated?

12         MS. PAPAPETRIOU:  So, on April 19th, I understand

13  that he did receive the pain medication.

14         THE COURT:  Yes, I'm on April 20th.

15         MS. PAPAPETRIOU:  Right.  And they would not have

16  taken his I.D. from him.

17         THE COURT:  Who wouldn't have taken his I.D. from

18  him?

19         MS. PAPAPETRIOU:  Anyone wouldn't have taken his

20  I.D., they're required to maintain their identification.

21         THE COURT:  My question is whether this man

22  received his Percocet.

23         MS. PAPAPETRIOU:  On the 20th, I believe he did

24  not because he refused to provide his identification.

25         THE COURT:  I'm just curious because I don't know.

1    The identification is like a little card or something?

2              MS. PAPAPETRIOU:  Correct.

3              THE COURT:  An I.D. card?

4              MS. PAPAPETRIOU:  Yes.

5              THE COURT:  And is there a way to determine who

6    that individual is absent that card, I'm just curious.  Is

7    there no way or the medical staff to determine who that

8    gentleman was?

9              MS. PAPAPETRIOU:  In that specific instance, the

10   medical staff cannot determine in a different way.

11             THE COURT:  I don't know what you mean in that

12   specific instance.

13             MS. PAPAPETRIOU:  So the Percocet is a controlled

14   substance and any medication that's a controlled substance

15   or narcotic or psychotropic, they are required to bring a

16   specific card to the housing unit.

17             THE COURT:  He wasn't in the housing unit on the

18   20th, right, this is just normal housing unit?

19             MS. PAPAPETRIOU:  Yes.

20             THE COURT:  Not the SHU.

21             MS. PAPAPETRIOU:  Correct.

22             THE COURT:  I got it, okay.

23             MS. PAPAPETRIOU:  If it was in the SHU, that would

24   have been different because the I.D. card is at their door.

25             THE COURT:  Okay.

*Hearing*                                                                40

1          MS. PAPAPETRIOU:  So when they are in general

2     population, they're required to main their own I.D. card.

3     And when pill line, when there is a medical assistant or a

4     pharmacy technician that comes onto the housing unit, they

5     identify themselves that they're there over the speaker and

6     all the inmates that have medication on pill line line up

7     and they each line up their I.D. card and they provide it to

8     the pharmacist.

9          THE COURT:  Okay.  And so, I just want to be

10    clear, that the representation by MDC is that this man who

11    was in pain from an appendectomy as he's reported, he's told

12    you can get your pain medication if you showed me your I.D.

13    And that this man, in pain from his appendectomy, that he

14    refused to provide his I.D., and hence the MDC in turn

15    refused to give him his medication.

16          So the reason according to what you're telling me

17    that he was not provided with pain medication is his fault

18    because he refused to provide the I.D.?

19          MS. PAPAPETRIOU:  Yes, your Honor.  This is the

20    information that was relayed.

21          THE COURT:  Who relayed that to you?

22          Give me a second, Mr. Biale.

23          MS. PAPAPETRIOU:  Mr. Glucksnis.

24          THE COURT:  Mr. Glucksnis.

25          Now, Mr. Glucksnis is the person, I just want to

1   be clear, the same person who we've established gave false

2   information to Ms. Lynch as to why Mr. Goulbourne wasn't

3   provided with his antibiotics.  This is the same gentleman

4   that you are relying on to say that the reason why

5   Mr. Goulbourne wasn't provided with his pain medication was

6   because he refused to provide his identification.  The same

7   person who provided false information previously is the same

8   person that you're relying on or, well, whether you have a

9   choice or not, but is the same person that you're saying

10  indicated that Mr. Goulbourne simply refused to provide his

11  identification.

12          MS. PAPAPETRIOU:  Correct.

13          THE COURT:  Now, just out of curiosity, if somehow

14  that identification was misplaced for whatever reason

15  because Mr. Glucksnis said that Mr. Goulbourne refused to

16  provide it, Mr. Goulbourne said he didn't have it.

17          I'm just curious, what procedures are in place at

18  the MDC to ensure that inmates receive, let's say,

19  life-saving medication in the event that they've lost their

20  I.D. I'm just trying to understand if this I.D. somehow

21  becomes the gatekeeper to life-saving measures and

22  medication that one might need that that it, we're done,

23  we're absolved of any responsibility to provide this

24  individual with any medication that they may need because

25  for whatever reason they don't have their I.D. and we have

1    no responsibility at that point because they don't have it.

2    Or do you have a policy in place in the event that an inmate

3    does not have their I.D. on them, have lost it, misplaced

4    it, and it is the time that they are supposed to receive

5    their medication as prescribed by a medical doctor.

6            It's a long question but I think you got it.

7            MS. PAPAPETRIOU:  So two separate parts.  I can

8    tell you how inmates go about -- their I.D.s are replaced by

9    their unit team staff.

10           THE COURT:  That's not my question.

11           I can't even explain to you how much I don't care

12   about the I.D.  What I care about is the provision of

13   medication, right?

14           So my question is:  What does the MDC do, as

15   matter of policy, or what should the MDC do as a matter of

16   policy, if an inmate has necessary medication that they need

17   to receive, and at the time that that medication is supposed

18   to be provided for whatever reason, they've lost their I.D.,

19   they've misplaced their I.D., what does the MDC have as a

20   policy in place to ensure that this individual is provided

21   with the necessary medication?

22           MS. PAPAPETRIOU:  The medical staff would

23   generally make the unit team staff aware that this person is

24   missing an I.D. card.

25           THE COURT:  I'm trying to figure out how we get to

*Hearing* 43

1  the medication.  Again, I don't care about that I.D. card, I

2  care about the provision of medication.

3        What, if anything, does the MDC do to ensure that

4  this individual who does not have their I.D. card is

5  provided with the medication as prescribed by the medical

6  professionals?

7        MS. PAPAPETRIOU:  I cannot provide you with a

8  concrete answer because I can assure you that each

9  individual goes about it differently.

10        THE COURT:  So there is no policy at the MDC to

11  ensure that that individuals who have misplaced or for

12  whatever reason don't have their I.D. card at the time that

13  the medication is provided, there is no procedure in place

14  to ensure that those individuals are provided their

15  medication?

16        MS. PAPAPETRIOU:  I cannot provide you a

17  sufficient response on that.

18        THE COURT:  I don't know what that means.

19        MS. PAPAPETRIOU:  I cannot give you a very

20  specific answer.  There is life-saving medications that are

21  generally self-carry.  The only medications that are

22  provided on pill line are controlled substances, narcotics.

23        THE COURT:  But they're prescribed medications.

24  I'm talking about prescribed medications.  I'm not talking

25  about over-the-counter medication.

1          I am talking about medications that a medical

2   professional has deemed necessary for this particular

3   individual, that's it.  That's the line, that's the bright

4   line, was it prescribed?

5          So are you simply unaware of any policy to ensure

6   that those individuals received their medication or are you

7   telling me there is no policy to ensure that those

8   individuals receive it?

9          MS. PAPAPETRIOU:  I prefer to say I am unaware.

10          THE COURT:  You prefer to say?  What I want you to

11   say is the truth.  See, that's the thing, I want the truth.

12   If I need to put you under oath, I'll do it.  I don't think

13   you understand what's happening here.  Give me the truth.

14   You play fast and loose with the truth any more with me

15   today and you, I promise, you're going to have an individual

16   problem.  I'm asking you questions about the MDC and their

17   policies.  I think you want this to be an institutional

18   issue but I can make this as an individual issue if you

19   would like.  Your option.

20          Are you simply unaware of any policy or is there

21   not a policy?  Not what do you prefer the answer to be, what

22   is the answer?

23          MS. PAPAPETRIOU:  I am unaware.

24          THE COURT:  I need to have an understanding about

25   these SHU tickets here.

*Hearing*                                                              45

1          Yes.

2          MR. BIALE:  Before we leave the subject of the

3    I.D. and the Percocet.

4          So what Mr. Goulbourne told me is his I.D. was

5    taken when he was taken to the hospital which makes sense,

6    you know, I don't know that he could have carried it at that

7    time because he was in such severe pain.  It was probably

8    given to the marshals who were escorting him.  And then he

9    didn't receive it back when he came back to the MDC on the

10   18th.

11         On the 19th, even though he didn't have his I.D.,

12   he was given a Percocet on the pill line.  So I'm not sure

13   what happened between the 19th and the 20th, but on the 20th

14   he went back to the pill line and asked for his medication.

15   They asked for his I.D., he explained I don't have it

16   because it was taken from me when I went to the hospital and

17   he was told, well, if you don't have your I.D. then I don't

18   have your medication.  That was the explanation that he gave

19   to me.

20         THE COURT:  So he was given it on the 19th

21   notwithstanding the fact that he didn't his identification?

22         MR. BIALE:  Correct.

23         THE COURT:  But he was not given it on the 20th

24   which was a Friday?

25         MR. BIALE:  I think it was a Saturday.

*Hearing*                                                    46

1          THE COURT:  It was a Saturday, right, it was a

2    Saturday.  But it wasn't given to him on the 20th based on

3    the absence of the identification?

4          MR. BIALE:  Correct.

5          THE COURT:  I want to talk about these SHU

6    tickets.

7          You have something about the medication you want

8    to --

9          MS. PAPAPETRIOU:  (Nodding).

10          THE COURT:  I want to talk about the SHU tickets.

11    So I asked for a copy of both tickets.

12          Can I have them?

13          So this is the initial and the rewrite?

14          So I have a question here, and certainly, I'll

15    make it clear:  This court has no patience and no tolerance

16    for threats that might be made against medical staff.  But

17    my concern here is why are these different?

18          MS. PAPAPETRIOU:  So I have not had the

19    opportunity to speak to the individual but I could tell you

20    based on my training because I am trained, I went to

21    Colorado and I got extensive training on incident report

22    writing and the HO process.

23          The first one is factually insufficient on the

24    surface because it does not include the direct -- when

25    you're writing an incident report to sanction an inmate for

*Hearing*                                                    47

1  statements that are made against the individual, which is

2  this person is a medical staff member, you need to include

3  in quote and what the individual...

4           THE COURT:  And they did there is a quote here.

5           MS. PAPAPETRIOU:  Correct.  But it's --

6           THE COURT:  What time was the second incident

7  report created?

8           MS. PAPAPETRIOU:  It's written on the bottom.

9  It's in, I'm sorry, it should be on the lower, lower, lower

10 section.

11          THE COURT:  It was written, I see, thank you.

12          So this report, this second report, was drafted

13 following Mr. Biale's inquiry because his inquiry, the

14 initial one, was April 24th if I'm correct.  The date of

15 this second report is April 25th and this second report was

16 April 25th at 1914 hours.

17          So this second report was created after the MDC

18 received an inquiry from Mr. Biale concerning the provision

19 of medication for his client.

20          I'm just curious, was there anything in that

21 initial -- I have it, hold on.

22          MR. BIALE:  At some point, I said it's not

23 appropriate to take him to the SHU if he's -- I'm not sure.

24          THE COURT:  I want to know if it's -- hold on.

25          So, on April 24th, Mr. Biale writes a letter to --

*Hearing*                                                        48

1    an e-mail, rather, to you, among others, in the legal

2    department.  In that letter, Mr. Biale references

3    specifically the fact that Mr. Goulbourne had been placed

4    into the SHU and it was subsequent to this letter that the

5    incident report was changed.

6              MS. PAPAPETRIOU:  It was suspended previous.

7              THE COURT:  I don't know what that means,

8    "suspended previous."

9              What does that mean?

10             MS. PAPAPETRIOU:  So when the investigating

11   officer, which is generally the lieutenant's office, finds

12   that an incident report is not sufficient in the Section 11

13   part, they suspend it and it is rewritten whether there is a

14   clerical error because it is a digital system in which this

15   is generated.  So the whole thing need needs to be returned.

16   Whether it had been an empty box or a date missing or a time

17   missing.

18             THE COURT:  The initial report includes the quote

19   of what was uttered by Mr. Goulbourne, and so, I'm just

20   curious.

21             MS. PAPAPETRIOU:  Correct.

22             THE COURT:  You're telling me --

23             MS. PAPAPETRIOU:  I'm sorry.

24             THE COURT:  No.  See, I'm talking.

25             As I read this report, there is a quote that says,

*Hearing*                                                    49

1  "He's going to get me."  Now, by the way, I have an issue

2  with the he's going to get me.  Regardless, that is what

3  this says.  So I'm to understand that this staffer, who

4  believed that he felt threatened, right?  He said, "I felt

5  threatened" and didn't directly respond.  Presumably, he

6  felt threatened based on the words that were uttered to him

7  or her, I don't know who it was, but that you're telling me

8  that they didn't include all of the words that were uttered

9  to them that provided the bases for their feelings of being

10 threatened.

11         That's what you're telling me.

12         MS. PAPAPETRIOU:  Yes.

13         THE COURT:  Okay.

14         MS. PAPAPETRIOU:  And this is a new staff member.

15         THE COURT:  Whether you're new or not, I'm just

16 trying to understand, right, how credible I believe it is

17 that someone says I feel threatened because of what someone

18 said to me.  And that instead of putting the worst of what

19 they said to them, they only put something that's not nearly

20 as bad as what was later reported only after Mr. Biale

21 complained about his placement or references his placement

22 in the SHU.  It is a little suspicious you could see.

23         MS. PAPAPETRIOU:  If I may?

24         THE COURT:  Sure.

25         MS. PAPAPETRIOU:  This is something that we do

1  oftentimes have an issue relaying to newer staff members

2  that they should, in, fact whether it has foul language or

3  explicit words are used or explicit behaviors used that it

4  should, in fact, be described in the incident report in that

5  it would only help the disciplinary process if all that is

6  included in the substance.

7         THE COURT:  But under the facts as I have them

8  before me, you know, putting aside whatever it is that you

9  generically tell folks, I'm talking about the facts in this

10  facts in this case.  And the facts in this case is that on

11  April 23rd at 1500 hours when this report, the initial

12  report was completed, there was a quote and it says, "He

13  immediately told me, 'he was going to get me'."  That was

14  changed to, "I'm going to fuck you up.  I'm going to get

15  you."  And that was changed after Mr. Biale's letter to

16  Legal concerning Mr. Goulbourne's denial of his necessary

17  medication and his placement in the SHU.

18         Just as a chronological fact, correct?

19         MS. PAPAPETRIOU:  I suppose I didn't --

20         THE COURT:  That's just the chronology of the

21  events on April 24th.  A letter was sent to MDC specifically

22  to you, among others.  That was on April 24th, the day after

23  this incident report was filed.  The day after that, after

24  Mr. Biale's letter, is when the incident report was changed;

25  correct?

1          MS. PAPAPETRIOU:  Correct.

2          THE COURT:  Who was it that reviewed the first

3    incident report and determined that the first incident

4    report was somehow insufficient?

5          MS. PAPAPETRIOU:  I don't have a copy of it.  It

6    is in the lower-left corner.

7          THE COURT:  So the lower-left corner?

8          MS. PAPAPETRIOU:  Section 14.

9          THE COURT:  That's who the report was delivered.

10   "Incident report delivered to above inmate by."

11         MS. PAPAPETRIOU:  Generally, the reviewing

12   individual.

13         THE COURT:  So are we certain that you're saying

14   that someone whose last name is Ferguson reviewed the

15   incident report dated April, no, sorry, forgive me

16   Lieutenant Compton.

17         MS. PAPAPETRIOU:  That's the rewrite that you're

18   looking at.

19         THE COURT:  I understand that.

20         My question to you is, who reviewed the original

21   incident report and determined that it was insufficient?

22         MS. PAPAPETRIOU:  If I can look at that first one,

23   I believe that is Lieutenant Ferguson.

24         THE COURT:  Sure.

25         MS. PAPAPETRIOU:  Lieutenant Ferguson.

1          THE COURT:  Is the person who reviewed the

2   original incident report and determined that it was

3   insufficient?

4          MS. PAPAPETRIOU:  Correct.

5          THE COURT:  And do you know that, in making the

6   determination as to whether the initial incident report was

7   insufficient, it was based on the review of the incident

8   report as I understand it?

9          MS. PAPAPETRIOU:  Correct.

10          THE COURT:  So he reviewed the report.  And on the

11   face of the report made a determination that it was

12   insufficient?

13          MS. PAPAPETRIOU:  Correct.

14          THE COURT:  So how did he know that other words

15   had been uttered because this information was with the

16   nurse, it was in their head, they hadn't disclosed it in the

17   report.  Tell me how it was he knew based on the -- I asked

18   you if it was based on just the face the report.

19          How did that happen?

20          MS. PAPAPETRIOU:  I do not have the specific facts

21   on how that information was relayed.  But there is a system

22   where it would kick it back and they may have -- I don't

23   have access to that, only the specific lieutenants that work

24   in that --

25          THE COURT:  Right.  Because you could imagine I

*Hearing*                                                        53

1  would have some concerns if there was a review process under

2  which an individual just reviews it to see if it's salacious

3  and meaty enough to meet the requirements to, I don't know,

4  for placing an individual in the SHU and say, you know what,

5  you might need some more as opposed to simply relaying the

6  facts and the way in which this has been described to me and

7  if you're just saying it was on the face of the incident

8  report.  I'm trying to understand the bases that

9  Mr. Ferguson would have determined it insufficient and known

10  that there was additional information that could be

11  included.

12          MS. PAPAPETRIOU:  I, of course, can't speak to

13  that.

14          THE COURT:  But he could, Mr. Ferguson.  I'm just

15  making my list.

16          So Mr. Ferguson is the person who reviewed the

17  original report and made a determination that the original

18  report was insufficient.  And, as a result, the process was

19  that, Mr. Ferguson, do you know if he contacted the medical

20  staffer?

21          MS. PAPAPETRIOU:  I can't speak to that.  I can't

22  speak to any of that.

23          THE COURT:  Okay, fair enough.

24          I have to tell you I think that it's no secret

25  that I am not satisfied fully with the responses that I have

1    been given.  And that this dissatisfaction stems largely

2    from the fact that there appears to me to have been

3    intentional misrepresentations made by the medical staff

4    that was relayed to the legal department.  And the legal

5    department, of course, relayed that to counsel in this case.

6            Certainly, there could be no question that

7    everyone involved was aware that these representations would

8    also be relied on by the Court in assessing the next steps.

9    And so, this is, as they say, the house that Jack built.

10           But I would like to have these individuals in

11   front of me, so I intend to have -- I want to hold an

12   evidentiary hearing on this issue.  So I'm going to set a

13   date down for the hearing.  I need to look at my calendar

14   but understand that the individuals, based on the

15   representations made by Ms. Papapetriou -- did pronounce it

16   correctly?

17           MS. PAPAPETRIOU:  Papapetriou.

18           THE COURT:  I apologize, Ms. Papapetriou.

19           My understanding is that the individuals who have

20   answers to the questions that I have, or certainly, at least

21   responsible for some of what transpired here would be

22   Mr. Baylor, Mr. Glucksnis.

23           Spell his name again.

24           MS. PAPAPETRIOU:  G-l-u-c-k-s-n-i-s.

25           THE COURT:  Ms. Lynch was the person who you have

*Hearing*                                                                55

1    indicated to me Mr. Glucksnis --

2              MS. PAPAPETRIOU:  He provided the information to

3    her.

4              THE COURT:  He provided the information to her.

5              So I want Ms. Lynch.  And there is a captain, a

6    Lieutenant Ferguson, who you said reviewed the second

7    incident report?

8              MS. PAPAPETRIOU:  First.

9              THE COURT:  Thank you, forgive me.  The first

10   incident report, Mr. Ferguson.

11             I want to have a hearing on this because I am not

12   satisfied with the facts that I have and I need to get to

13   the bottom of this.  Certainly, it should go without saying

14   that this court has an interest in ensuring that the

15   individuals who are in custody generally, but particularly,

16   individuals.  Mr. Goulbourne is awaiting sentencing by this

17   court, so he is in the MDC as a result of affairs that he

18   needs to attend to in this court.  So, certainly, I have an

19   interest in ensuring that those individuals, and we all

20   should have an interest in ensuring that all individuals

21   under our charge receive the medical care that they are

22   required.

23             So I intend to hold an evidentiary hearing in this

24   case so that I can further understand what transpired

25   because it seems to me there were intentional

*Hearing*                                                        56

1  misrepresentations that were made with respect to

2  Mr. Goulbourne's care.  And I'm going to require Mr. Baylor,

3  Mr. Glucksnis, Ms. Lynch, and Mr. Ferguson to appear.

4          Yes.

5          MR. BIALE:  Just, your Honor, just to throw in

6  something else.

7          The person who actually examined him on the 25th,

8  I believe, according to the medical records, is a nurse

9  named Marilyn Garcia.  So I don't know.

10         THE COURT:  What does is it that you

11 think Ms. Garcia is going to be able to provide me in terms

12 of what I need to know that I don't know?

13         MR. BIALE:  I am not sure whether Mr. Glucksnis

14 ever actually examined Mr. Goulbourne.

15         THE COURT:  But the determination or absence of a

16 determination -- it appears to me that Mr. Baylor, who is in

17 charge, has assumed responsibility for it, right?

18         MR. BIALE:  I'm just saying that given we're

19 trying to figure out what occurred in this time period.

20         THE COURT:  What's her name?

21         MR. BIALE:  Marilyn Garcia.  And then

22 Ms. Papapetriou referenced someone named Beddoe when she

23 provided the list earlier.

24         THE COURT:  Would I then ask you who made the

25 misrepresentations, you said specifically Glucksnis.  Is

*Hearing*                                                        57

1    that to the exclusion of Beddoe?

2              MS. PAPAPETRIOU:  Yes.

3              THE COURT:  So Mr. Beddoe, as far as you

4    understand, didn't make any representations concerning the

5    provision of Mr. Goulbourne's antibiotics as of --

6              MS. PAPAPETRIOU:  Correct.

7              THE COURT:  -- I guess it would have been the

8    23rd.

9              MS. PAPAPETRIOU:  Correct.

10             THE COURT:  So, not involved.

11             MS. PAPAPETRIOU:  Correct.  I only spoke to him

12   yesterday evening.

13             THE COURT:  Fair enough so he actually assisted in

14   providing you accurate information.

15             MS. PAPAPETRIOU:  Yes.

16             THE COURT:  Okay.  So, to be fair to you, the

17   accurate information only came about when you asked because

18   when Ms. Lynch asked, the accurate information was not

19   provided?

20             MS. PAPAPETRIOU:  I guess we could say that,

21   that's correct.

22             THE COURT:  All right.  Next.  Yes?

23             MS. PAPAPETRIOU:  If I could just say, the reason

24   the information -- the inquiries came in on Thursday

25   afternoon, I believe.

*Hearing*                                    58

1      THE COURT:  I'm sorry.

2      MS. PAPAPETRIOU:  I believe the inquiry came in on

3  Thursday afternoon, that was the 25th.

4      THE COURT:  Mr. Biale's on the 24th?

5      MS. PAPAPETRIOU:  Right.  I'm just trying to put a

6  timeframe together.  And I'm just trying to specifically --

7  I can't pull up everything from my phone.  But on the 26th,

8  was that Friday, I had on the 25th and 26th, I had Ms. Lynch

9  following up with the information because I was not at the

10  institution I had one of our other attorneys.

11      THE COURT:  So you received the inquiry from

12  Mr. Biale on the 24th.  You then directed Ms. Lynch to

13  follow up on the inquiry and that's the time when you were

14  given the false information for Mr. Glucksnis concerning the

15  provision?

16      MS. PAPAPETRIOU:  Yes.

17      THE COURT:  Was there, after Mr. Biale's second

18  missive, Ms. Lynch went back and Mr. Glucksnis made an

19  intentional misrepresentation concerning the provision?

20      MS. PAPAPETRIOU:  That's what I understand.

21      THE COURT:  Now, you've tried a number of times to

22  tell me that Mr. Goulbourne was seen this morning, correct?

23      MS. PAPAPETRIOU:  Yes.

24      THE COURT:  All right.  And who was he seen by?

25      MS. PAPAPETRIOU:  Dr. Baylor.

*Hearing*                                                                59

1          THE COURT:  Dr. Baylor.

2          No my understanding, and I want to have an of

3    better understanding of his care, because my understanding

4    with respect to antibiotics is that once you've had a

5    significant lapse in the dosages that there are two options

6    which is, one, is to discontinue the antibiotics altogether,

7    or two, to start a regimen, a new regimen.  In this case, it

8    was a seven-day regimen, correct, that was originally

9    prescribed?

10          MS. PAPAPETRIOU:  Five.

11          THE COURT:  Excuse me, a five-day regimen.

12          And you're saying that today there was a

13    determination made by Mr. Baylor that he should not receive

14    an additional dosage of medication?

15          MS. PAPAPETRIOU:  Yes.

16          THE COURT:  But that was Mr. Baylor, right?

17          MS. PAPAPETRIOU:  Yes.

18          THE COURT:  So he was already on my list.

19          What I want, as I indicated, I'm going to have an

20    evidentiary hearing to discuss what has transpired.  In the

21    past, however, I want something, a notarized statement from

22    Mr. Baylor, concerning the provision of antibiotics now

23    because I want to have a better understanding of

24    Mr. Goulbourne's treatment today.

25          Yes, Mr. Biale?

*Hearing*                                                    60

1          MR. BIALE:  Can I also ask that the Court direct

2     that he be taken to an outside doctor and have that doctor

3     determine whether he needs additional antibiotics?

4          THE COURT:  Yes, exactly.  That's an excellent

5     point by you.

6          I'm also directing that Mr. Goulbourne be

7     transported to a third-party doctor by the end of day

8     tomorrow so that he can be examined and a determination --

9     we can get a second opinion as to whether he requires

10    antibiotics or other treatment related to his appendectomy.

11    And I expect to have a report by end of day tomorrow and

12    please make sure that what I receive from the third-party is

13    in writing.

14         As I said, I intend to get to the bottom of this.

15    We have a responsibility.

16         MR. NAVARRO:  Your Honor, I just want to clarify

17    one point in the Court's last order.

18         Your Honor said that you wanted a report tomorrow

19    regarding whatever the outside evaluator says.  Is that a

20    report from the Government or from the MDC that you are

21    looking for?

22         THE COURT:  The MDC should provide it to the

23    Government and the Government should provide it to the

24    Court.

25         MR. NAVARRO:  My only concern with that, your

*Hearing*                                                    61

1   Honor, is I don't know what time he will be able to be taken

2   out tomorrow and he don't get the information back

3   necessarily right away.  So I don't know whether we will be

4   in a position to provide an update to your Honor by

5   tomorrow.

6              THE COURT:  Well, I'm going to assume he's going

7   to be taken out before -- what's the issue?

8              MR. NAVARRO:  The issue is, your Honor, if that

9   he's taken to an outside facility, the Government does not

10  have the ability to speak directly to that outside facility.

11  And so, therefore, we have to rely on a couple levels of

12  hearsay to get the information back and that takes some

13  time.  And I'm concerned whether we can comply with your

14  Honor's order on the same day that he's seen.

15             THE COURT:  I'm assuming if he's evaluated

16  tomorrow when he leaves something can be provided.  I mean,

17  presumably, if they believe that he requires antibiotics, he

18  would be given a prescription for it.

19             MR. NAVARRO:  That's right, your Honor.

20             I have no doubt that the information will be

21  provided to Mr. Goulbourne or whoever is transporting him.

22  What I'm saying is I have concerns about whether that

23  information can make its way to the Government in a timely

24  enough fashion for us to provide an update tomorrow.

25             What I would suggest, your Honor, if your Honor

1   was willing, was that we be permitted to provide an update

2   by noon the next day.  And if there is an issue with that,

3   we can come back to your Honor rather than have to come back

4   to you tomorrow and say, your Honor, we don't have the

5   information yet.  And if we get it sooner, we will provide

6   it sooner.

7          THE COURT:  You'll make every effort to get it to

8   me tomorrow but you have until noon on --

9          MR. NAVARRO:  Today is the 1st so the 3rd, your

10  Honor.  Thank you, your Honor, I appreciate it.

11         THE COURT:  I'm trying to figure out if there is

12  anything else.  Again, I will figure out when this hearing

13  is going to be, I have to look at my calendar.

14         (Discussion held off the record.)

15         THE COURT:  Folks, we're going to do 3:00 o'clock

16  on May 8th and I will confirm this via a minute entry and

17  order and, again, I'm going to require that Mr. Baylor,

18  Mr. Glucksnis, Lynch, Ferguson, and potentially, Garcia to

19  appear.

20         Yes?

21         MR. BIALE:  And, your Honor, I think it would be

22  appropriate for the Court to have the internal

23  correspondence that was referenced about the situation in

24  real-time when you're evaluating the testimony that you're

25  going to get from these individuals.

*Hearing*                                                        63

1          THE COURT:  I'm sorry.  What are you talking

2    about?

3          MR. BIALE:  I'm talking about Ms. Papapetriou

4    referenced that there was e-mail correspondence.

5          THE COURT:  Yes.

6          MR. BIALE:  Internal e-mail correspondence,

7    presumably, in response to the e-mails that I sent.

8          THE COURT:  Yes, I'd like that produced to the

9    Court, thank you, Mr. Biale, by Monday.

10         Understood?

11         MS. PAPAPETRIOU:  Yes.

12         THE COURT:  Am I forgetting anything else?

13         At a certain point the MDC is going to have to

14   understand that the judges of this court are no longer going

15   to tolerate the mismanagement of the medical care of the

16   defendants that are in their charge.  And so, it appears to

17   me that our efforts up until this point haven't been

18   sufficient.  And so, I'm going to try another route.  Here

19   we go.

20         I appreciate the Government's efforts in

21   attempting to help Mr. Goulbourne receive his medication as

22   required, you laid that out.  There's nothing that I see

23   that indicates that you were doing anything but trying to

24   move this process along, am I correct?

25         MR. BIALE:  I agree.

*Hearing*                                                      64

1          THE COURT:  And so, I appreciate that.

2          It is not always the case that the Government is

3    so involved and it appears, as you've laid it out, that not

4    only did you attempt to help remedy the situation you did so

5    doggedly.  The fact that the MDC ignored you as well is mind

6    boggling to me.  But, of course, you know, here we are.  But

7    this is -- this does not lay at your feet.

8          MS. MCGRATH:  Thank you, your Honor.

9          THE COURT:  All right.  Thank you, folks.

10         MR. BIALE:  Thank you.

11         MS. MCGRATH:  Thank you.

12         MR. NAVARRO:  Thank you.

13         (WHEREUPON, this matter was adjourned to May 8,

14   2024, at 3:00 p.m.)

15

16                          *   *   *

17

18                  CERTIFICATE OF REPORTER

19
     I certify that the foregoing is a correct transcript of the
20   record of proceedings in the above-entitled matter.

21

22

23         *Anthony D. Frisolone*

24   _____
     Anthony D. Frisolone, FAPR, RDR, CRR, CRI
25   Official Court Reporter

# **EXHIBIT B**

1

<pre>
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2      - - - - - - - - - - - - - - X
        UNITED STATES OF AMERICA,     :   23-CR-00475(DLI)
 3                                     :
                                       :
 4                                     :   United States Courthouse
              -against-                :   Brooklyn, New York
 5                                     :
                                       :
 6                                     :   December 15, 2023
                                       :   10:00 a.m.
 7      JAMES YOUNG,                    :
                                       :
 8            Defendant.               :
        - - - - - - - - - - - - - - X
 9
           TRANSCRIPT OF CRIMINAL CAUSE FOR SHOW CAUSE HEARING
10              BEFORE THE HONORABLE DORA L. IRIZARRY
                     UNITED STATES DISTRICT JUDGE
11

12                      A P P E A R A N C E S:

13

14      For the Government:       BREON PEACE, ESQ.
                                  United States Attorney
15                                Eastern District of New York
                                  271 Cadman Plaza East
16                                Brooklyn, New York 11201

17                                BY:  STEPHANIE PAK, ESQ.
                                       Assistant United States Attorney
18

19      For the Defendant:        FEDERAL DEFENDERS OF NEW YORK
                                  One Pierrepont Plaza
20                                16th Floor
                                  Brooklyn, New York 11201-2776
21
                                  BY:  ALLEGRA GLASHAUSSER, ESQ.
22

23      Also Present:             NEHA KHAN, ESQ.
                                  MDC Staff Attorney
24
                                  BLAKE GLUCKSNIS, MDC Assistant Health
25                                Service Administrator
</pre>

*Proceedings*                                                              2

A P P E A R A N C E S: (Continued)

Court Reporter:            DENISE PARISI, RPR, CRR
                          225 Cadman Plaza East
                          Brooklyn, New York 11201
                          Telephone: (718) 613-2605
                          E-mail: DeniseParisi72@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

                    *    *    *    *    *

        (In open court.)

        THE COURTROOM DEPUTY:  Criminal cause for show cause

hearing, docket number 23-CR-475, United States versus James

Young.

        Please state your appearances.

        MS. PAK:  Stephanie Pak on behalf of the Government.

With me at counsel's table is Neha Khan and Blake Glucksnis of

the Bureau of Prisons, Metropolitan Detention Center.

        Good morning, Your Honor.

        THE COURT:  Good morning to all of you.

        On behalf of Mr. Young?

        MS. GLASHAUSSER:  Good morning, Your Honor.

        Allegra Glashausser, representing Mr. Young, who is

seated next to me.

        THE DEFENDANT:  James Young.

        THE COURT:  Good morning, sir.

        Good morning, Ms. Glashausser.

1          We are here because of the medical situation

2    concerning Mr. Young and, frankly, in this Court's view, the

3    MDC's inappropriate response to his medical condition, and,

4    most importantly, the MDC's -- and just for the record, MDC is

5    the Metropolitan Detention Center here in Brooklyn where our

6    pretrial detention inmates, as well as some sentenced

7    prisoners, are housed, along with prisoners who have cases in

8    the Southern District of New York.  Some of them may have also

9    been sentenced.  And when I say "BOP," I'm referring to the

10   Bureau of Prisons.

11         What has been most disturbing to me, to this Court,

12   the blatant disregard by the MDC of a very explicit order by

13   Magistrate Judge Levy issued on November 22nd of this year at

14   the arraignment of Mr. Young on the indictment of these

15   charges, an order that, I should add, was entered on the

16   consent of the Government to have Mr. Young transferred the

17   next day, November 23rd by 11:00 a.m., to a medical facility.

18         In addition, that order made it very clear that the

19   magistrate judge wanted the MDC to report back to him with

20   respect to the effectuation of the transfer and the

21   implementation of that order.  Instead, that order was

22   ignored.

23         We were here Wednesday when Ms. Glashausser

24   detailed, I would say, about 80 percent of the history of what

25   happened here.

1        In addition on Wednesday, this Court directed the

2    Government, who did nothing -- Ms. Pak did nothing, despite

3    the fact that she was kept informed by being copied on the

4    various email correspondence between Ms. Glashausser and the

5    MDC, to find out why Mr. Young had not been transferred and to

6    address the fact that his medical condition, which is

7    extremely serious -- it's a MRSA infection.  He's got other

8    things going on as well as a result of a prior car accident --

9    obviously, he is wheelchair-bound, so he has other limitations

10   as well -- and Ms. Pak did nothing to ensure that Judge Levy's

11   order was effectuated.

12        So here we are today.  And the response -- the other

13   thing that the Court did on Wednesday was that the Court

14   itself issued a medical treatment order on Wednesday, and in

15   that medical treatment order, the MDC was notified of the

16   order to show cause and the concern that I had over the

17   failure to obey Judge Levy's November 22nd order.  Instead,

18   the response that I got from the MDC was:  See the attached

19   medical records.  He was seen on Sunday, as indicated.

20        That was from Ms. Khan, the staff attorney.

21        I did see the attached medical records.  I read

22   every one of the 99 pages.  And, quite frankly, the story that

23   it tells, the picture that it shows, is even worse than what

24   Ms. Glashausser detailed at the conference on Wednesday.  In

25   fact, instead of being transferred to a medical facility, at

1   some point, not clear to me exactly when -- I would have to

2   look at the other administrative orders or records, I should

3   say, from the MDC -- he was placed in SHU.  Oh, by mistake.

4   That's a pretty darn big mistake.  For someone who needs

5   medical treatment, there's no allegation whatsoever, I haven't

6   seen anything anywhere, that Mr. Young violated any of the

7   regulations of the prison; that he threatened anybody; that he

8   engaged in some acts of violence.  He was placed in the SHU

9   for medical treatment?  Are you serious?  And then, oh, that's

10  just a mistake.

11          In addition, his medical supplies were mistakenly

12  thrown out.  So for a period of time, just as Ms. Glashausser

13  explained on Wednesday, he didn't have any new gauze to

14  replace his wounds with; he didn't have any kinds of

15  sterilizing chemicals.  None of that.

16          And I almost did get the status report that the

17  Court directed the Government to file at five o'clock on

18  Wednesday, and it indicates that the MDC staff advised her

19  that Mr. Young is receiving treatment for an active MRSA

20  infection.  And, mind you, their initial response to

21  Ms. Glashausser and the Government's excuse for not acting on

22  Judge Levy's order was that, oh, he doesn't have MRSA, when it

23  was very apparent from the very first medical records from

24  intake.  And, in fact, in one of the subsequent

25  examinations -- Mr. Young, I'm really sorry to get into this

1    detail, but I really think that the record needs to be clear,

2    okay -- he had some kind of growth or something, pustule,

3    under his arm that burst.  Well, you know what, that can

4    happen while he is trying to clean himself, change clothes,

5    change bandages in his cell where he has a roommate.  It took

6    medical staff to clear up that situation for him during that

7    medical visit.

8            I don't know whether Mr. Young is right-handed or

9    left-handed, but he has a fracture on his left hand.  That's

10   just appalling.  The MDC can't even get a cavity treated, much

11   less something as serious as this.  And I'm talking from

12   20 years of experience sitting in this courthouse.  And this

13   is nothing new.  Because back in the late '80s, the late Judge

14   Weinstein, himself, did a walkthrough and issued a very

15   scathing opinion about what he saw.  This is nothing new.

16           And what's more appalling even is that there were

17   two pending litigations here in this very courthouse over the

18   same issues; the conditions at the MDC, the lack of medical

19   treatment, among other things.  And the fact that the MDC has

20   the unmitigated gall to completely disregard an order of the

21   Court -- which also is not a first-time thing for the MDC --

22   the person who responds to Ms. Glashausser in her initial

23   inquiry to say, "oh, he doesn't have it" is -- first of all,

24   it is a flat out lie.  Or looking at it in the best light

25   possible, the person just was too lazy to look at the records.

1    Either way, it's not good.  It is not good.

2            So the Government gets told that the MDC thinks it's

3    able to adequately treat the MRSA and the Government is

4    asking, I suppose, on behalf of the MDC, that this Court

5    withdraw Judge Levy's order; however, there is nothing in the

6    Government's report to the Court, and nothing in the email

7    response that I received from Ms. Khan, that explains why the

8    MDC chose to ignore a Court order.  Because I have news for

9    you, representatives of the MDC, you are not above the law.

10   There is a reason why our forefathers decided that there

11   should be three co-equal independent branches of government.

12   This is not the first time that the MDC has ignored a Court

13   order from other judges of this Court and orders that I have

14   issued.

15           So either Ms. Khan or Mr. Glucksnis -- am I

16   pronouncing that correctly?

17           MR. GLUCKSNIS:  Glucksnis.

18           THE COURT:  Glucksnis.  I'm sorry.

19           I would like to hear what was going on in your head

20   that made you think that you were authorized to completely

21   ignore a Court order that also required reporting back on the

22   execution of that order.

23           MS. KHAN:  Your Honor, so on November 22nd when we

24   received the Court order, at that time, the labs had not

25   indicated that he had MRSA at that time.

 1          However, prior to that when he was on his intake on

 2   November 16th, he was treated proactively as if he had MRSA

 3   due to the fact that, I believe, prior to coming to MDC

 4   Brooklyn he had already had MRSA --

 5          THE COURT:  Correct.  He was in a Rikers medical

 6   facility, which ought to speak volumes, because it's Rikers

 7   that is probably one of the other most abominable prisons on

 8   this planet -- and I've been to Rikers; I've seen Rikers

 9   personally -- then that should speak volumes and you should

10   take proactive steps to make sure that he is being treated.

11   So you had that information on the 16th.  You had the

12   information.  And it was based on that information, that

13   Ms. Glashausser made the application to Judge Levy that the

14   Government consented to the order, and you are not giving me a

15   good reason why you disregarded a Court order.  And, at the

16   minimum, you had an obligation to report whatever your reasons

17   were, or to ask the judge -- and, properly, you have lawyers

18   on staff.

19          Are you a lawyer?

20          MS. KHAN:  Yes.

21          THE COURT:  Okay.  So act like one.  Act like one.

22          If there is some reason why a Court order -- maybe

23   it's wrong, maybe there's no basis for it -- there is

24   something called a motion for reconsideration.  You go back to

25   the judge and, say, Judge, you wanted us to report back to

1   you.  This is why we think the order should be vacated; we're

2   asking you to reconsider.  Or don't they teach those things in

3   law school anymore?  I mean, really, what is your job as an

4   attorney?  Just to have that on your doorstep?  I mean,

5   really?  Or is that what they are teaching in law schools now,

6   judges issue orders, you don't obey them.

7            Because what I'm reading from the medical records

8   that I saw here is that he has a legitimate condition.  It has

9   been verified.  Not only that, but the medical records also

10  show that, yes, he was given antibiotics and they don't work,

11  because the condition that he has is specifically resistant to

12  some very strong antibiotics.  And I know they're very strong

13  because, unfortunately, I've had occasion in my lifetime to

14  have to use them.  And they can cause very serious side

15  effects.  It is resistant to medication.

16           Not only that, to make matters worse, apparently

17  there isn't even a working laundry on that unit that he is on.

18  So he is being forced to -- and I don't even know how that

19  would work, even if there was a laundry on his floor, because

20  I would think that his things would have to be washed

21  separately from other inmates, then there has to be some sort

22  of disinfection process.  So even that is problematic.

23  Whereas, a medical facility does have in place a process for

24  dealing with that.

25           But there isn't even a way that something like that

1  could be instituted because there isn't even a laundry that he

2  could use on his unit, so he's washing in the sink.  Is he

3  given disinfectant to clean the sink?  Presumably his roommate

4  uses the same sink for his hygiene purposes?

5          You know, I'm not talking about things that are out

6  of this world or of another universe.  This is a common sense

7  approach.  This is just basic common sense.  And for you,

8  specifically as staff attorney, to have been told that the

9  Court has issued an order to show cause, as to why you

10  disregarded Judge Levy's order, not to respond to that and

11  then to think that, oh, it's okay, I'll just send along the

12  medical records, so now you are disregarding my order.  I'm a

13  district judge.  I expect my orders to be obeyed.

14          So you still haven't told me why you disregarded the

15  order.

16          MS. KHAN:  So on November 22nd, the -- I had replied

17  saying that we could treat his condition at MDC Brooklyn --

18          THE COURT:  Replied to who?

19          MS. KHAN:  I replied to the original email that came

20  in on November 22nd explaining that he would be treated at MDC

21  Brooklyn.  There are other inmates with MRSA at MDC Brooklyn

22  that are treated regularly.  It's not something that MDC

23  Brooklyn medical staff is unfamiliar with how to treat --

24          THE COURT:  Well, that's scary, honestly.  That's

25  very scary, because I am not hearing that this is properly

1    being taken care of or addressed.  Certainly not in

2    Mr. Young's situation.  And everybody's situation is

3    different; there can be different strains.

4         MS. KHAN:  So the antibiotic that he was previously

5    on has been changed to suit the type of MRSA he has, as of

6    recently.  And I was told by medical staff that his wound is

7    actually doing a lot better as of this week, as early as

8    earlier this week, that the wound is, in fact, healing from

9    this new antibiotic.

10        THE COURT:  Do you wish to be heard,

11   Ms. Glashausser?

12        MS. GLASHAUSSER:  Your Honor, I think that Your

13   Honor sees what's happened very clearly and correctly.  I

14   think that Judge Levy's order was right.  He had MRSA then.

15   He still has it.  And he has an open wound in his armpit as

16   well as in his groin area, and those are related to a

17   preexisting condition that reoccurs.  He understands that he

18   usually needs surgery to clear those wounds.  I'm not sure if

19   he will have that in this case.  And that's in addition to all

20   of his other medical problems.  He's in a wheelchair.  He has

21   difficulty moving around, as one of his legs and one of his

22   arms is injured.

23        In the medical records, you can see the order that

24   he is not supposed to have contact with other people.  There's

25   one form where it says he could not sign because of his MRSA

1   infection.  There's another form saying that he could have

2   gloves.

3          So those medical issues coupled with very serious

4   hygiene issues --

5          THE COURT:  He's left-handed.

6          MS. GLASHAUSSER:  Right.  I think that's why he was

7   raising his left hand --

8          THE COURT:  Okay.  I wasn't sure.  He's left-handed

9   and that is where he's got the bandage.

10          MS. GLASHAUSSER:  So I think Your Honor is

11   completely right that MDC is not adequately providing him

12   medical care.  Judge Levy's order was correct.  Your Honor

13   should reissue it, or whatever the right way to do that is, so

14   he can get appropriate treatment in a medical facility.

15          And, frankly, I'm not sure why MDC and the

16   Government are resisting this.  The Government initially

17   agreed, based on my representation from Mr. Young.  We didn't

18   have the records then, now we do, and Your Honor is right.  It

19   shows something even worse than what I had believed without

20   the records.  Their original consent was the right one.  We

21   know that MDC has access to medical facilities that could

22   treat Mr. Young.  I don't think it would be forever -- these

23   conditions hopefully will resolve -- and then he could be

24   returned to MDC once he is medically able to go there.

25          With respect to the order in particular and

1   Ms. Khan's response, it was that email where Ms. Khan

2   indicated that he did not have MRSA and does not have an

3   infection, so that was wrong.  And nothing in the medical

4   records suggests that MDC ever thought that he didn't have

5   MRSA.  First it says he came in with a suspected MRSA, and

6   then they have the cultures where it confirms that he has

7   MRSA, has an active infection, and that continues until today,

8   or until the last date on the medical records that we have.

9           THE COURT:  I don't take kindly to

10  misrepresentations, especially from lawyers.

11          MS. KHAN:  On November 21st was when the culture was

12  taken, and that was the culture that came back as MRSA.  So on

13  November 22nd, we didn't have those results yet, which is why

14  I stated he didn't have MRSA because at that time --

15          THE COURT:  You had the medical records and you had

16  his intake from November 16th and you knew that he was coming

17  from a medical facility from Rikers Island.  This is not a

18  condition that goes away like a bad headache or a cold.  So

19  instead of saying, you know what, we took some tests, we need

20  to verify -- which would be the answer in a report directly to

21  the judge -- that's not what you did.  And, clearly, he does

22  have it, because that's verified from the medical records.

23          I don't get what your role at the MDC is here,

24  because, quite frankly, your actions are negligent and

25  contemptuous of the Court, because two lawsuits are not enough

*Proceedings*                                                      14

1   for the MDC.

2          And, Ms. Pak, you are complicit in all of this

3   because your office, as I said on Wednesday, is very much

4   aware of the two lawsuits because it's the U.S. Attorney's

5   Office representing the MDC as their lawyers in the civil

6   action.  Perhaps I should have asked Mr. Eichenholtz to be

7   here today.  You didn't even tell a supervisor.

8          I've heard enough.  I am not satisfied that based on

9   what I have seen that the MDC is qualified in any way, shape,

10  or form to address Mr. Young's condition, especially given the

11  lack of laundry facilities, and I'm not even sure that the MDC

12  can be trusted to engage in the proper sanitizing regimen that

13  might be required.  I think that, given Mr. Young's condition,

14  it would be grossly unfair to impose that on him.  The MDC is

15  in utter disregard of the safety and welfare of, at the

16  minimum, Mr. Young's roommate, but other inmates in the

17  facility, and its own staff.

18         And the other thing that I did not address is that,

19  you know, apparently the safety protocols that are followed is

20  basically Mr. Young can't touch anything and he has to wear --

21  what is it? -- a yellow jumpsuit or something like that so

22  that the other inmates know to keep away from him.  So he's

23  been ostracized for a medical condition.  Let's put a big red

24  letter A on him.  Not to mention the initial response of

25  putting him in the SHU for no good reason.

*Proceedings*                                                                 15

1          So Mr. Young has to be transferred to a medical

2    facility forthwith, by no later than tomorrow, and I realize

3    it's Saturday, but too bad.

4          MS. KHAN:  Judge, if I may?

5          THE COURT:  Yes.

6          MS. KHAN:  Our staffing capabilities are

7    currently -- are extremely low.  If you could, please, allow

8    us at least until whatever the Court finds suitable --

9          THE COURT:  Tomorrow.

10         MS. KHAN:  It's an impossibility with staffing.

11   Logistically --

12         THE COURT:  But this is how you are going to be able

13   to take care of his medical needs.

14         MS. KHAN:  Correct, Judge, but unfortunately --

15         THE COURT:  Because you have no staff that can do

16   what they are supposed to do.

17         MS. KHAN:  Judge, in order to comply with your order

18   properly, I would ask for more time.  Tomorrow would be an

19   impossibility for staffing.

20         THE COURT:  Well, how much time are you asking for?

21         MS. KHAN:  I would be asking for a week.

22         THE COURT:  No.  Tomorrow.

23         MS. KHAN:  Judge, tomorrow would be an impossibility

24   for staffing.

25         THE COURT:  A week is too long.  A week we're going

1   into Christmas, and then you're going to say, well, we're

2   short because of Christmas.

3            MS. KHAN:  Can we have until Tuesday?

4            THE COURT:  Tuesday is too long.

5            MS. KHAN:  Monday?

6            THE COURT:  Monday the latest by noon.  And I want a

7   report back.  And I'm serious about that.  I will hold you in

8   contempt if you do not comply with my order.

9            Do you understand that?

10           MS. KHAN:  Yes.

11           THE COURT:  You are on notice.  Then you will have

12   to come to court with a lawyer.

13           And I see Ms. Von Dornum in the courtroom and I see

14   senior staff here also from the U.S. Attorney's Office.  I

15   think that they will verify that I mean business.  This is not

16   a joke.  This is not a game.  This is a human being's life.

17   And he is in detention pretrial.  Okay, yes, he is accused of

18   doing something that, if convicted, he will be punished for,

19   but he's not there yet.  He has a presumption of innocence.

20   He has not been proven guilty.

21           If I do not get a report that he has been

22   transferred by Monday noon, rest assured that you will be back

23   here again so fast you will have whiplash.

24           Are we clear?

25           MS. KHAN:  Yes, Judge.

*Proceedings* 17

1      THE COURT:  Is there anything else that I need to

2  address with respect to Mr. Young specifically?

3      MS. GLASHAUSSER:  Your Honor, just that Mr. Young is

4  noting -- and I've heard this from my other clients as well --

5  that the medical staff -- and really much of the staff at MDC

6  are not there on the weekend, they're locked in for the

7  weekend, and that is what happened after Judge Levy's medical

8  order.  Instead of being transferred, he was locked in for

9  five days over the Thanksgiving weekend, and he believes

10  that's what will happen this weekend as well, which may be why

11  MDC is asking to delay the transfer until Monday.

12      THE COURT:  So the Court has just been advised --

13  and I suppose this is why Ms. Khan is saying that tomorrow is

14  impossible -- apparently there is a whole lockdown at the MDC,

15  so all legal calls, videoconferences, social visits, are

16  temporarily suspended, which is, frankly, all the more reason

17  why somebody with a medical condition, who is not a behavior

18  problem, who is not a security problem from an internal safety

19  perspective, needs to be at a medical facility, because I do

20  note that Judge Levy's order was issued on November 22nd, so

21  that was the Wednesday before Thanksgiving.  So in order that

22  others may celebrate their Thanksgiving holiday, he was placed

23  in SHU.

24      Is there anything further?

25      By Monday, he will have to be transferred, I said,

1   by noon.  I want a report that he has been transferred as of

2   Monday morning.  I don't want to hear excuses.  There will be

3   no excuses.

4          Is there anything else, Ms. Glashausser or Ms. Pak?

5          Transferred by noon and a report by noon.

6          Anything else?

7          MS. GLASHAUSSER:  No, Your Honor.

8          MS. PAK:  Not from the Government, Your Honor.

9          THE COURT:  Okay.  So I still need Ms. Pak and

10  Ms. Glashausser, but not anything necessarily concerning

11  Mr. Young's case directly, so he can be taken back by the

12  marshals, and the MDC folks are excused, but there is one

13  administrative thing that I want to address with Ms. Pak.

14         THE COURTROOM DEPUTY:  On the record, Judge?

15         THE COURT:  Yes.

16         MR. GLUCKSNIS:  Thank you, ma'am.

17         (Pause.)

18         THE COURT:  I would like to know, Ms. Pak, why it

19  was that you were not here on Wednesday morning at the time

20  that this case was scheduled.

21         MS. PAK:  Your Honor, I, unfortunately, at that time

22  was also handling a -- what I was hoping would not turn into a

23  conflicting appearance in Courtroom 2A.  It ultimately --

24         THE COURT:  Are you talking about the arraignment

25  part?

1           MS. PAK:  Yes, Your Honor.

2           THE COURT:  Well, I happen to know that there was no

3    arraignment calendar on Wednesday morning.

4           MS. PAK:  Your Honor, there was a removal matter

5    that had come in at that time, and I was hoping that the two

6    matters would not overlap in preparing for that arraignment as

7    well --

8           THE COURT:  There was no arraignment court, and my

9    understanding was that you were in the arraignment part, and

10   instead you sent poor Mr. Berman over here, a lamb to the

11   slaughter, unarmed with all the pertinent information about

12   the potential issues that could be raised here.  And instead

13   probably you should have asked Mr. Berman to handle the

14   removal issue and come here yourself to address the issue, but

15   he was completely blind-sided by the health issue.  You should

16   have known that Ms. Glashausser was going to raise that with

17   the Court, given the seriousness of it, and it shows a real

18   lack of judgment on your part.  I'm sure that someone else

19   could have handled that removal matter.  Your obligation was

20   to be here, especially under these circumstances.

21          MS. PAK:  I apologize for that, Your Honor, and it

22   won't happen again.

23          THE COURT:  Oh, it won't happen again, because keep

24   in mind this:  The only thing that anybody has, but

25   particularly a lawyer, is their reputation, and that involves

*Proceedings*                                                          20

1   having integrity, honesty, forthrightness, candor -- those may

2   be similar, but they're nuanced -- and having the spine to

3   deal with difficult situations and not to throw other people

4   under the bus.  I've been where Mr. Berman was.  It was not a

5   pleasant situation for him.  I actually feel sorry for him.

6   And I'm glad your supervisors are here to hear that, because

7   that was not only a serious lack of judgment, but, in some

8   sense, there was a misrepresentation as to what your

9   availability was, because unless you had to be in a court

10  part, you were scheduled to be here, and that was your

11  priority.  You get somebody else to cover the other thing.

12  This case was scheduled here for that date in advance.

13  Credibility is everything.  It takes forever to build a

14  reputation.  It takes one incident to undermine it.  So I

15  expect that none of this will happen again.

16              MS. PAK:  Yes, Your Honor.  Understood.

17              THE COURT:  You are all excused.

18              Thank you.

19              (Matter concluded.)

20

21                    *     *     *     *     *

22  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
23

24    /s/ Denise Parisi                    December 16, 2023
    _____    _____
25      DENISE PARISI                              DATE

# EXHIBIT C

1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - -    X
 3
     UNITED STATES OF AMERICA,    :   23-CR-475(DLI)
 4
 5         -against-              :   United States Courthouse
                                      Brooklyn, New York
 6
     JAMES YOUNG,                 :
 7                                    December 20, 2023
              Defendant.         :   10:30 o'clock a.m.
 8
     - - - - - - - - - - - -    X
 9

10              TRANSCRIPT OF ORDER TO SHOW CAUSE
           BEFORE THE HONORABLE DORA L. IRIZARRY
11              UNITED STATES DISTRICT JUDGE.

12
     APPEARANCES:
13

14   For the Government:         BREON PEACE
                                 United States Attorney
15                               BY: MATTHEW HAGGANS
                                     STEPHANIE PAK
16                               Assistant United States Attorneys
                                 271 Cadman Plaza East
17                               Brooklyn, New York

18
     For the Defendant:          FEDERAL DEFENDERS OF NEW YORK INC.
19                               One Pierrepont Plaza, 16th Floor
                                 Brooklyn, NY 11201
20
                                 BY: ALLEGRA W. GLASHAUSSER, ESQ.
21

22   Court Reporter:            Charleane M. Heading
                                225 Cadman Plaza East
23                              Brooklyn, New York
                                (718) 613-2643
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
</pre>

2

1       THE CLERK:  Criminal cause for show cause hearing,

2   docket number 23-CR-475, United States versus James Young.

3       Please state your appearances.

4       MR. HAGGANS:  Good morning, Your Honor.  Matthew

5   Haggans for the United States.  I'm joined at counsel table by

6   AUSA Stephanie Pak, Supervisory Staff Attorney at MDC Sophia

7   Papapetru and Staff Attorney at MDC Neha Khan.  Good morning,

8   Your Honor.

9       THE COURT:  Good morning.

10      MS. GLASHAUSSER:  Good morning, Your Honor.  Allegra

11  Glashausser representing Mr. Young but I am waiving his

12  appearance today.

13      THE COURT:  Thank you.

14      We are here for an order to show cause hearing as to

15  why the MDC should not be held in contempt for its failure to

16  comply with the very clear directive that I gave the MDC, and

17  Ms. Khan was present here that day with another colleague from

18  the MDC as was the government, directing that Mr. Young be

19  transferred by no later than Monday, December 18th, at noon,

20  and the government was charged with providing the court with

21  an update.

22      The representation that was made to the court on

23  Monday by the government was that Mr. Young was scheduled to

24  be transferred before noon, still wasn't by noon, but he was

25  due to be en route to the facility before noon.  The

3

1   government also, Ms. Pak represented that she would further

2   corroborate with the Court that the defendant had been

3   transferred.

4           Well, that corroboration never came on Monday.  I

5   wanted to give the MDC the benefit of the doubt that, in fact,

6   it had done what it was charged to do by Monday and, lo and

7   behold, late yesterday afternoon, Ms. Glashausser advised the

8   court that Mr. Young was back at the MDC.  Needless to say, I

9   was not pleased.  This is, again, very typical of what the MDC

10  does.  This was the whole discussion that we had on Friday

11  about the utter contemptuousness and disregard that the MDC

12  has of court orders because, apparently, the Bureau of Prisons

13  thinks that it is above the law, that it does not have to

14  respond to court orders.

15          When your director of the Bureau of Prisons, Colette

16  Peters, came here I think earlier in the year to talk to all

17  of us Judges, District and Magistrate Judges, this was raised

18  with her.  In fact, I think I was the one to raised it,

19  although not the only Judge who raised concerns about that.

20  And I think, Ms. Papapetru, you were present at that meeting.

21  And we were given all kinds of assurances about new procedures

22  that would be put in place to deal with what was of the

23  paramount concern at that meeting, medical attention or lack

24  thereof being given to the inmates.  There were other things

25  that were also of great concern but that was, that took up a

4

1    huge chunk of the discussion, but here we are again.

2            So, instead, what I find out is that instead of

3    being transferred to a facility, a medical facility, basically

4    a rehab type of facility where Mr. Young's wounds can be

5    attended to, make sure that he takes the medication when he's

6    supposed to take the medication, where he can get tested to

7    make sure that the medication is still working because,

8    unfortunately, this illness that he has, it's marked by the

9    fact that it becomes resistant to medication and he's already

10   resistant to significant, very strong medication, and he has

11   other issues.  He is wheelchair bound.  He's got other medical

12   issues, not to mention the lack of a laundry facility in his

13   unit, not to mention that he is, there's no way to avoid him

14   having contact with other people because he's in general

15   population, and putting him in SHU which is what the MDC did

16   in response to Judge Levy's order of November 27th because,

17   heaven forbid, that the MDC's staff should disturb their

18   Thanksgiving holiday and do the right thing which is obey a

19   court order, and it just flippantly gets mentioned in his

20   medical records as, oh, he was mistakenly put in SHU, oh, and

21   by the way, we lost all his medical supplies.

22           So now I find out that he was taken to the hospital.

23   The idea was not that he be taken to the hospital and I don't

24   think that anyone was alleging that he necessarily needed to

25   be hospitalized which apparently was the conclusion of the

5

1   doctors who treated him there.  No one was talking

2   hospitalization.  Nonetheless, having been told he does not

3   need to be hospitalized, he should have from there been taken

4   to a medical facility.  Instead, he was taken back to the MDC.

5   I promised Ms. Kahn that if they, if you did not obey, if the

6   MDC did not obey my order, that she would be back here so

7   fast, she would get whiplash.  I keep my word.

8          The conduct of the MDC here has -- I tried to think

9   of how to describe it.  It's an abomination.  Utterly

10  contemptuous of the court.  It's contemptuous of human life

11  and dignity.  It's appalling.  It's unprofessional.  And for

12  staff attorneys not to comply with court orders, well, you

13  know what, if this was a civil case, you'd be reported to the

14  fitness committees of the state.

15         So now I have on my bench here some new update that

16  apparently based on -- this was from Ms. Pak -- that

17  apparently based on her discussions with the MDC Warden and

18  MDC Counsel, that apparently, as of the writing, I don't know

19  what time that this was written, the defendant is on his way

20  to a nursing home for long-term care.

21         Mr. Haggans, you can remain seated.

22         MR. HAGGANS:  Thank you, Your Honor.  I'm glad the

23  Court has received the letter.  That's based on information

24  from the last 90 minutes or so.

25         I do want to take the opportunity to acknowledge and

6

1  apologize to the Court.  The government has let the Court

2  down.  The government has not met the Court's expectations.

3  　　　　　THE COURT:  Oh, you know, I was considering getting

4  a special prosecutor on this case.  I was considering going to

5  the Chief Judge of the Circuit to get a special prosecutor on

6  this case just so that you're aware because Ms. Pak also

7  failed to obey a court order.  It was her obligation on Monday

8  to give me an update which meant that she should have

9  proactively found out what happened to Mr. Young on Monday.

10  So she too should be facing contempt of court charges.

11  　　　　　MR. HAGGANS:  If I may address that briefly,

12  Your Honor?

13  　　　　　THE COURT:  Yes.

14  　　　　　MR. HAGGANS:  So for the Court's awareness, as is

15  appropriate in our office, when serious and significant

16  matters such as this are raised, they're raised to supervisors

17  and AUSA Pak did so in this case and that was to me.  And so

18  when I said --

19  　　　　　THE COURT:  Yes, not until I called for her to come

20  after she sandbagged Mr. Berman.

21  　　　　　MR. HAGGANS:  From last Wednesday?

22  　　　　　THE COURT:  Last Wednesday, correct.

23  　　　　　MR. HAGGANS:  That's correct, Your Honor, and we

24  apologize for that.  Your Honor is correct that for a matter

25  of this nature, it would have been far preferable for the

7

1   Assistant with the most firsthand direct knowledge to have

2   appeared in person and we regret that.

3          I just want to assure the Court that AUSA Pak has

4   been advising her supervisors of the status of this matter.  I

5   have been advising my supervisor.  It's been briefed to the

6   highest levels of our office including the Civil Division, the

7   Criminal Division and the United States Attorney.  It's also

8   been briefed to Mr. Eichenholtz who I know the Court is

9   familiar with from the Office of the Attorney General, the

10  Deputy Attorney General formerly of our office, but I just

11  want to reiterate something, Your Honor.

12         When I said a moment ago that the government fell

13  short of the Court's expectations from Friday, I just want to

14  be very clear that that, that includes me.  I should have

15  personally foreseen that while hospital treatment was an

16  improvement, certainly, if he had been admitted to the

17  hospital, as the government believed on Monday was a

18  possibility, if he had been admitted, he would have received

19  the various forms of treatment that the Court was

20  appropriately quite concerned about from Friday and I should

21  have foreseen that if he was not admitted, that we would be

22  back in an uncomfortable situation, not least of which because

23  we would not be in compliance with the Court's order.  For

24  that, I personally apologize to Your Honor.

25         THE COURT:  Ms. Glashausser, do you wish to be heard

8

1    at all on this?

2            MS. GLASHAUSSER:  No, Your Honor.  I'm happy

3    Mr. Young is on his way to the rehabilitation facility which

4    is what we were seeking all along.

5            THE COURT:  Ms. Papapetru, do you wish to be heard

6    with respect to the MDC?

7            MS. PAPAPETRU:  Your Honor, we just apologize for

8    not completely obeying your order and that we should have

9    expected that he would have returned from the hospital and

10   that we should have been more proactive in responding.

11           THE COURT:  He should have been transferred directly

12   from the hospital to a facility.

13           MS. PAPAPETRU:  I agree, Your Honor.

14           THE COURT:  Because, you know what, he was

15   endangering the safety and well-being -- he had a roommate,

16   for God's sake.  He's washing his clothes in a sink that he

17   shares with a roommate.  There's no indication that he was

18   given anything to disinfect the areas that invariably he had

19   to touch and that then his roommate would be touching.

20   There's no indication that staff was going in there and

21   disinfecting.  I didn't hear anything about that.  And then

22   there's no working laundry either.  And, of course, there

23   would have to be some sort of disinfecting mechanism there as

24   well.  I haven't heard anything about any of that.

25           MS. PAPAPETRU:  If I may, Your Honor?

9

1        THE COURT:  Yes.

2        MS. PAPAPETRU:  The washing machines were -- there

3   were new washing machines and new dryers placed on that

4   housing unit over a week ago to my knowledge.  I do not have

5   specific knowledge when they were brought out of order, but I

6   know that they were replaced with new machines early last

7   week.

8        THE COURT:  Early last week?  In the meantime, he

9   had been there for three weeks with no laundry facility.

10       MS. PAPAPETRU:  Yes.  I believe the housing --

11       THE COURT:  It still begs the question that when he

12  utilizes something, it needs to be disinfected to avoid

13  everyone else from being infected.  The entire conduct of the

14  MDC in this matter has been absolutely, utterly atrocious,

15  beyond the pale of anything that I have seen in the 20 years

16  that I have been on this court, and I've seen some pretty

17  nasty things, and I go regularly to the MDC to look for

18  myself.

19       I totally do expect that moving forward, that when a

20  court issues an order, which should not be necessary because

21  supposedly there had been procedures in place to deal with

22  medical issues, but when a judge issues an order, your

23  obligation is to obey it.  And as I told Ms. Kahn, if there's

24  some reason why, perhaps the information, why the order should

25  not have been issued, perhaps the information the order was

1  based on was inaccurate or maybe there was a change that the

2  judge was not made aware of, as I told Ms. Kahn on Friday, be

3  lawyers.  You can ask the government to present on your

4  behalf.  It's been done in other cases.  Move for

5  reconsideration.  Move to vacate.  Explain why.

6              What was done here, the thing that really riles me

7  is that the MDC decided to be -- you can have a seat, ma'am --

8  the MDC decided, oh, we took him to the hospital and in

9  another week or so, we'll send him over to a facility.

10             Ms. Kahn, I don't know if that was your doing, but I

11 don't know how you can be so flip and think that somehow, that

12 eventually I would not find out about this because the truth

13 always surfaces sooner or later, and that you would somehow

14 think that you would get over and get out from under your

15 obligation to obey a court order, that you would think that

16 you're that slick that you can get over.  It is beyond

17 unprofessional.

18             MS. KAHN:  I apologize, Your Honor.

19             THE COURT:  You know, your apologies are so empty.

20 They are empty.  It is disgusting.  These are human beings

21 entrusted in your care.  And thankfully, finally, in

22 compliance you will be and I expect some kind of verification

23 that, in fact, he is at the facility today.

24             MR. HAGGANS:  That's understood, Your Honor.

25             THE COURT:  Because we will be back here every

 1  single darn day, I don't care if the court is closed, until it

 2  gets done.  It wouldn't be the first time I spent Christmas in

 3  a courtroom.  And if I have to send an order to the Marshals

 4  to bring you here, I will do that because I already had an

 5  order composed to bring your bodies here.

 6          MS. PAPAPETRU:  Your Honor, I will let you know

 7  myself when he's in the facility.

 8          THE COURT:  Yes, because when Ms. Kahn was advised

 9  of the order to show cause by my courtroom deputy, her

10  response was, Oh, he was seen by the doctors on Sunday and

11  here are his medical records.  Very flip response.

12          I suggest you have a meeting with your attorney

13  staff and explain to them what their obligations are under the

14  law because I will, I will go to grievance committees and get

15  their licenses pulled.  They have no right to act as lawyers.

16          We have a date set for this case already.  Is there

17  anything else that needs to be raised at this time?

18          MS. PAK:  At this time, Your Honor, nothing further

19  from the government.  And I do apologize as well on behalf of

20  what has transpired thus far.

21          THE COURT:  You better get your act in order.

22          MS. PAK:  Understood, Your Honor.

23          THE COURT:  Ms. Papapetru, anything else on behalf

24  of the MDC?

25          MS. PAPAPETRU:  We apologize, Your Honor, for our

1  actions and moving forward, we hope to not let you down again.

2          THE COURT:  We will be meeting with your new warden

3  in January.

4          MS. PAPAPETRU:  Yes.

5          THE COURT:  I will make sure he has copies of these

6  transcripts.

7          MS. PAPAPETRU:  Your Honor, I actually requested

8  them to provide them to him and I brought him up to speed

9  yesterday and again this morning.  And I did arrange for those

10  meetings so you can raise your concern.

11          THE COURT:  Ms. Glashausser?

12          MS. GLASHAUSSER:  Yes, Your Honor, this is luckily

13  no longer a problem for Mr. Young as he is hopefully already

14  at the rehabilitation facility, but just in reference to the

15  laundry machines, my understanding from another client in the

16  same unit is that it was after Your Honor, after we discussed

17  the issue of laundry machines and Your Honor talked to the MDC

18  about the laundry machines that the unit received one laundry

19  machine and one dryer.  The dryer as of yesterday had already

20  broken.

21          THE COURT:  I'm not surprised.

22          All right.  Thank you.

23          MR. HAGGANS:  Thank you, Your Honor.

24          MS. GLASHAUSSER:  Thank you, Your Honor.

25          (Matter concluded.)