# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

December 19, 2024

**Via ECF and Email**
The Honorable Diane Gujarati
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    **United States v. Terrence Wise, 23-CR-9 (DG)**

Your Honor:

I write in anticipation of sentencing, currently scheduled for January 9, 2025. At fifty-five years old, Terrence Wise stands precariously at the crossroads of his life. Already in failing mental and physical health at the time of his arrest resulting from four decades of drug addiction, while incarcerated at MDC Brooklyn, Mr. Wise developed lung cancer. Due to the admitted negligence of the MDC Brooklyn medical staff, Mr. Wise's lung cancer went untreated for many months, despite his efforts to advocate for himself. "The results were somehow missed by the health services department, and the delay was unfortunate," they wrote. ECF No. 26 at 1. MDC's inexplicable delay reduced Mr. Wise's five-year likelihood of surviving his lung cancer from 80% to less than 50%—without even accounting for his preexisting conditions. *See* Ex. A (report of Dr. Phillip Hoffman).

Mr. Wise is a thoughtful, intelligent, kind man with the humility and insight to recognize that he is fortunate to be alive for his sentencing. *See* Ex. B (report of Mitigation Social Worker Allison Berger). He is also a product of the crack epidemic that ravaged his impoverished Brooklyn community in the 1980s and 1990s, from which he could never escape, and which has become the present-day fentanyl crisis. Mr. Wise's instant conviction is a direct result of his substance use disorder. In October and November 2022, in the throes of active addiction, Mr. Wise and his East New York neighbors began to realize that the crack cocaine they were purchasing from a particular drug dealer was laced, unknown to them, with fentanyl. A series of overdose deaths followed, the last of which left Mr. Wise's dear friend abandoned in a dumpster. Traumatized, horrified, and enraged by the harm and death this man was causing in his community, Mr. Wise set off on an inexcusable path to make amends, landing him here.

Pretrial incarceration at the MDC has been a flashpoint, throwing his uncertain future into sharp relief. Prior to his cancer diagnosis, and between lockdowns, Mr. Wise engaged in the few available programs, completing numerous education courses, and sought counseling with a therapist. When he was belatedly diagnosed with lung cancer in May 2024, Mr. Wise came face-to-face with his own mortality. He committed himself to making the most of his new reality, deepening bonds with his daughter, aunt, and other loved ones. For the last seven months, he has

undergone a harrowing course of chemotherapy, radiation, lung cancer surgery, and immunotherapy with numerous side effects and setbacks. He has spent much of that time shackled to hospital beds, and requires nine more months of cancer treatment.

Mr. Wise's case desperately calls out for treatment, support, and supervision, rather than additional incarceration, and certainly not for the duration sought by the government or contemplated by the irrational guidelines. He is an ideal candidate for Judge Levy and Judge Chen's Eastern District of New York STAR court, which provides intensive support for re-entering defendants struggling with mental illness and substance abuse. He has been incarcerated in horrible, untenable conditions for over two years, while battling lung cancer. We respectfully submit that the time he has served at MDC Brooklyn, to be followed by supervised release, is sufficient to meet the goals of sentencing in this rare case. In the alternative, we request that he remain incarcerated locally until the conclusion of his ongoing cancer treatment at Maimonides Medical Center, which is expected in October 2025.

## I.   The Instant Offense was the Culmination of a Life and a Community Wracked by Substance Abuse

Born into extreme poverty in Brooklyn in 1969, Mr. Wise was dealt a particularly challenging hand. His life and his path are described in Exhibit B, the report of Mitigation Social Worker Allison Berger, LMSW, who has worked comprehensively with Mr. Wise for the last two years. Before Terrence was born, his father was murdered. By the time he was three years' old, his mother was dead from a drug overdose, leaving him to be raised by his also-addicted grandmother. At twelve, he began using marijuana, and by fourteen, he was in the grip of full-blown crack cocaine addiction. He did not complete the sixth grade. He was shot, stabbed, and attempted suicide numerous times in his formative teen years. By eighteen, he was cycling in and out of jails and prisons for the next thirty-five years, all his offenses related to his substance use disorder, or for selling drugs to support his own habit.

From 2015-2019, in his late forties, Mr. Wise finally found a brief period of stability and sobriety, supported by a financially stable partner who showed him a different life. Unfortunately, in February 2019, Mr. Wise suffered a sharp decline in his mental health, resulting in psychiatric hospitalization for twelve days. As Ms. Berger writes, "Terrence had surpassed milestones he had never really reached before, so when he started to lose footing, the fall was steep, and the damage was immense." Ex. B at 4. By 2020, his declining mental state and numerous relapses caused the end of the relationship, leading directly into the Covid-19 pandemic. For the next two-and-a-half years, Mr. Wise went in and out of drug and mental health treatment, enrolling himself in long-term residential treatment for the first time in his life in the summer of 2020. After a medical emergency there, where he fractured his orbital bone, Mr. Wise left treatment and ultimately hit rock bottom. His life was filled with despair and addiction. He was surrounded by people in similar circumstances, for whom he cared deeply.

In October and November 2022, Mr. Wise began to realize that the crack cocaine he and others were buying from a specific drug dealer was causing unintended effects. It was laced with fentanyl, which he and they did not intend to purchase or use. The impacts of fentanyl-laced drugs, sold to unknowing Brooklyn buyers, is well-known, and has been widely reported and

prosecuted. *E.g.*, United States Attorney's Office for the Eastern District of New York, "Press Release: Brooklyn Man Arrested for Distributing Fentanyl," *at* https://www.justice.gov/usao-edny/pr/brooklyn-man-arrested-distributing-fentanyl (Aug. 4, 2022) ("Fentanyl is a federally controlled substance, administered by professionals in medical fields, because of its potency and mortal consequences if abused. It is not a recreational drug to be passed around at parties. Thousands of people are dying because drug dealers are unapologetically pushing fentanyl laced products," stated FBI Assistant Director-in-Charge Driscoll.).

Mr. Wise stopped buying crack from the dealer, confronting him about what he was selling numerous times. Tragedies amassed. Six or seven times in a month, Mr. Wise called 911 to report overdoses in his community; he specifically recalls making these reports from overdoses at Belmont and Williams, Belmont and Alabama, Pitkin and Georgia, and Belmont and Georgia. In early November, his dear friend Nicole suffered one such overdose. She was left in a dumpster, where she was found, taken to Interfaith Hospital, and eventually died on November 5, 2022. The way fentanyl took over East New York in October and November 2022 reflects nationwide patterns. *See, e.g.,* Maia Szalavitz, "How Fentanyl Drove a Tsunami of Death in America," *The New York Times, at* https://www.nytimes.com/interactive/2024/09/27/opinion/fentanyl-overdose-deaths.html (Sept. 27, 2024) ("People who use drugs and those who work with them can often cite a specific month, sometimes a particular day, when fentanyl entered the local drug supply. It's as if bartenders suddenly replaced light beer with a drink that tasted the same but was 95 percent alcohol and customers unwittingly chugged it. Many drinkers would rapidly pass out, and some might die. When fentanyl arrives in a community, local responders go from dealing with, say, a few overdoses a week or a month to half a dozen or more per day.").

On November 4, 2022, directly following the discovery of Nicole in the dumpster, Mr. Wise, in his own words, "snapped." He vowed to make the dealer stop selling this poison to his community. *See* PSR ¶ 8 (surveillance video of incident picking up Mr. Wise stating, "Nobody's selling here."). The events of the next month, of which Mr. Wise played only a part, are unimaginable to us here, seven miles west in Brooklyn. Mr. Wise approached the dealer with an improvised Molotov cocktail, which he threw at his van. At the same time, the dealer took out a gun and shot at Mr. Wise, grazing his shoulder, for which he was prosecuted for attempting to murder Mr. Wise. *See* Ex. C (Kings Supreme Court record, reflecting charges of attempted intentional murder, assault with a weapon with intent to cause serious injury, reckless endangerment in the first degree, criminal possession of a loaded firearm, and lesser included offenses). *See* PSR ¶ 6. Days later, the dealer relayed death threats to Mr. Wise, telling him he had a "contract" on his life. One of his associates intentionally crashed his van into Mr. Wise's vehicle, which Mr. Wise then set on fire. *Id*. at ¶ 8. Mr. Wise and the neighborhood were completely out of control. A month after that, Mr. Wise was pulled over by the NYPD in a car stop. They recovered a gun from the front driver's side door pocket of his rental truck, entirely unconnected to the arson offenses, which Mr. Wise had carried for self-defense. As a felon, that he could not do.

## II.  Objections to the Presentence Investigation Report

Mr. Wise raises numerous objections to the guidelines calculation in the Presentence Investigation Report ("PSR"). He also provides his medical records and other documentation

regarding his cancer diagnosis and treatment, all of which occurred immediately following the Presentence Investigation Interview ("PSI"). Notably, at the time of the interview, Mr. Wise reported to the probation officer that "a mass was found in his lung and he coughs up blood," PSR ¶ 76, which is what prompted undersigned counsel to demand immediate medical attention from MDC Brooklyn, revealing their delays. The PSR mistakenly (by relying on the MDC's initial reports) attributes the mass on his lung to having been shot at 1996, and deeming it a "benign neoplasm," neither of which turned out to be remotely accurate: the rapidly growing mass on his lung was cancer. With his express permission, Mr. Wise's medical records are all available at this link: http://bit.ly/3P3gFSg.

Mr. Wise pled guilty to Counts One and Four, pursuant to a plea agreement. Ex. D. That agreement expressly protects his "right to challenge whether, as a matter of law, Counts One and Four are grouped together as a single group pursuant to U.S.S.G. § 3D1.2(d), as found in the PSR. *See* PSR ¶¶ 10, 14-32. They do not.

Section 3D1.2 requires that "All counts involving substantially the same harm shall be grouped together into a single Group." "Counts involve substantially the same harm within the meaning of this rule: (a) when counts involve the same victim and the same act or transaction; (b) when counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan; (c) when one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts; or (d) when the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." *Id*. The Commission has explained that a "primary consideration" under these rules is "whether the offenses involve different victims." USSG § 3D1.2, cmt. Counts "involving injury to distinct victims…should be treated separately rather than grouped." USSG § 3D1.2, cmt.

No subsection is applicable here. Count One, Making and Possessing a Destructive Device, caused harm to the drug dealer and his van on November 4, 2022. Count Four, Felon in Possession of a Firearm, caused harm to society on December 2, 2022. The crimes involved different victims, different transactions, and different harms. They do not group as a matter of law.

The PSR takes the position that U.S.S.G. § 3D1.2(d) applies, "as the offense level is determined on the aggregate hard created, as both offenses involved firearms." PSR ¶ 10. Accordingly, the PSR follows Section 3D1.2's directive that offenses covered by Guideline 2K2.1, as both Counts One and Four are, "are to be grouped." This overly technical reading of the guidelines is mistaken, as it flows from the false initial premise that Counts One and Four "involv[e] substantially the same harm." *Id*. That reading has been rejected by numerous circuit courts, generally at the insistence of the government. Here in the Eastern District, too, the government and Probation have taken the exact opposite position in a nearly identical case.

In *United States v. Mizrahi*, 22-CR-504 (DLI), the defendant threw a pipe bomb in the street. After securing a search warrant for his home, law enforcement later found ammunition on

a shelf in his basement. *See* 22-CR-504 (DLI), ECF No. 1. *Mizrahi* presents the exact same grouping question as here: do the exploded pipe bomb and the later-recovered ammunition amount to an aggregate harm, or are they not substantially the same harm? The government argued against grouping: "The possession of ammunition and possession of an explosive device should not be grouped together under U.S.S.G. § 3D1.2. The ammunition and explosive device materials have no connection to each other outside of both being in the possession of the defendant." 22-CR-504 (DLI), ECF No. 51 at 1. The government maintained, "They do not have the same harm as previously described – the harm from an explosion is vastly different than that from being shot with ammunition or mere possession of ammunition." *Id*. at 2. "The ammunition and explosive material have no relation to each other; and simple simultaneous possession of them does not change that analysis. Furthermore, these acts do not reflect the same societal harm because the possession of explosive materials is usually linked to acts of terrorism while the possession of ammunition is a danger to the community that need not be linked to such acts." *Id*.

In *Mizrahi*, Probation agreed with the government: "In this case, the two acts and events were committed separate and apart from each other and are not distinctly related as part of the same common scheme or plan…the possession of both ammunition and an explosive does not constitute a relationship between two. Therefore, these counts are not grouped." Ex. E (Mizrahi PSR Addendum)[1]. So too, here.

The issue of whether 3D1.2(d) offenses that "are to be grouped" must be grouped, when the offenses produced different harms, is the subject of a circuit split. As the government noted in *Mizrahi*, "there is no Second Circuit precedent directly on point for this analysis." 22-CR-504 (DLI), ECF No. 51 at 2. The First, Fifth, Tenth, and Eleventh Circuits have all squarely held that "[G]rouping is not mandatory or automatic simply because a defendant is charged with an offense that falls under a guideline listed in § 3D1.2(d)." *See United States v. Quevedo-Moncada*, No. 23-50029 (9th Cir. 2024), 2024 WL 3082530, (Fitzwater, D.J., concurring) ("Several other circuits, however, would appear to permit what the district judge did here. *See, e.g., United States v. Vasco*, 564 F.3d 12, 23 (1st Cir. 2009) (citations omitted) ("Crimes involving multiple victims, even if the offenses arose out of a single event, are properly grouped separately."); *United States v. Jose-Gonzalez*, 291 F.3d 697, 707 (10th Cir. 2002) ("When ... the gist of the offense is injury to persons, the offense against each human victim belongs in a different group, even when the offenses arose out of a single event."); *see also United States v. Doxie*, 813 F.3d 1340, 1344-45 (11th Cir. 2016) (per curiam) (citations and internal quotation marks omitted) ("It is well-settled in this Circuit ... that the mere listing of ... offenses as types that are to be grouped does not automatically necessitate grouping [under § 3D1.2(d)]," because "the automatic grouping of offenses listed in the first category can detract from the purpose of section 3D1.2—to combine offenses involving *closely related* counts."); *United States v. Goncalves*, 613 F.3d 601, 605-06 (5th Cir. 2010) (per curiam) (citation omitted) ("[G]rouping is not mandatory or automatic simply because a defendant is charged with an offense that falls under a guideline listed in § 3D1.2(d).")).

---

[1] We respectfully request to file Exhibit E under seal, as it is part of another defendant's presentence investigation report and contains that defendant's personal and confidential information.

In *Quevedo-Moncada*, the United States argued (unsuccessfully in the Ninth Circuit) just as the United States argued here in *Mizrahi*: that both crimes' guidelines appearing on the 3D1.2(d) list of offenses that "are too be grouped" is an "overly simplistic position." *United States v. Quevedo-Moncada*, No. 23-50029, (9th Cir.), ECF No. 25 (Government's Answering Brief) at 17. In *Doxie*, the Eleventh Circuit held that the district court properly did not group that defendant's tax and fraud offenses, despite both being covered by guidelines on the 3D1.2(d) list. 813 F.3d at 1347 (11th Cir. 2016). The Court found that the fraud and tax crimes were not "closely related" on their facts: the crimes involved "not just different victims, but different behavior." *Id*. In *Vasco*, the First Circuit held that murder-for-hire and an interstate threat against two different people do not group, because they impacted different victims. 564 F.3d at 23 (1st Cir. 2009). In *Jose-Gonzalez*, the Tenth Circuit held that despite both crimes appearing on the 3D1.2(d) list of offenses that "are to be grouped," these "grouping rules…may not be mandatory in a case like this. One must look not only to the rules themselves, but also to the explanation behind them, because the Guidelines permit, even encourage, departure when the rationale behind a rule does not apply." 291 F.3d at 706-707 (10th Cir. 2002). There, as here, the defendant committed offenses with distinct victims and harms: transporting unlawful aliens within the United States, which "represents the threat to societal interests in protecting our borders," and causing the death of each individual immigrant, causing harm to each of them. *Id*. Finally, in *Goncalves*, the Fifth Circuit held that two offenses—passing counterfeit notes and using a falsely altered military discharge certificate—were properly not grouped, despite both being governed by guidelines on the 3D1.2(d) list. 613 F.3d at 601 (5th Cir. 2010). "The crimes involve different schemes, different objectives, and different victims, and they took place at different times. They are thus not of 'the same general type.'" *Id*. (internal citations omitted).

This Court should side with the First, Fifth, Tenth, and Eleventh Circuits. When Mr. Wise threw a Molotov cocktail at his drug dealer's van on November 4, 2022 (Count One), his actions were targeted at that individual victim arising out of a one-on-one dispute. That person's van was set on fire, just as Mr. Wise was his individual victim when the dealer shot him in the shoulder. When Mr. Wise, a month later, was stopped by the police and had a gun in his truck, there was no individual victim. The government does not claim any connection between the Molotov cocktail and the firearm. That both happen to be governed by 2K2.1 is "overly simplistic" and "do not reflect the same societal harm"—the arguments of the United States in parallel cases. The government and Probation's opposite positions here and in *Mizrahi* do not withstand inspection, and are troubling. As the Second Circuit has not taken a position in this circuit split, and because of the importance of correctly calculating Mr. Wise's guidelines range, this Court should afford Mr. Wise the benefit of the rule of lenity. *United States v. Simpson*, 319 F.3d 81 (2d Cir. 2002) (applying the rule of lenity to sentencings guidelines that are ambiguous).

The importance of this technical quirk of the guidelines cannot be overstated. If the counts group, as the government[2] and the PSR allege, Mr. Wise's guidelines are 135-168 months.

---

[2] Notably, the government initially made a series of offers to Mr. Wise that agreed with his position that the counts do not group, before changing course. The government's promise to advocate for a sentence of not more than 105 months, Ex. D at ¶ 5(b), results from a prior offer made by the government to Mr. Wise when the government took the position that the counts do not group.

PSR ¶ 117, Probation Sent. Rec. If the counts do not group, Mr. Wise's guidelines are 63-78 months, or less than half, accounting for up to eight additional years of incarceration. The vast disparity in the way the same two admitted crimes calculate out depending on a purely legal calculation quesrion illustrates the irrationality of strict adherence to the advisory guidelines in a case like this, which this Court is empowered to fully reject. *E.g.*, *Rita v. United States*, 551 U.S. 338, 351 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). Additionally, judges are free to deviate from the Guidelines based on policy disagreements. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) ("As a general matter, 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."). Beyond considerations of the particular defendant, the Court may in fact consider whether the Guidelines applicable to a case "properly reflect § 3553 considerations," may reach the "merits of such a claim," may act on such concerns, and determine, as a general matter, that "the Guidelines reflect an unsound judgment." *Rita*, 551 U.S. at 351-7 (2007).

Accordingly, because the counts do not properly group, Mr. Wise is subject to the following guidelines calculation:

<u>Count One: Making and Possessing a Destructive Device (November 4, 2022)</u>

| | |
|---|---|
| Base Offense Level: | 20 |
| Plus: Offense Involved a Destructive Device | +2 |
| <u>Plus: Device Used in Connection with Another Felony Offense</u> | <u>+4</u> |
| | 26 |

<u>Count Four: Felon in Possession of a Firearm (December 2, 2022)</u>

| | |
|---|---|
| Base Offense Level: | 14 |
| Plus: Obliterated Serial Number | +4 |
| <u>Plus: Recklessly Creating Substantial Risk of Serious Bodily Injury During Flight</u> | <u>+2</u> |
| | 20 |

<u>Multiple Count Analysis (§3D1.4)</u>
Highest Adjusted Offense Level:        26

| | Level | Units |
|---|---|---|
| Group One (Count 1): | 26 | 1 |
| Group Two (Count 4): | 20 | 0.5 |
| Total units: | | 1.5 |

| | |
|---|---|
| Total Adjusted Offense Level: | 27 |
| <u>Less: Timely Acceptance of Responsibility</u> | <u>-3</u> |
| | 24 |

Criminal History Category III:              Guidelines range of 63-78 months.

## III.  Mr. Wise Developed Lung Cancer While Incarcerated at MDC Brooklyn, and Suffered Materially from His Delayed Diagnosis and Care There, Warranting a Significant Downward Variance

While at the MDC, Mr. Wise developed lung cancer. Despite his efforts to advocate for himself, his condition went undiagnosed and untreated for a significant period of time, materially impacting his health, his course of treatment, and his likelihood of surviving the next five years, let alone a lengthier sentence. This Court should consider both the ordeal Mr. Wise has suffered, as well as the MDC's significant contribution to that harm, in fashioning an appropriate sentence.

On May 1, 2024, undersigned counsel filed the first of many letters in this Court seeking emergency medical attention for Mr. Wise. ECF No. 24. On November 9, 2023, Dr. Awd at MDC Brooklyn reviewed Mr. Wise's chest x-ray, finding a calcified nodule. *Id*. at 13. He ordered a lung CT scan with a scheduled target date of December 28, 2023. *Id*. That date came and went. On January 26, 2024, Mr. Wise was taken not for the scheduled lung CT scan, but for an unrelated kidney ultrasound. *Id*. Finally, on February 29, 2024, two months after the scheduled target date, Mr. Wise was taken for the lung CT scan, which revealed a 3.6cm x 2.3cm x 3.6cm partially spiculated mass in the right lung. *Id*. Mr. Wise was not told of this mass, and received no medical treatment. *Id.* On March 12, 2024, Mr. Wise wrote to medical asking for the results of his test, receiving no response. *Id*. On March 13, 2024, Federal Defenders filed a subpoena, *Touhy* request, and HIPAA release for Mr. Wise's medical records, receiving no response. *Id.* On April 11, 2024, unaware of the mass on his lungs, Mr. Wise wrote to MDC medical that he was coughing up blood, receiving no response. *Id*. He wrote additional urgent requests, including that he is still coughing up blood and still awaiting his test results, on April 17 and 22, 2024, receiving no response. *Id*. On April 24, 2024, undersigned counsel visited Mr. Wise in preparation for his upcoming PSI, learned of the four unanswered sick calls, and sought immediate medical attention, receiving no response. *Id*. Finally, on April 26, 2024, Mr. Wise saw a nurse practitioner, who advised him for the first time of the mass on his chest, and diagnosed it, baselessly, as benign. *Id*. On April 29, 2024, Mr. Wise appeared for his PSI and reported the mass to undersigned counsel and probation, who again sought urgent medical attention. *Id*. When he returned to the MDC, he was taken to the emergency room at Brooklyn Hospital Center. *Id*. There, he learned that in the two months since his lung CT scan, the mass had increased in size from 3.6cm to 6cm. *Id*.

When ordered by Judge Henry to explain what went wrong, the government filed ECF No. 26, quoting from the MDC: "On February 29, 2024, Mr. Wise went out to the Brooklyn Hospital Center (TBHC) for a CT scan because of a 7-mm calcified nodule in the right lung. MDC Brooklyn did not receive the results until March 11, 2024. The CT scan shows a 3.6 x 2.3 x 3.6 cm mass. The results were somehow missed by the health services department, and the delay was unfortunate." The government and the MDC provided no explanation for the delay between the December 28, 2023 target date and the February 29, 2024 test date, the unanswered urgent calls about coughing up blood, or Mr. Wise or counsel's requests and demands for his records and results. *See* ECF Nos. 24-31.

Mr. Wise remained at Brooklyn Hospital undergoing tests from April 29, 2024 until May 20, 2024, when he was transferred to Maimonides Medical Center. On May 15, 2024, Memorial

Sloan Kettering Cancer Center reviewed the biopsy taken by Brooklyn Hospital and diagnosed him with non-small cell carcinoma, favored to be adenocarcinoma, or lung cancer, in the right lung. He was transferred to Maimonides, which confirmed the diagnosis, and determined that his initial stage was IIB, for a lung mass between 5-7cm, with lymph nodes negative for cancer and no distant metastases. He was given a lengthy course of chemotherapy and radiation. Then, on September 24, 2024, he underwent a right upper lobectomy and lymph node dissection. That painful, invasive procedure revealed that cancer had indeed spread to his lymph node, rendering his actual stage IIIA. In October 2024, after the pathology returned, Mr. Wise began a one-year course of immunotherapy (18 cycles, given once every three weeks). Ex. F. He has received the first three of the eighteen cycles at the time of this writing.

Mr. Wise remained in the hospital, shackled to the bed, twenty-four hours a day, for many months following his eventual, delayed, April 29, 2024 admission. He was so shackled at Brooklyn Hospital, and then at Maimonides Medical Center, at Windsor Nursing Home and at CareWell Nursing Home. The conditions at the nursing homes were so abysmal that Mr. Wise eventually agreed to return to MDC Brooklyn, despite its notorious failings, between his cancer treatments. He then travelled back and forth from the MDC and its incessant lockdowns and violence and his chemotherapy and radiation, severely risking his health. He was admitted back into Maimonides on September 24, 2024 for his lobectomy, and remained there (again shackled to the bed) for approximately one month, followed by another stay (shackled to the bed) at CareWell. In late October, he returned to MDC Brooklyn, where he has experienced myriad side effects and resulting issues from his cancer treatment and surgery, such as having to be rushed to medical when he could not breathe due to another inmate in a nearby cell being pepper-sprayed. It goes without saying that his current conditions, from which he departs and returns every three weeks for immunotherapy, are not remotely conducive to healing.

Dr. Philip Hoffman is a physician specializing in hematology and medical oncology, specific to lung cancer, who has been on the full-time faculty of the University of Chicago for more than forty years. Ex. A. Dr. Hoffman has reviewed Mr. Wise's medical records "in an effort to determine if his cancer might have been identified earlier; and if so, to offer an opinion on how his stage of cancer, the treatment recommended, and prognosis might have differed." *Id.* at 1. Dr. Hoffman concluded that:

> "[D]espite Mr. Wise's efforts to advocate for his own health, i.e., multiple requests for his scan results and for medical visits, there was a major delay in arriving at his diagnosis—from the end of February 2024 until May 2024. This led to progression of his cancer stage from IB to IIIA. In addition, while he might have required chemotherapy as part of his treatment with either stage, he would not have required 6 weeks of concomitant radiation therapy if he had been diagnosed at the earlier stage. Moreover, had the 2/29/24 CT been obtained either shortly after it was ordered on 11/9/23, or even on its target date of 12/28/23, it is entirely possible that the tumor would have been between 2 cm and 3 cm, making his stage T1cN0M0, stage IA3, with an expected 5-year survival of 80% with surgery alone. Thus, the delays in responding to Mr. Wise's complaints and in obtaining appropriate studies led to advancement of his lung cancer, the need for additional therapy and a

reduction in his life expectancy. I hold all of these opinions to a reasonable degree of medical probability."

Ex. A at 3-4.

The expected five-year survival for patients with stage IIIA lung cancer, like Mr. Wise, following the course of treatment that he received, is 41%. *Id*. The one-year course of immunotherapy that he is currently receiving may increase that likelihood by 5-15%. *Id*. That is a significant "may"—if Mr. Wise is designated to a Bureau of Prisons facility out-of-range from his cancer doctors at MDC Brooklyn, there is no reason to believe that he will receive the timely completion of his course of this treatment, even at a Federal Medical Center. Further, the 41% likelihood of survival refers to an average across a large database. Prior to his lung cancer, Mr. Wise had suffered a lifetime of physical and mental health challenges, including being shot and stabbed multiple times, high blood pressure, borderline diabetes, and high cholesterol. PSR ¶¶ 74-96. Notably, he underwent major surgery on his left lung in 1996, after it collapsed and bled internally, and he was placed into a medically induced coma, after being shot. That is Mr. Wise's remaining lung. His prognosis is, in a word, grim.

## IV.    Mr. Wise's Conditions of Confinement at MDC Brooklyn Warrant a Downward Variance

Mr. Wise's medical ordeal reflects the intolerable and insufficient medical care at MDC Brooklyn. He is not alone. Numerous judges in this district have recently documented severe medical neglect at MDC Brooklyn, in addition to Mr. Wise's case. *See, e.g.*, Dec. 15, 2023 Hr'g Tr. at 3-6, 15, *United States v. Young*, 23-CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023) (admonishing the MDC for repeatedly defying orders to transfer wheelchair-bound defendant with active MRSA infection to a medical facility); *United States v. Pickett*, 22-CR-486 (NRM), Dkt. Entry Sept. 16, 2024 (having ordered the government to investigate months of non-responded-to requests for medical treatment by another inmate who turned out to have cancer, Judge Morrison held that "neither the government nor the representatives from the Bureau of Prisons satisfactorily explained to the Court why the Bureau of Prisons repeatedly failed to treat defendant's complaints of excruciating pain, nor why he did not have access to medical providers who could competently assess and diagnose the cancerous growth in his leg until he was hospitalized in August 2024.").

Improper medical care at MDC Brooklyn only compounds the other poor conditions of confinement he's experienced there. Mr. Wise is the first to admit that he is rightly being punished for his crime. But the conditions of confinement he has endured have been far more punishing than we have come to expect from the federal criminal justice system. They have taken a toll on him, on his mental health and physical safety, and on his ability to meaningfully rehabilitate, that is not justified by his offense conduct. MDC Brooklyn's problems are numerous; by now, they are well-known and beyond dispute. The facility is gravely understaffed, leading to persistent lockdowns. Violence has become commonplace, with two recent inmate murders during Mr. Wise's incarceration. Staff corruption brings a regular supply of contraband, including cellular phones and drugs, into the units, increasing rates of discipline and contributing

to violent conflict. As a result of the conditions, which are outside his control, Mr. Wise has effectively served much of his pretrial detention in unwarranted SHU-like conditions.

"For years, the conditions in the federal jails that serve…the Eastern District of New York have been a major, growing, and widely understood problem." *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024). "Defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care." *Id*. "It has gotten to the point that it is routine for judges in both [the Southern] District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable." *Id*.

Prior to the pandemic, inmates who did not present disciplinary problems, such as Mr. Wise, were permitted outside of their cells for the vast majority of the day—typically from 6:00am until the 4:00pm count, and then again from 4:30pm until 9:00pm. During that time, inmates could attend rehabilitative programming, engage in recreation, go to the law library to conduct legal research or review their discovery on computers, call their families, and so on. That all ended with the pandemic, and conditions have remained "modified," in MDC-parlance, for the ensuing four-plus years, including the entirety of the time Mr. Wise has been incarcerated pretrial. Now, the MDC is routinely "locked down" for extended periods of time, during which inmates are all regularly confined to their 7.5 square meter double-bunked cells from 22 to 24 hours a day.

As is now well known, MDC Brooklyn has attributed these substandard conditions and challenges to staffing shortages. *See* Ex. G. "On a daily basis"—according to the officers themselves—"housing units at MDC Brooklyn are left vacated (unmanned by staff) and locked down." *Id*. at 1. The officers consider the conditions "inhumane to both staff and inmates." *Id*. at 2. "The agency as a whole has failed to assist MDC Brooklyn with the staffing crisis, hence allowing MDC Brooklyn to fail." *Id*. According to the government, as of November 2023, only 200 of 301 "authorized, non-supervisory correctional officer positions" at the MDC were filled and, of those 200 officers, thirty-four were either on extended leave or about to be transferred. Letter from the Government at 1-2, *Chavez*, 22-CR-303 (JMF) (S.D.N.Y Dec. 6, 2024), ECF No. 28. As Judge Furman calculated, this means that the MDC has been operating at only about 55% of its full CO staffing level, a historically low percentage. *Chavez*, 2024 WL 50233, at *7. Lockdowns—effectively, solitary confinement—have become MDC's solution to every institutional problem, be it staffing shortages, searches for contraband (brought in by staff), or inmate violence (uncontrolled by staff). Inmates like Mr. Wise are not exempt from these lockdowns, regardless of their good conduct. During lockdowns, family visits and calls cease without advance warning, or an end in sight; cold meals are delivered to cells, often well outside meal times; recreation and programming are wholly non-existent.

These lockdowns have persisted during Mr. Wise's incarceration. To describe just a few, in December 2023, the MDC ordered a lockdown after an inmate (not Mr. Wise, of course) assaulted a staff member. *See* Dec. 2023 Mem. for Inmate Population from Captain Rodriguez, *United States v. Zeitlin*, 23-CR-419 (LAK) (S.D.N.Y. Jan 2. 2024), ECF No. 58-1. Inmates received a memo, *id.*, confirming a full lockdown for the entire facility—in the cell twenty-four

hours a day, no calls, no visits—"until further notice," which continued for two straight weeks, including Christmas. The facility then softened the lockdown to permit a mere two hours a day out of the cell; this lasted for two days until another assault led to another full lockdown, until January 4, 2024. Detainees housed at the MDC during the same stretch as Mr. Wise have tracked the time, *e.g.*, one defendant who kept a log of these lockdowns reported that he had been "locked down for 137 of [the] 245 days" he was detained there. Def.'s Sentencing Mem. at 7, *United States v. Jacobs*, 23-CR-413 (VB) (S.D.N.Y. Nov. 7, 2023), ECF No. 25. Lawyers in this office routinely receive emails announcing same-day and multi-day lockdowns, including from legal visits, or are advised of same upon arriving at the facility, including during Mr. Wise's imprisonment on January 25, 2024; February 20-21, 2024; March 7, 2024; March 26-27, 2024; May 21-22, 2024; and June 7, 2024. Yet another memo from the captain announced a full lockdown, again "until further notice," on July 17, 2024, following what he called "an inmate death." *See* Ex. H.

"Chaos reigns, along with uncontrolled violence." *United States v. Colucci*, 23-CR-417, 2024 WL 3643857, at *4 (E.D.N.Y. Aug. 5, 2024) (*citing United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024)). Throughout the facility, violence has risen, fortunately escaping Mr. Wise, but naturally leaving him traumatized and afraid. On June 23, 2023, during Mr. Wise's incarceration, the Corrections Officer Union President warned the BOP, and the public, "The Local is trying to prevent loss of life and or serious physical harm to staff." Ex. G. "What are you waiting for, another loss of inmate life?" *Id*. She was unfortunately prescient. The July 2024 "inmate death" cited by Captain Rodriguez was in fact an inmate murder, the second this summer. In *Colucci*, Judge Brown reviewed incidents of violence at the MDC during the spring and summer of 2024—all while Mr. Wise has been incarcerated there, between cancer treatments:

> Each of the five months preceding this [August 2024] opinion was marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim. One knife attack was captured on a surveillance video producing images that are horrifying beyond words. The activities precipitating these attacks are nearly as unthinkable and terrifying as the ensuing injuries: drug debt collection, fights over illegal narcotics, resisting an organized gang robbery, internecine gang disputes and as yet-unidentified "brawls."

*Colucci*, 2024 WL 3643857 at *5. In March 2024, an inmate was stabbed repeatedly in both arms, his abdomen, and his knee. *Id*. He received no medical care, but rather was placed in the SHU for 25 days. *Id*. In April 2024, an inmate was stabbed 44 times on his back, chest, abdomen, right arm, and leg. *United States v. Rivas*, 18-CR-398 (RPK), ECF No. 363. The attack was captured on video and released to the press. *Id*., *see* John Annise, *See it: Video From Inside Troubled Brooklyn Federal Jail Shows Brutal Gang Statbbing*, New York Daily News (July 27, 2024), *at* https://www.nydailynews.com/2024/07/27/see-it-video-from-inside-troubled-brooklyn-federal-jail-mdc-shows-brutal-gang-stabbing/. In May 2024, Christian Griffin alerted a corrections officer that he was in danger, and asked to be transferred to a different unit. *Griffin*, 2024 WL 2891686, at *1. The officer did nothing, and three inmates assaulted him, fracturing his orbital bone. *Id*. at *2. Doctors at the hospital recommended follow-up care, and possibly

surgery; the MDC provided no medical care. *Id*. In June 2024, Uriel Whyte was murdered on his unit, fatally stabbed, reportedly over a within-MDC drug dispute. *Colucci*, 2024 WL 3643857 at \*5. Just six weeks later, on July 17, 2024, Edwin Cordero was murdered, too. *Id*. at \*6, *see* Lola Fadulu, *Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail*, The New York Times (July 17, 2024), *at* https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html. The facility remained locked down for nearly two months.

Incessant lockdowns and the ever-present risk of violence are compounded by other systems failures. The facility is notorious for substandard facilities, ranging from the 2019 blackout and power outage that left inmates without light or heat for a week, to the MDC's spring 2024 admission of weevils or maggots in the food served to inmates. *See* Annie Correal and Joseph Goldstein, *'It's Cold as Hell': Inside a Brooklyn Jail's Weeklong Collapse*, The New York Times (Feb. 9, 2019), *at* https://www.nytimes.com/2019/02/01/nyregion/mdc-brooklyn-jail-heat.html; John Annise, *Maggot-Infested Meals Being Served to Inmates at Brooklyn Federal Jail, Lawyers Say*, New York Daily News (Mar. 30, 2024), *at* https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-inmates-at-brooklyn-federal-jail-lawyers-say/. Visitation policies are ever-changing and arbitrary, depriving defendants of their lifelines outside the facility.

In sum, time served at MDC Brooklyn is "materially different than [time] served at a jail or prison elsewhere in the United States." *Colucci*, 2024 WL 3643857, at \*7. While no mathematical formula can equate endless lockdown and threat of violence, or even death, with an appropriate multiplier, Mr. Wise's qualitative experience shows that every day, week, and month he has served is significantly more challenging, less rehabilitative, and more severely punishing than we can or should reasonably expect from the federal prison system. It is sufficient to meet the goals of sentencing here.

## III. Careful Consideration of the § 3553(a) Factors Warrant a Significant Downward Variance from Even the Correct Guidelines Calculation, to Time Served

Mr. Wise's history of significant trauma, Ex. B., the delayed diagnosis and treatment of his lung cancer, and his conditions of pretrial confinement combine to render additional years of imprisonment unnecessary to meet the goals of sentencing. Mr. Wise has been incarcerated for 25 months. Properly calculated, his guidelines range is 63-78 months. *See* Part II, *ante*. Prior to his cancer diagnosis, treatment, and surgery, the government agreed to seek no more than 105 months, and Probation recommended the bottom his guidelines range, calculated by them, incorrectly as we maintain, at 135 months. Mr. Wise's circumstances since his PSI in April have materially changed. Given the stark drop in his life expectancy, we urge the Court to apply a significant downward variance, and to seriously consider a time-served sentence to be followed by a period of supervised release. In the alternative, we request a sentence of no more than 36 months, and that he remain incarcerated locally until the conclusion of his ongoing cancer treatment at Maimonides Medical Center, which is expected in October 2025.

Mr. Wise is an ideal candidate for Judge Levy and Judge Chen's Eastern District of New York's STAR court, which provides intensive support for re-entering defendants struggling with mental illness and substance abuse. Defendants in STAR court agree to be supervised much more

closely than defendants on traditional supervised release. They are monitored by specially trained probation officers who have expertise in mental illness and substance abuse. And they attend regular court hearings with Judges Levy and Chen to hold them accountable throughout their period of supervised release.

It is axiomatic that "[i]mprisonment is not the only way we punish." *United States v. Zimmerman*, 2012 WL 3779387 (E.D.N.Y. 2012) (*citing Gall v. United States*, 552 U.S. at 48–49 (2007)). In Mr. Wise's case, prior periods of incarceration have begat additional incarceration. Mr. Wise clearly requires something different in order to create lasting change: an intensive period of supervision, where he is both supported and closely monitored. Mr. Wise is eager to embrace the structure and support that United States Probation will provide while on supervised release. If released, Mr. Wise intends to live with his daughter, who is in close proximity to his oncology team at Maimonides. With job-seeking and treatment supports that Probation is well-equipped to provide, he can find a path to staying sober and becoming the productive member of society he had a taste of in the late 2010s. He understands the value of therapy and hopes to finally reckon with the pain that has led him to recidivate.

Older now, with a deeply uncertain future on account of his lung cancer and potentially long remaining term of incarceration, Mr. Wise knows it is past time to grow up. He is considerate, thoughtful, and reasonable. He knows that he needs support—tangible and emotional—in order to truly leave his past behind him. During his PSI, he requested that mental health counseling and substance abuse treatment be conditions of his release. Within the constraints of the MDC, he has maintained regular communication with his family. He has earned several certificates from what limited programming opportunities exist. Ex. I. He knows that given his medical fragility, if he returns to life as a drug addict on the streets, he will die. He is determined to outlive his prognosis.

Given Mr. Wise's specific personal history, medical condition and delayed care, and the risks to his life and health of additional incarceration, we respectfully submit that his is the rare case justifying a significant variance well outside of the guidelines system. A time-served sentence, to be followed by intensive supervised release and participation in STAR court, is sufficient but not greater than necessary here.

Thank you for your consideration.

Respectfully submitted,

/s/

Mia Eisner-Grynberg, Esq.
Deputy Attorney-in-Charge
Eastern District of New York
(718) 330-1257

cc:     AUSA Andrew Roddin (by email and ECF)
        United States Probation Officer Nicole Gervase (by email)
        Terrence Wise (by mail)

# **EXHIBIT A**

November 25, 2024

Mia Eisner-Grynberg, J.D.
Deputy Attorney-in-Charge
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201

RE: Terrence Wise, DOB 7/5/1969

Dear Ms. Eisner-Grynberg:

I am a physician specializing in hematology and medical oncology, and have been on the full time faculty of the University of Chicago for more than 40 years. As is the case in most academic centers, physicians focus in one or two areas of our very broad field. The longstanding focus of my clinical and educational efforts has been lung cancer, and most of my clinical research efforts have also been in lung cancer treatment. I currently hold the position of Clinical Professor of Medicine in the Section of Hematology/Oncology.

At your request, I have reviewed the medical records provided of Terrence Wise. Mr. Wise was diagnosed with non-small cell lung cancer, clinical stage IIB in May 2024, and began treatment with combined chemotherapy and radiation therapy, in anticipation of surgery to follow that induction course. You asked me to review his medical records from the Metropolitan Detention Center-Brooklyn, and those from Maimonides Medical Center, in an effort to determine if his cancer might have been identified earlier; and if so, to offer an opinion on how his stage of cancer, the treatment recommended and prognosis might have differed.

Mr. Wise reportedly had a chest x-ray in 1/2023 that showed a 7 mm nodule in the R lung (per MDC clinic note 11/7/2023), obtained in relation to a positive tuberculin skin test. In response, another x-ray was ordered for 11/8/2023, which redemonstrated a nodule that was stable compared with 1/2023. Dr. Awd ordered a non-contrast chest CT to investigate this further, with a "target date" of 12/28/2023 for it to be done. For some reason, the CT was not performed until 2/29/24 (even though an unrelated kidney ultrasound was performed at the same facility on 1/26/2024). The CT of 2/29/24 showed a mass measuring 3.6 x 2.3 x 3.6 cm in the right upper lobe and paratracheal area. Dr. Bialor signed that he reviewed this report on 3/18/24, nearly 3 weeks later.

Meanwhile, Mr. Wise sent an internal note to Sick Call on 3/12/24 requesting to know the result of the scan. Then on 4/11/24, again on 4/17/24, and again on 4/22/24, he sent messages to Sick Call indicating that he was coughing up blood and had some pain in the left chest, and he was requesting to be seen. Eventually, on 4/26/24, he was seen by B. Timothy, ANP-C. Her note indicates that Mr. Wise denied having cough, shortness of breath or chest pain. She noted the impression of the 2/29/24 CT reading, entered an erroneous visit diagnosis of D14.30 ("benign

neoplasm of …lung"), and advised usual follow-up for his other chronic problems. Dr. Awd cosigned that visit note on 4/29/24, but appropriately requested referral to pulmonology with a short target date of 5/3/24, for bronchoscopy and biopsy ASAP. The same day, Dr. Bialor requested an urgent referral to the emergency department because of hemoptysis (coughing blood) and the CT findings. He reiterated Dr. Awd's request to schedule bronchoscopy ASAP.

At the Brooklyn Hospital, where Mr. Wise was admitted first, another CT scan reportedly showed the right lung tumor now measuring 6.0 x 3.5 x 4.5 cm. At Maimonides Hospital, a CT on 5/20/24 stated the mass to be 4.8 cm; a PET scan on 6/4/24 measured it as 5.4 x 4.2 x 3.8 cm. Lymph nodes were not enlarged on CT, nor FDG-avid on the PET scan, and were negative at the time of bronchoscopy on 5/23/24. This led to assigning his stage as **T3** (because of size between 5 cm and 7 cm); **N0** (lymph nodes negative for cancer); **M0** (no evidence of distant metastases); **Stage IIB.** A needle biopsy of the lung mass demonstrated adenocarcinoma, the most common histologic type of lung cancer.

The clinicians caring for Mr. Wise were concerned that his tumor was behaving like a superior sulcus tumor, wherein the tumor extends upward beyond the apex of the lung into the brachial plexus (the nerves that supply the arm), because at one point, Mr. Wise complained of occasional numbness and weakness of his right arm. Although the MRI scan of the shoulder did not demonstrate that extension, it was reasonable for the clinicians to manage him as someone with a superior sulcus tumor, with induction chemotherapy plus radiation therapy prior to planned surgery. Even if the superior sulcus assumption was incorrect, it was still very reasonable to treat at least with induction chemotherapy. That approach might make the tumor more amenable to successful surgery, and patients with stage IIB cancer are generally offered chemotherapy after surgery anyway, so giving it initially would have the same benefit against microscopic distant metastatic disease (the usual reason chemotherapy is given after surgery). The treatment plan was arrived at jointly with a medical oncologist, radiation oncologist and thoracic surgeon—this is the standard approach for new patients with lung cancer.

While one of the major potential benefits of combined chemotherapy and radiation is radiosensitization, i.e., a more pronounced effect of the radiation on the cancer owing to the presence of chemotherapy drugs in the patient's system during treatment, the normal surrounding tissues may also experience radiosensitization, leading to more side effects of the combination. Specifically, there is usually more fatigue, more temporary effects on the blood counts, and temporary difficulty and pain with swallowing (since the esophagus inevitably gets some radiation effect when treating the central chest). Radiation pneumonitis (inflammation of the lung due to radiation) may also occur, which sometimes can cause serious respiratory difficulty. Late effects of radiation to the chest may include adverse effects on the heart and surrounding pericardium, and scarring of the portion of the lungs that the treatment targeted.

After the chemotherapy and radiation, Mr. Wise underwent a right upper lobectomy and lymph node dissection on 9/24/2024. Pathology demonstrated residual adenocarcinoma measuring 0.1 cm in a tumor bed of 3.5 cm; negative resection margins; one peribronchial lymph

node was involved with tumor, including extranodal extension. All other sampled lymph nodes were negative. The final pathologic stage was **ypT1aN1** ("y" indicating the staging was subsequent to the induction chemotherapy and radiation therapy; "p" indicating pathologic stage; T1a indicating a residual tumor less than 1 cm in size; N1 indicating involvement of a peribronchial node).

In view of the positive lymph node found at surgery, I must assume that the peribronchial lymph node was also involved prior to induction chemoradiation. Thus, in retrospect, his stage immediately prior to treatment was **T3** (tumor between 5 and 7 cm) **N1**, stage **IIIA**.

If the follow-up had been appropriately prompt after the first CT on 2/29/24, and the rest of the evaluation had been conducted during March, I believe Mr. Wise's stage would have been **T2a** (because of size between 3 cm and 4 cm) **N0** (lymph nodes negative for cancer) M0 (no evidence of distant metastases), Stage **IB**. Patients with stage IB cancer are generally offered surgery (usually a lobectomy, the same as he ultimately received), and the decision about adding chemotherapy after surgery is variable. If the tumor turns out to be more than 4 cm when examined by the pathologist, chemotherapy is generally offered. Radiation therapy would not be offered. If, at worst, in March 2024 he had the noted peribronchial lymph node involvement, his stage would have been **T2aN1**, stage **IIB**.

Based on a very large database of the International Association for the Study of Lung Cancer (IASLC), the expected 5-year survivals of patients with stage **IB**, **IIB** and **IIIA** lung cancer are **73%**, **56%**, and **41%**, respectively.

These 5-year survival data predate the widespread use of immune checkpoint inhibitors in the adjuvant setting for non-small cell lung cancer. Accordingly, it is very likely that Mr. Wise will be advised to undergo a year of adjuvant immunotherapy, which would be expected to improve his 5-year survival rate by 5-15%. The degree of improvement will vary, depending on the PD-L1 determination on his tumor (that report is probably pending). The recommendation for adjuvant immunotherapy would apply to patients with stage IIB and stage IIIA, so that the amount of expected increase in 5-year survival over the IASLC controls would be similar.

In my opinion, then, despite Mr. Wise's efforts to advocate for his own health, i.e., multiple requests for his scan results and for medical visits, there was a major delay in arriving at his diagnosis—from the end of February 2024 until May 2024. This led to progression of his cancer stage from IB to IIIA. In addition, while he might have required chemotherapy as part of his treatment with either stage, he would not have required 6 weeks of concomitant radiation therapy, if he had been diagnosed at the earlier stage. Moreover, had the 2/29/24 CT been obtained either shortly after it was ordered on 11/9/23, or even on its target date of 12/28/23, it is entirely possible that the tumor would have been between 2 cm and 3 cm, making his stage **T1cN0M0**, **stage IA3**, with an expected 5-year survival of 80% with surgery alone. Thus, the delays in responding to Mr. Wise's complaints and in obtaining appropriate studies led to

advancement of his lung cancer, the need for additional therapy and a reduction in his life expectancy.  I hold all of these opinions to a reasonable degree of medical probability.

Thank you for asking me to review this matter.

Sincerely,

Philip C. Hoffman, M.D.
Clinical Professor of Medicine
Section of Hematology/Oncology
University of Chicago

4

# **EXHIBIT B**

# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

---

Tamara L. Giwa
*Executive Director and
Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

December 19, 2024

Honorable Judge Diane Gujarati
United States District Court
Eastern District of New York
225 Cadman Plaza East
Courtroom 4B South
Brooklyn, New York 11201

Re:     *United States v. Terrence Wise*
        *Docket No. 1:23-cr-00009-DG*
        *Letter in Support of Sentencing*

> *"I haven't had my moment yet. I'm still waiting to have my moment."*
> *-Terrence Wise*

Dear Judge Gujarati,

Terrence Wise is a fighter. He fought to survive as a young child, raised in poverty by his grandmother after the untimely deaths of his parents. Terrence, who was introduced to drugs at the age of 13, has been at war with addiction and the tight grasp it has had on him, his family, and his community. He has battled the tug and pull of the streets, incarceration, and survived multiple near-death experiences.

Terrence has spent much of his life at odds with himself, fighting to be the man father he knows he is at his core and not simply the person everyone told him he would become; like his parents – both deceased due to drugs and violence. This case is an amalgamation of this internal struggle – his misguided and drug fueled attempts to do right by his community resulting in chaos, confusion, and fear. While many would assume that the fight ends here with this case, hitting the proverbial "rock bottom," this is the point in which the real battle for survival, "the fight of his life," truly begins.

Approximately 8 months ago, after much negligence and delay by the medical staff at the MDC, Terrence was diagnosed with cancer. Since then, he has undergone scans, biopsies, radiation, chemotherapy, and surgery. He will continue to undergo immunotherapy for at least the next 10 months. This past year has taken its toll – physically, mentally, and emotionally, but Terrence Wise is not just a fighter, he is <u>survivor.</u>

1

I.    <u>Getting to Know Terrence</u>

I am a Mitigation Social Worker at the Federal Defenders of New York. Over the course of the last 2 years, I have had the extraordinary privilege of getting to know Terrence Wise. I have visited with him, in person, nearly 30 times. Many of my visits have been bedside at the Brooklyn Hospital Center, Maimonides Hospital Center, Windsor Park Nursing Home, and Care Well Health Medical Center. In these settings, Terrence is shackled to a hospital bed, 24 hours a day/7 day a week, in 2-point restraints. He has done his best to try to keep his morale high. He requested books to read, built relationships with the parade of doctors and nurses, and cracked joked with the often-gruff security staff hired by the U.S. Marshall's to keep watch over him. Occasionally, when I would visit with him, the mood would heavy and he'd whisper to me, "Miss Allison, you know I ain't had my moment yet."

The first time I met Terrence, in-person, at the MDC, in January of 2023, I was struck his physical appearance. Terrence was tired in every sense of the word. He appeared much older than his stated age, was missing most of his teeth, his face sunken in, and weight low. He picked at his fingers when we talked, which I now know is a cue that he is feeling anxious. He assured me, on that first visit, that he wanted to work as a team and that he wanted my support.

Very early on, long before he fell ill, a theme appeared in our discussions about his life – mortality. Terrence remarked so many times that he was "lucky to be alive." He has openly shared his feelings of shame and remorse, as he has been trying to reconcile his actions with his morals and sense of self. He understands the seriousness of his behaviors which led to this conviction and has consistently shown sincere emotion when discussing the case and the harm he could have caused.  He had some low moments reflecting on his life, the choices he has made, the many people he lost (and missed) due to addiction, and his demanding (and often painful) cancer treatment. But feeling "lucky" also breeds gratitude, acceptance, and hopefulness. These characteristics are the pillars of his resilience since he was born.

II.    <u>Who is Terrence Wise? Parental loss, poverty, and a stolen childhood</u>

Born on July 5, 1969, Terrence was raised by his maternal grandmother, Bessie Wise in Brooklyn, New York. His life, like many others from his generation and community, has been greatly impacted by the presence of drugs and violence in the neighborhoods he was raised in. His father, Fred Banks, was murdered before he was born. Just two short years after his birth, his mother, Toni Wise, died of a drug overdose. Terrence has no memories of his mother and has always lived with this void. Sadly, Toni is one of several children his grandmother lost to substance use and overdose.

2

Terrence expressed feeling loved by his grandmother but recognizes that she was not always adequately able to care for him due to poverty, her age, the grief she was navigating having buried several children, and her own struggles with alcohol and painkillers. Terrence and Bessie lived in the East Flatbush area of Brooklyn until he was 13 years old. They relocated to East New York in the early 1980's at the beginning of the crack epidemic. His life has been mostly contained to this part of Brooklyn, as illustrated by the instant offense.



Upon moving to East New York, he lost his youth and innocence. He says that this change in environment introduced him to new people and experiences that undoubtedly impacted his life forever. Terrence explained that between the years of 13 and 16, he started selling drugs for older men in the neighborhood. Around this time, his best friend was shot and killed in front him, leaving with him lasting trauma. At 14, he started using the drugs he was selling, including crack. By the age of 16, he was using drugs so heavily that he considered himself a "full blown addict." He stopped attending school to support his grandmother and his habit.

[Image A. Terrence Wise in grade school]

Terrence does not romanticize his teenage years and the time he spent hustling in the street. He knows he grew up too quickly. He explained that he only envisioned 3 likely outcomes for his life: jail, a hospital, or the morgue. When we first started working together, he expressed to me that he truly considered himself lucky to be alive. Long before his cancer diagnosis, mortality was on his mind. Throughout his life course he has survived several near-death violent incidents including being badly beaten, shot at, shot, and stabbed multiple times on multiple occasions. Terrence reports that he was in a coma for approximately two months following a shooting in September 1996. He has been diagnosed with Post-Traumatic Stress Disorder.

For over 35 years, he has experienced the all-too-common intersections of mental health and substance use with the criminal legal system. His history of arrests, incarceration, challenges with community supervision, and hardships maintaining interpersonal relationships have all been triggered by his dependence on substances. Terrence has had stretches of sobriety and stints of stability. However, his relapses have resulted in a revolving door of incarceration, where the primary focus is not treatment.

III.    How did we get here? Cycles of chaos and calm

As previously described, Terrence's history of substance use is substantial. There is a generational cycle of addiction in his family. Terrence smoked marijuana for the first time when he was 13 and within 3 years, a pivotal time in his adolescence, he was smoking crack-cocaine regularly. He has been revived following several overdoses. His profound addiction to crack, diagnosis of Bipolar Disorder, PTSD, and decades of unaddressed trauma are direct contributing factors to his criminal history, including this case.

Medical records from Brookdale Hospital, which cover many visits and admissions between 2004 and 2022, illustrate this futile struggle. Terrence's history also includes suicidal ideation and self-harm. These records reflect that he knows when he needs to seek help and is not afraid to ask for it. On several occasions, he voluntarily sought emergency psychiatric care and entered short-term detox.

Terrence feels as though he has let many people down – his children, grandchildren, his grandmother's memory, the legacy of his parents, people in his community, and his most recent partner, Philease. From approximately 2015 – 2019, Terrence describes being in the "best place ever." Upon being released from a term of incarceration in 2015 (where he served his longest sentence to date), he worked extraordinarily hard to find and maintain work, sobriety, attend mental health treatment, and be in good standing with his parole officer. In 2017, he met Philease and fell in love.

Philease worked in the medical field and was financially stable. At the time they met she resided in Chicago but took a chance on him and relocated to New York City to be closer to Terrence while he completed his term of parole supervision. Terrence had built some stability on his own and when Philease entered his life, she contributed to his joy and comfort. Terrence surpassed milestones he had never really reached before so when he started to lose footing, the fall was steep, and the damage was immense.



[Image B. Terrence and Philease in 2018]

When he was with Philease he felt happy and safe. Terrence was managing his underlying mental health and substance use disorders, but he was still at risk to experience a mental health episode and relapse. On February 7, 2019, he was admitted to Brookdale Hospital, Philease at his side, begging for him to access treatment. He remained in the psychiatric

unit for 12 days. The systems that are currently in place do not have the infrastructure to ensure long-term mental health care. When a person is in crisis, the treatment is merely a band aid.

As the couple approached 2020, Terrence's declining mental state and relapses became too much for the couple to bear and the relationship ended. Shortly after, Covid-19 started to spread in New York leading to the shutdown. Between 2020 and 2022, Terrence fluctuated in his ability to manage his substance use and mental health. He had been seeing a therapist and psychiatrist at the Damian Family Health Center in Queens but stopped attending when he relapsed. To his credit, in 2020, he attempted long-term inpatient substance use treatment program for the first time *ever* at Serendipity in Brooklyn. On August 5, 2020, Terrence was admitted to Brookdale Hospital and underwent surgery after he experienced a medical emergency on-site, resulting in a loss of consciousness and a fall at Serendipity. He fractured his orbital bone.

IV.    Fentanyl enters his community

After leaving Serendipity, Terrence once again returned to East New York, the neighborhood where his drug use started. He had successfully completed his probation and was no longer being monitored. Covid had resulted in him losing his employment earlier on in the year, but he was able to adequately support himself with the Covid stimulus checks and unemployment that his daughter helped him apply for. Eventually, those benefits expired.

Terrence felt like he lost everything. Feeling hopeless, he returned to using drugs to temporarily numb his pain and the extreme stress of the pandemic, which was even more isolating given the end of his relationship with Philease (which he blames himself for). Things were bad during this time but became increasingly worse as people in his community started to overdose at staggering rates. He was both frightened for himself and angry that people were losing their lives. Terrence associated the increase in overdose deaths with the introduction of fentanyl and fentanyl laced drugs being sold and distributed amongst his community. He explained that on at least one occasion, he bought and used drugs that were laced with fentanyl, without his knowledge, and he was overcome with fear.

Terrence was extremely unwell leading up to the instant offense. His mental health was not being treated and he was using drugs at an alarming rate –exacerbating his symptoms of mania and psychosis. His thinking patterns were not rational, and he was not considering the consequences of his actions – he was just acting. Terrence explained that he became overwhelmed with fear, sorrow, and anger when he learned that a close friend overdosed, and her body was left in a dumpster. This image is deeply upsetting and talking about it still brings tears to Terrence's eyes. He was no stranger to grieving people who died by

overdose, but the steps taken to discard of her remains felt so threatening it triggered Terrence. In his very altered state of thinking, he tried to take matters into his own hands as he knew who was responsible for distributing these drugs.

The events that followed resulted in Terrence behaving erratically. He put his own life in extreme danger and was shot at multiple times (resulting in an injury to his shoulder), he set his own rented vehicle on fire, he had his car rammed into by the person he was trying to prevent from selling drugs in his pocket of East New York. Terrence has spent a significant amount of time trying to reconcile the impact of the events that occurred in October, November, and December of 2022 with his intention.

While he recalls some of the details of this time in flashes, his memory of reviewing the discovery, namely the surveillance videos, are vivid. He was profoundly shaken by his appearance and became emotional when discussing his demeanor, and actions – barely recognizing himself. His transformation is reflected in the images below. On the left, we see Terrence in, or around, 2018 and on the right is a picture of him in 2022, taken after his arrest. The change is staggering.




[Image C. Terrence in, or around 2018]          [Image D. Terrence in 2022]

Watching himself during one of the darkest periods of his life gave him more insight into the unintended collateral consequences of his substance use. He described how his substance use disorder and his mental health diagnoses affect one another. He explained that when he is managing his sobriety, he is more participatory in his mental health treatment and is medication compliant – and vice-versa. However, the bridge between these two has been fragile in the past. He has stated to me several times, through tears, "I really could have hurt somebody when I was really just trying to keep people alive." He is deeply troubled by this contradiction.

V.     Life and death at the MDC

When his case was transferred to the Eastern District of New York from Kings County, he was remanded and detained at the MDC. At the MDC, a jail he had never stepped foot into, he experienced countless lockdowns and observed violent altercations. As a man in his 50s, he said once and for all, "I'm tired." By the time we met, he already made a commitment to stay sober and to care for his overall health. Again, he regaled at how lucky he was to be alive having survived fentanyl laced drugs and being shot at during the instant offense. He accepted his detainment and decided to use it as an opportunity to become sober again. When he was arrested, he was determined to live through whatever the outcome of his case is going to be – he was preparing himself for prison time; cancer was not on his bingo card.

On April 29, 2024, Terrence was produced to the Eastern District of New York courthouse for his Pre-Sentence Investigation interview. During this meeting, Terrence coughed, and coughed some more. The cough was guttural and sounded painful. Then, he shared that he was coughing up blood and that a nurse told him on April 26, 2024, that he "had a mass in his lung." Immediately after his interview, deeply concerned, Mia Eisner-Grynberg demanded he be seen by medical again. What we learned next was deeply troubling and started the true beginning of Terrence's fight for his life, as is detailed in counsel's submission.

The MDC failed him but in classic Terrence fashion, he has found a way to manage his cancer treatments and build meaningful relationships to weather the storm. He continues to diligently follow the orders of his oncology team. He is grateful for the support of cellmate who has been his eyes and ears during this debacle, his family on the outside, and his incredible medical team.

VI.     What does the future hold?

One could call the string of events that resulted in his arrest as his "wake up call." Terrence considered this an intervention and an opportunity to heal and recover. From inside the walls and cages of the MDC, he is staying healthy, focused, sober, and hopeful.

In May of 2023, in a joint letter submitted to the AUSA, I wrote, "Terrence has not only stressed that he is lucky to be alive but continues to stress that he is grateful to be alive" This statement could not ring truer today. Terrence is a trustworthy historian; he is transparent and accountable. He has often joked with me that he is "like a cat because he has 9 lives." Terrence has attributed all his prior near-death experiences to his own poor decision making. His cancer diagnosis was the first time he felt close to death, and he could not blame himself or impulses. He sought out help, was ignored for months, and suffered greatly. In fact, he made a deliberate choice to save his life – to diligently follow the recommendations of his oncology team. In the past when he felt scared, he would use or run away. He faced this obstacle head on, undergoing approximately 2 months of transports

between the jail and the oncology center and weeks in-and-out hospitals and nursing homes (shackled to a bed). Not only is he grateful to be alive, but he now knows he wants to be alive. His fight is evident.

Terrence knows that he has a long road of recovery ahead of him upon his return to the community. To adequately manage his physical health, he must prioritize his mental health. Sobriety looks different today than it did several months ago. Having undergone radiation and had a lung resection, he is highly sensitive to smoke. His lungs are easily agitated when he is around smoke (cigarette, marijuana, and synthetic marijuana smoke is persistent at the MDC) and recently pepper spray was activated in his unit, requiring him to receive emergency medical attention. The thought of smoking a cigarette doesn't even appeal to Terrence, let alone smoking crack. He has been managing his pain with brief and supervised pain management interventions. I have even observed his telling medical staff at the hospital that he has a substance use history to ensure that they are mindful of how to treat his pain without unintended collateral consequences.

Terrence will continue to be under the care of an oncologist and will undergo monthly immunotherapy treatment via infusions. Upon resolution of his case, Terrence will benefit from continuing medical treatment with his oncology team at Maimonides Medical Center, consistent psychiatric care, and trauma informed therapy. Without strengthening the management of his mental health his foundation will not be strong enough to withstand the weight of all he has been through and any other challenges that will come his way in the future. Terrence is a hard worker and wants to get back on the road of independence. I believe he is a great candidate for the Supervision to Aid Re-entry Program (a.k.a. STAR Court) that will support his transition to Supervised Release with hands on support from U.S. Probation, Judge Levy, Judge Chen, The Federal Defenders of New York, and the community of participants that are eager to maintain sobriety.

He wants to continue to rebuild his relationships with his children (whom he has been in contact with since his diagnosis). Terrence has survived insurmountable pain and trauma during his life, and he deserves the opportunity to process and address this pain with a professional He deserves to have his moment. I am committed to continuing to support Terrence in the next chapter of his case and upon his release to the community. He is a deeply special person who deserves to fill up his lungs (one once riddled with cancer), take a deep breath, and know that he is alive, forgiven, and free.

We hope that we can resolve this case in a way that allows him to take responsibility for the harm he caused, while also being afforded the opportunity to engage in meaningful wrap-around care as soon as possible.

Thank you for your attention to this matter and for your consideration.

Sincerely,

Allison Berger, LMSW
Mitigation Social Worker

# EXHIBIT C



NYS Criminal Inquiry System

Hello Jessica Hernandez!

Logout

**Docket Information**

| | | | | | |
|---|---|---|---|---|---|
| Docket Number: | IND-76830-22/001 | County: | Kings | First Arraignment Date: | 02/01/2023 |
| Legacy Docket Number: | | Arrest Number: | K22652651 | Next Appearance Date: | |
| Serial Number: | | Arrest Date: | 12/14/2022 | Next Appearance Part: | |
| Court: | Kings Supreme Criminal Court | CJTN: | 70153590M | Expected Attendance Method: | |
| Filed Date: | 12/29/2022 | NYSID: | 9793968Q | Address: | 618 MARLBOROUGH ROAD |
| Defendant Name: | King, Kwame | Summons/Complaint #: | | | Brooklyn, New York 11226 |
| Interpreter Language: | | Last Disposition Date: | 10/04/2023 | Active TOP: | No |
| Date of Birth: | 02/07/1981 | Docket Disposition: | Pled Guilty | Active Warrant: | No |
| Sex: | Male | | | Sealed Case Message: | |
| AKA: | | | | | |

**Charge Information**

| Charge | Counts | CJTN | Count # | Latest Charge Outcome | Incident Date | Ticket # |
|---|---|---|---|---|---|---|
| PL 110-125.25 01 BF Murder: Intention | 1 | 70153590M | 1 | Covered by (Count #7) | 11/04/2022 | |
| PL 110-120.10 01 CF Aslt W/Int Caus Ser Inj W/Weap | 1 | 70153590M | 2 | Covered by (Count #7) | 11/23/2022 | |
| PL 120.25 DF Reckless Endangerment-1st | 1 | 70153590M | 3 | Covered by (Count #7) | 11/23/2022 | |
| PL 120.20 AM Reckless Endangerment-2nd | 1 | 70153590M | 4 | Covered by (Count #7) | 11/23/2022 | |
| PL 265.03 03 CF CPW-2nd: Loaded Firearm | 1 | 70153590M | 5 | Covered by (Count #7) | 11/23/2022 | |
| PL 265.03 01B CF CPW-2nd: Loaded Firearm | 1 | 70153590M | 6 | Covered by (Count #7) | 11/23/2022 | |
| PL 265.01-B 01 EF Criminal Possession Firearm | 1 | 70153590M | 7 | Pled Guilty | 11/23/2022 | |
| PL 265.01 01 AM Crim Poss Weap–4thFirearm/Wep | 1 | 70153590M | 8 | Covered by (Count #7) | 11/04/2022 | |

**Sentence Information**

| Charge | Fine Paid | Surcharge Paid | CVA Paid | DNA Paid | SOR Paid | SSO Paid | Other Paid |
|---|---|---|---|---|---|---|---|
| PL 265.01-B 01 EF Criminal Possession Firearm | $0.00 | $300.00 | $25.00 | $50.00 | $0.00 | $0.00 | $0.00 |

| Sentence Type | Sentence Detail |
|---|---|
| Imprisonment | Imprisonment (9m, Start 10/04/2023, OP) |
| Fee | Fee (DNA ($50.00) – due 12/15/2023) |
| Surcharge | Surcharge (MS ($300.00), CVAF ($25.00) – due 12/15/2023) |

# **EXHIBIT D**

JRS:AMR
F. #2022R00940

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA                    PLEA AGREEMENT

             - against -
                                            23-CR-9 (DG)
TERRENCE WISE,

                    Defendant.

– – – – – – – – – – – – – – – – – – X

        Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States

Attorney's Office for the Eastern District of New York (the "Office") and TERRENCE WISE

(the "defendant") agree to the following:

        1.     The defendant will plead guilty to Counts One and Four of the above-

captioned indictment (the "Indictment"), charging violations of 26 U.S.C. § 5861(d) and (f)

(Count One), and 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (Count Four). These counts carry the

following statutory penalties:

<u>Count One: Making and Possessing a Destructive Device</u>

    a.    Maximum term of imprisonment: 10 years
        (26 U.S.C. § 5871).

    b.    Minimum term of imprisonment: 0 years
        (26 U.S.C. § 5871).

    c.    Maximum supervised release term: three years, to follow any term
        of imprisonment; if a condition of release is violated, the defendant
        may be sentenced to up to two years without credit for pre-release
        imprisonment or time previously served on post-release
        supervision
        (18 U.S.C. §§ 3583(b) and (e)).



COURT'S
EXHIBIT NO. 1
IDENTIFICATION/EVIDENCE
DKT.# 23CR0069
DATE: 3/15/2024
PENGAD 800-681-6989

      d.     Maximum fine: $10,000
              (26 U.S.C. § 5871).

      e.     Restitution: In the full amount of each victim's losses as
              determined by the Court
              (18 U.S.C. §§ 3663 and 3664).

      f.     $100 special assessment
              (18 U.S.C. § 3013).

      g.     Criminal forfeiture as set forth in paragraphs 6-12
              (18 U.S.C. § 924(d)(1); 21 U.S.C. § 853(p); 26 U.S.C. § 5872(a);
              28 U.S.C. § 2461(c)).

<u>Count Four: Felon in Possession of a Firearm</u>

      a.     Maximum term of imprisonment: 15 years
              (18 U.S.C. § 924(a)(8)).

      b.     Minimum term of imprisonment: 0 years
              (18 U.S.C. § 924(a)(8)).

      c.     Maximum supervised release term: three years, to follow any term
              of imprisonment; if a condition of release is violated, the defendant
              may be sentenced to up to two years without credit for pre-release
              imprisonment or time previously served on post-release
              supervision
              (18 U.S.C. §§ 3583(b) and (e)).

      d.     Maximum fine:  $250,000
              (18 U.S.C. § 3571(b)(3)).

      e.     Restitution: N/A

      f.     $100 special assessment.
              (18 U.S.C. § 3013).

      g.     Criminal forfeiture as set forth in paragraphs 6-12.
              (18 U.S.C. § 924(d)(1); 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c)).

The sentence imposed on each count may run consecutively to the other count, and the sentence imposed on either or both counts may run consecutively to any other sentence the defendant is currently serving.

2.        The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case.  The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence.  See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  The Office estimates the likely adjusted offense level under the Guidelines to be 34, which is predicated on the following Guidelines calculation:

|  |  |  |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2K2.1(a)(4)(B)) | | 20 |
| Plus: | Three to seven firearms (U.S.S.G. § 2K2.1(b)(1)(A)) | +2 |
| Plus: | Destructive device other than a portable rocket, missile, or device for use in launching a portable rocket or missile (U.S.S.G. § 2K2.1(b)(3)(B)) | +2 |
| Plus: | Firearm with altered or obliterated serial number (U.S.S.G. § 2K2.1(b)(4)(B)) | +4 |
| Plus: | Firearm possessed in connection with another felony offense (U.S.S.G. § 2K2.1(b)(6)(B)) | +4 |
| Plus: | Recklessly creating substantial risk of death or serious bodily injury in course of fleeing from law enforcement officer (U.S.S.G. § 3C1.2)) | +2 |
| Total: | | 34 |

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 32 and a range of imprisonment of 151–188 months, assuming that the defendant falls within Criminal History Category III.  Furthermore, if the defendant has accepted responsibility as described above, to the satisfaction of the Office, and if the defendant pleads guilty on or before March 15, 2024, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an adjusted offense level of 31.  This level carries a range of imprisonment of 135–168 months, assuming that the defendant falls within Criminal History Category III.  The defendant stipulates to the above Guidelines calculation, except that the defendant reserves the right to challenge whether, as a matter of law, Counts One and Four are grouped together as a single group pursuant to U.S.S.G. § 3D1.2(d).

   3. The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court.  If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

   4. The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 188 months or below.  This waiver is binding without regard to the sentencing analysis used by the Court.  The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's

conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the

defendant's plea is later withdrawn.  The defendant further waives the right to raise on appeal or

on collateral review any argument that (a) the statutes to which the defendant is pleading guilty is

unconstitutional and (b) the admitted conduct does not fall within the scope of the statutes.

Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the

defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.  The

defendant waives any right to additional disclosure from the government in connection with the

guilty plea.  The defendant agrees that with respect to all charges referred to in paragraphs 1 and

5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C.

§ 3006A note, and will not file any claim under that law.  The defendant agrees to pay the special

assessment by check payable to the Clerk of the Court at or before sentencing.

5.    The Office agrees that:

a.  no further criminal charges will be brought against the defendant
    for (1) making and possessing a destructive device in the vicinity of
    369 Glenmore Avenue, Brooklyn, New York on November 4, 2022,
    as charged in Count One of the Indictment; (2) making and
    possessing a destructive device in the vicinity of 369 Glenmore
    Avenue, Brooklyn, New York on November 7, 2022, as charged in
    Count Two of the Indictment; (3) the arson of a white U-Haul van
    with Arizona license plate AL54330 in the vicinity of 2042 Pitkin
    Avenue, Brooklyn, New York on November 9, 2022, as charged in
    Count Three of the Indictment; and (4) the possession of one silver
    .32 S&W caliber revolver with a black handle near the intersection
    of Flatlands Avenue and Fountain Avenue, Brooklyn, New York on
    December 2, 2022, as charged in Count Four of the Indictment, it
    being understood that this agreement does not bar the use of such
    conduct as a predicate act or as the basis for a sentencing
    enhancement in a subsequent prosecution including, but not limited
    to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq.; and at the
    time of sentence, it will move to dismiss the remaining counts of the
    Indictment with prejudice;

and, based upon information now known to the Office, it will

      b. not seek a sentence above 105 months; and

      c. make no motion for an upward departure under the Sentencing Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraphs 5(b) and 5(c). Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to: (a) moving for the additional one-level downward adjustment for timely acceptance of responsibility described in paragraph 2 above; and (b) the provisions of this paragraph.

      6.     The defendant acknowledges that he obtained and/or acquired property that is subject to forfeiture as a result of his violations of 26 U.S.C. §§ 5861(d) and 5861(f), and 18 U.S.C. §§ 922(g)(1) and 924(a)(8), respectively, as alleged in the Indictment. The defendant consents to the forfeiture of all right, title, and interest in one silver .32 S&W caliber revolver with a black handle seized from a vehicle driven by the defendant in or around the intersection of Flatlands Avenue and Fountain Avenue in Brooklyn, New York on or about December 2, 2022 (the "Seized Asset"). The defendant agrees that the Seized Asset represents: (a) any firearm involved in any violation of 26 U.S.C. § 5861(d); (b) any firearm or ammunition involved in or used in any violation of any criminal law of the United States; (c) any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense; (d) any firearm or ammunition involved in or used in any knowing violation of 18 U.S.C. § 922 or 924; and/or (e) substitute assets, and thus are forfeitable to the United States pursuant to 18 U.S.C. §§ 924(d)(1), 982(a)(2) and 982(b)(1), 21 U.S.C. § 853(p), 26 U.S.C. § 5872(a), and 28 U.S.C.

6

§ 2461(c), in an administrative or judicial (civil or criminal) proceeding at the Office's election. The defendant consents to the entry of a Preliminary Order of Forfeiture, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, forfeiting the Seized Asset.

7.      If the defendant fails to forfeit the Seized Asset, the defendant consents to the forfeiture of any other property of his up to the value of the Seized Asset, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1), and further agrees that the conditions of 21 U.S.C. § 853(p)(1)(A)-(E) have been met.

8.      The defendant agrees to fully assist the government in effectuating the surrender and forfeiture of the Seized Asset to the United States, and to take whatever steps are necessary to ensure that clear title passes to the United States, including the execution of any documents necessary to effectuate the surrender and transfer of title to the United States. The defendant agrees not to file a claim or petition seeking remission or contesting the forfeiture of the Seized Asset in any administrative or judicial (civil or criminal) proceeding. The defendant further agrees not to assist any person or entity in the filing of any claim or petition seeking remission or contesting the forfeiture of the Seized Asset in any administrative or judicial (civil or criminal) forfeiture proceeding. Further, if any third party files a claim to the Seized Asset, the defendant will assist the government in defending such claim.

9.      The failure of the defendant to forfeit any monies and/or properties as required under this agreement, including the failure of the defendant to execute any documents to accomplish the same on timely notice to do so, may constitute a material breach of this agreement. Upon such a breach, the defendant will not be entitled to withdraw the plea, but the Office may bring additional criminal charges against the defendant.

10.     The defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of any monies and/or properties forfeited hereunder, including notice set forth in an indictment, information, or administrative notice.  In addition, the defendant knowingly and voluntarily waives his right, if any, to a jury trial on the forfeiture of the Seized Asset, and waives all constitutional, legal, and equitable defenses to the forfeiture of said monies and/or properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto clause of the Constitution, any applicable statute of limitations, venue, or any defense under the Eighth Amendment, including a claim of excessive fines.

11.     The defendant agrees that forfeiture of the Seized Asset is not to be considered a payment of a fine, penalty, restitution loss amount, or any income taxes that may be due, and shall survive bankruptcy.

12.     The defendant acknowledges that the Office, at its sole discretion, may seek to forfeit the Seized Asset through commencement of an administrative or civil forfeiture proceeding.

13.     This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

14.     Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements, if applicable, this agreement supersedes all prior

promises, agreements or conditions between the parties.  To become effective, this agreement

must be signed by all signatories listed below.


Dated: Brooklyn, New York
    March 15_____, 2024


                                    BREON PEACE
                                    United States Attorney
                                    Eastern District of New York


                        By:    _____
                                    Andrew M. Roddin
                                    Assistant United States Attorney


                                    Approved by:

                                    _____
                                    Supervising Assistant U.S. Attorney


I have read the entire agreement and discussed it with my attorney.  I understand all of its terms
and am entering into it knowingly and voluntarily.

_____
TERRENCE WISE
Defendant


Approved by:

_____
Mia Eisner-Grynberg, Esq.
Counsel to Defendant


9

# EXHIBIT E
## (to be filed under seal)

# EXHIBIT F



**Maimonides**
Cancer Center

6300 Eighth Avenue 2nd Floor    Tel: 718-765-2600
Brooklyn, NY 11220    Fax: 718-635-7214

### Division of Hematology/ Oncology

| | | | |
|---|---|---|---|
| Susan Burdette-Radoux, MD | Julie Huang, MD | Christina Lao, NP | Huiwen Ying, NP |
|   Medical Director | Yiqing Xu, MD, PhD | Rachel Magloire, PA | Ariele Pollack, NP |
| | Abhigna Kodali, MD | Tolulope Falana, NP | Tova Hecht, PA |
| Yiwu Huang, MD, PhD | Salah Almokadem, MD | Yan Pronin, PA | Xunyan Zheng, NP |
| Jay Lipshitz, MD | Anna Urazov, MD | Velta Willis, NP | |
| Lan Mo, MD, PhD | Xiaoyang Wang, MD | | |

10/02/2024

Patient's Name: WISE, TERRENCE
D.O.B. 7/05/1969
MR# 12750184

To whom it may concern,

Terrence Wise (D.O.B. 07/05/1969) presents with stage IIB RUL lung adenocarcinoma. He completed neoadjuvant cisplatin/etoposide x 2 cycles with concurrent RT and proceeded with RUL resection. Pathology is still pending. Upon follow up visit, he is planned for adjuvant pembrolizumab q3 weeks for 18 cycles (1 year). If you have any questions or concerns, please reach out at 718-765-2656 or email DrJulHuangTeam@maimo.org.

Sincerely,

Julie Huang, D.O.

Maimonides Cancer Center

# **EXHIBIT G**



# AFGE Local 2005
## Council of Prison Locals #33, AFL-CIO
100 29th Street
Brooklyn, New York 11232



DATE: June 23, 2023

MEMORANDUM FOR: AMY BONCHER, REGIONAL DIRECTOR

FROM: Rhonda Barnwell, President, AFGE Local 2005 President/ *Rhonda Barnwell*

SUBJECT**:** Unsafe Working Conditions

The Local has tried diligently to resolve this issue at the local level numerous times and have been unsuccessful at every attempt. Though this is an ongoing issue, and multiple Bureau of Prisons Institutions, it creates a higher risk for staff and inmates alike within a high rise/Detention Center setting. As you are aware MDC Brooklyn maintains various levels of inmate offenders, all while continuously receiving large volumes of in-transit inmates and new commits daily, as well as court appearances and Escorted Hospital trips. The demands of a high transit Institution with little to no staff is a violation of Article 27 of the Master Agreement.

For a multitude of reasons, MDC Brooklyn is and has been severely understaffed for years. The current turnover rate for incoming/new Officers is over 50%, and will continue to decline if the Northeast Region and or the Director continues to turn a blind eye to what is actually happening in New York City, as we can not compete with the pay band of other agencies within the Tri-state area.

On a daily basis housing units at MDC Brooklyn are left vacated (unmanned by staff) and locked down, with the expectation of Management that a single (One) Officer is to make rounds, feed, and perform additional correctional duties on the vacated units. Additionally, visiting room staff are required to perform the duties of additional officers because the agency refuses to cease legal and social visits when there are no staff. The Local is trying to prevent loss of life and or serious physical harm to staff. Lest I remind you of the serious staff assault that took place here at MDC Brooklyn around February 2022, in which Officer A. Flores was physically assaulted by an inmate, who punched him in the mouth

and attempted to drag him down the housing unit stars via his stab proof vest. As a result of the assault, Mr. Flores had to have jaw reconstruction surgery and eventually quit the BOP because of the safety concerns and him not feeling supported by the Agency.

During previous LMR Meetings, institution management was made aware of the Local's concerns regarding this change in the employees' working conditions, to which Management's stated "staff would not be held accountable if there was an assault and or loss of life during these times". This is unacceptable as Management at the local level are aware of the potential hazards associated with requiring one officer to maintain 3 housing units in a single shift, all while being mandated with little to no sleep. This is a violation of the Collective Bargaining Agreement and Program Statement 3000.03. Do you consider this a safe practice? Would you want to work under these conditions?

The Agency's actions are inhumane to both staff and inmates, as the institution remains locked down on several occasions, which angers the inmates and heightens the inherent danger for staff. Coverage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and or inmate medical emergencies. This is especially true on weekends and holidays and there is no longer any TDY staff to assist with this burden.

In accordance with Article 27 of the Master Agreement; the Employer agrees to lower those inherent hazards to the lowest possible level; the employer also agrees to furnish employee's places and conditions of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical harm. For the past two years Management at the local level has refused to utilize proposals and Memorandums from the Local Union, hence relying solely on mandatory overtime, volunteer overtime, and augmentation to manage more than half of the correctional services roster.

The agency as a whole has failed to assist MDC Brooklyn with the staffing crisis, hence allowing MDC Brooklyn to fail.  What are you waiting for, another loss of inmate life? Your indifference and continued failure to act, will bring the Federal Bureau of Prisons more negative notoriety.

In an effort to make you more aware of these inadequacies, I have attached copies of MDC Brooklyn's Correctional Services Roster.

The local union is requesting that the agency cease and desist with forcing staff members to work more than one post in a single shift. The Local is also requesting that the Agency adhere to Article 6 (b2), Article 18 (r,s), and Article 27 of the Master Agreement and provide a safe environment for all staff.

The Local Union is requesting that we meet in person to discuss these pressing concerns and devise corrective actions.

The parties devote up to 2( two) days for your written response before this situation is escalated to a third party to include the media, and the inmate advocates.

R.Barnwell, /R.BARNWELL

President, AFGE

Local 2005, CPL33

# **<u>EXHIBIT H</u>**



**U.S. Department of Justice**

Federal Bureau of Prisons

*MDC Brooklyn*

*Brooklyn, New York 11232*

From: C. Rodriguez, Captain

<u>Notice to the inmate population</u>

SUBJECT: Modified Institutional Operations

Effective Wednesday, July 17, 2024, MDC Brooklyn was placed on modified operations, following an inmate death. Due to the nature of this incident, a thorough investigation will be conducted to ensure the safety and security of all staff and inmates within MDC Brooklyn. Furthermore, it is the expectation of the Captain that inmates will live in a safe and secure environment. Violence in this setting leads to negative consequences such as injuries, death, prolonged lockdowns, disruption of operations and programs, and increased tension. Therefore, it is imperative all inmates adhere to established rules, expectations and respect one another. As a result of this incident, the inmate population will remain secured until further notice. Legal calls and legal visits will continue as normal, however social visits will be cancelled until further notice. Return to normal operations is strictly based on the investigation's results, in conjunction with inmate behavior and will be assessed daily.

<u>Aviso para los presos</u>

SUBJETO: Operaciones Modificadas

A partir del Miercoles, 17 de julio de 2024, MDC Brooklyn fue puesto en operaciones modificadas, después de la muerte de un recluso. Debido a la naturaleza de este incidente, se llevará a cabo una investigación exhaustiva para garantizar la seguridad de todo el personal y los reclusos dentro del MDC Brooklyn. Además, el Capitán espera que los reclusos vivan en un entorno seguro y protegido. La violencia en este entorno tiene consecuencias negativas como lesiones, muerte, operaciones modificadas prolongadas, interrupción de operaciones y programas y aumento de la tensión. Por lo tanto, es imperativo que todos los reclusos cumplan con las reglas y expectativas establecidas y se respeten unos a otros. Como resultado de este incidente, la población reclusa permanecerá asegurada hasta nuevo aviso. Las llamadas y visitas legales continuarán con normalidad, sin embargo, las visitas sociales se cancelarán hasta nuevo aviso. El regreso a las operaciones normales se basa estrictamente en los resultados de la investigación, junto con el comportamiento del recluso y se evaluará diariamente.

# EXHIBIT I



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**Business Ethics**

*Corporate Skills Training Program provided by the Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
October 7, 2023



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**The Ten Soft Skills You Need**
*Corporate Skills Training Program provided by the*
*Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
October 7, 2023



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

## Terence Wise

**Business Acumen**

*Corporate Skills Training Program provided by the Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist

**October 14, 2023**



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**Budgets & Financial Reports**
*Corporate Skills Training Program provided by the
Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
**October 14, 2023**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**Marketing Basics**
*Corporate Skills Training Program provided by the Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
October 21, 2023



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**Time Management**

*Corporate Skills Training Program provided by the
Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
October 21, 2023



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**Conflict Resolution**

*Corporate Skills Training Program provided by the Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
**October 22, 2023**



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**Basic Bookkeeping**

*Corporate Skills Training Program provided by the
Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
October 22, 2023

# Certificate of Completion

This certifies that

# Terrence Wise

Completed the following class:

# The National Parenting Program:

## *Phase One*



**MDC BROOKLYN**

_G. Matey, Special Population Coordinator_

10/25/2023

DATE



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**Entrereneurship**
*Corporate Skills Training Program provided by the*
*Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
**October 28, 2023**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**Developing Creativity**
*Corporate Skills Training Program provided by the*
*Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
**October 28, 2023**



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Terence Wise*

**Sales Fundamentals**

*Corporate Skills Training Program provided by the
Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
November 4, 2023

